No. 24-1012

# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

---

**HUMANA INC.,**
**Plaintiff-Appellant,**

v.

**BIOGEN, INC.**
**and ADVANCED CARE SCRIPTS, INC.,**
**Defendants-Appellees**

---

On Appeal From a Judgment
Entered in The
United States District Court
For the District of Massachusetts

---

## BRIEF FOR THE PLAINTIFF-APPELLANT

---

Robert E. Dunn
EIMER STAHL LLP
1999 S. Bascom Ave., Ste. 1025
Campbell, CA 95008
(408) 889-1690
rdunn@eimerstahl.com

Sarah H. Catalano
EIMER STAHL LLP
10 East Doty St., Ste 621
Madison, WI 53703
608-620-8574
scatalano@eimerstahl.com

Scott C. Solberg
James W. Joseph
Benjamin E. Waldin
Gregory M. Schweizer
EIMER STAHL LLP
224 S. Michigan Ave., Ste. 1100
Chicago, IL 60604
(312) 660-7600
ssolberg@eimerstahl.com
jjoseph@eimerstahl.com
bwaldin@eimerstahl.com
gschweizer@eimerstahl.com

Justin P. O'Brien
LOVETT O'BRIEN LLP
125 High Street, Suite 2611
Boston, MA 02110
617-603-0748
jobrien@lovettobrien.com

*Attorneys for Plaintiff-Appellant*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellant Humana Inc. is publicly held, does not have a parent corporation, and no other publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD.............................1

STATEMENT OF JURISDICTION.......................................................1

STATEMENT OF ISSUES .............................................................2

STATEMENT OF THE CASE............................................................4

   I.  Statutory Framework of Medicare Parts C and D ..........................4

   II. Biogen's Fraudulent Kickback Scheme ........................................8

      A.   Part I: Seeding and Sweeping ...................................8

      B.   Part II: Sham "Charitable" Copay Assistance............................9

   III.Defendants' False Certifications to Humana.................................11

   IV.  The District Court Dismisses Humana's Complaint and Denies Leave to Amend..........................................................................13

SUMMARY OF THE ARGUMENT ..................................................15

STANDARD OF REVIEW ...........................................................18

ARGUMENT ........................................................................19

   I.  Humana Has Standing to Assert a Civil RICO Claim....................19

      A.   Humana Is the Primary Victim of Defendants' Fraudulent Scheme, and the Direct Purchaser Rule Does Not Bar Humana's RICO Claims .......................20

      B.   Humana Was a Direct Purchaser From ACS and Thus Has Standing Even if the Direct Purchaser Rule Applies ..............................................33

   II. Humana Adequately Alleged Predicate Acts of Mail and Wire Fraud With Sufficient Particularity....................................................37

A.    The Facts Alleged in the Complaint Sufficiently Demonstrate That Humana's Mail and Wire Fraud Claims Are Not Groundless and Provide Defendants Sufficient Information to File a Response ....................................38

B.    Because Key Information About the Fraudulent Scheme Was in the Defendants' Exclusive Possession, the District Court Erred by Not Affording Humana an Opportunity to Obtain Discovery....................................................47

III.The District Court Abused Its Discretion in Denying Leave to Amend .......49

A.    Humana Obtained Critical Information Months After Filing Its Initial Complaint, Which Humana Included in the Proposed Amended Complaint ..50

B.    Amendment Would Not Have Been Futile ..............................................52

C.    Humana Did Not Unduly Delay Seeking Leave to Amend, and Granting Leave to Amend Would Not Have Prejudiced Defendants.............................58

CONCLUSION .......................................................................................................60

CERTIFICATE OF COMPLIANCE ......................................................................61

CERTIFICATE OF SERVICE ...............................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

**<u>Cases</u>**

*Ahmed v. Rosenblatt,*
    118 F.3d 886 (1st Cir. 1997) ...................................................................49

*Amyndas Pharms., S.A. v. Zealand Pharma A/S,*
    48 F.4th 186 (1st Cir. 2022)............................................................58, 59

*AngioDynamics, Inc. v. Clarion Med. Techs.,*
    No. 18-30038-MGM, 2019 WL 10787926 (D. Mass. Sept. 25, 2019) ...............38

*Anza v. Ideal Steel Supply Corp.,*
    547 U.S. 451 (2006)................................................................21, 31

*Apple Inc. v. Pepper,*
    139 S. Ct. 1514 (2019)................................................26, 27, 31, 53

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
    459 U.S. 519 (1984)............................................................20, 27–28

*Benitez-Allende v. Alcan Aluminio do Brasil, S.A.,*
    857 F.2d 266 (1st Cir. 1988) ...................................................................57

*Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc.,*
    140 F.3d 898 (11th Cir. 1998) ...................................................21, 22

*Bonilla v. Volvo Car Corp.,*
    150 F.3d 62 (1st Cir. 1998)...................................................................37

*Bridge v. Phoenix Bond & Indem. Co.,*
    553 U.S. 639 (2008)................................................................21, 23

*Carter v. Berger,*
    777 F.2d 1173 (7th Cir. 1985) ...................................................................33

*Cordero-Hernández v. Hernández-Ballesteros*,
    449 F.3d 240 (1st Cir. 2006) .........................................................38, 49

*Doyle v. Hasbro, Inc.*,
    103 F.3d 186 (1st Cir. 1996) ....................................................................49

*Dumont v. Reily Foods Co.*,
    934 F.3d 35 (1st Cir. 2019) ......................................................................39

*Feinstein v. Resol. Tr. Corp.*,
    942 F.2d 34 (1st Cir. 1991) ......................................................................49

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
    778 F.3d 2287 (1st Cir. 2015) .............................................................52, 57

*Foisie v. Worcester Polytechnic Inst.*,
    967 F.3d 27 (1st Cir. 2020) ......................................................................38

*Foman v. Davis*,
    371 U.S. 1782 (1962) ...............................................................................50

*FTC v. Sanford Health, Sanford Bismarck*,
    No. 1:17-cv-133, 2017 WL 10810016 (D.N.D. Dec. 15, 2017) ............34

*FTC v. Sanford Health*,
    926 F.3d 959 (8th Cir. 2019) ...................................................................34

*Grant v. News Grp. Boston, Inc.*,
    55 F.3d 15 (1st Cir. 1995) ........................................................................50

*Guilfoile v. Shields*,
    913 F.3d 178 (1st Cir. 2019) ....................................................................40

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
    392 U.S. 481 (1968) ...........................................................................30, 33

*Heater v. Gen. Motors, LLC*,
    568 F. Supp. 3d 626 (N.D. W.Va. 2021) ................................................39

*Hemi Grp., LLC v. City of New York*,
  559 U.S. 1 (2010) ..................................................................................21

*Holmes v. Securities Investment Protection Corp.*,
  503 U.S. 258 (1992) ..........................................................................*passim*

*Humana Inc. v. Mallinckrodt ARD LLC*,
  No. CV19-06926, 2020 WL 3041309 (C.D. Cal. Mar. 9, 2020) .........................46

*Humana, Inc. v. Indivior, Inc.*,
  Nos. 21-2573 & 21-2574, 2022 WL 17718342 (3d Cir. Dec. 15, 2022)........31–32

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) .......................................................................*passim*

*Illinois v. Ampress Brick Co.*,
  536 F.2d 1163 (7th Cir. 1976) ..............................................................30

*In re Celexa & Lexapro Marketing & Sales Practices Litigation*,
  915 F.3d 1 (1st Cir. 2019) ........................................................1, 15, 24

*In re Lupron Mktg & Sales Pracs. Litig.*,
  295 F. Supp. 2d 148 (D. Mass. 2003) ..................................................46

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
  933 F.3d 1136 (9th Cir. 2019) .........................................................34, 35

*In re Neurontin Marketing & Sales Practices Litigation*,
  712 F.3d 21 (1st Cir. 2013)...............................................................*passim*

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
  797 F.3d 538 (8th Cir. 2015) ..............................................................34

*Int'l Floor Crafts, Inc. v. Dziemit*,
  420 F. App'x 6 (1st Cir. 2011)............................................................37

*Kaufman v. CVS Caremark Corp.*,
  836 F.3d 88 (1st Cir. 2016) ...............................................................18

*Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*,
    329 F.3d 216 (1st Cir. 2003) ................................................................. 37

*Lowell v. Am. Cyanamid Co.*,
    177 F.3d 1228 (11th Cir. 1999) ..................................................... 34, 35

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
    29 F.4th 337 (7th Cir. 2022) ........................................................ 16, 34

*Marion Healthcare, LLC v. Becton Dickinson* & Co.,
    952 F.3d 832 (7th Cir. 2020) ................................................................. 35

*Marrero-Rolon v. Autoridad de Energia Electrica de P.R.*,
    No. 15-1167, 2015 WL 5719801 (D.P.R. Sept. 29, 2015) ................................. 35

*Marrero-Rolon v. Autoridad de Energia Electrica de P.R.*,
    No. 15-1167, 2016 WL 9459821 (D.P.R. Mar. 31, 2016) ................................. 35

*Marrero-Rolon v. Autoridad de Energia Electrica de P.R.*,
    No. 15-1167 (JAG), 2016 WL 9459823 (D.P.R. Oct. 20, 2016) ........................ 35

*Marrero-Rolon v. Autoridad de Energia Electrica de P.R.*,
    No. 16-8049 (1st Cir. Aug. 7, 2017) ..................................................... 35

*McCarthy v. Recordex Service, Inc.*,
    80 F.3d 842 (3d Cir. 1996) ............................................................ 30, 31

*Metro. Prop. & Cas. Ins. Co. v. Savin Hill Family Chiropractic, Inc.*,
    No. 15-12939, 2016 WL 11004383 (D. Mass. June 15, 2016) ............................. 49

*N. Bridge Assocs., Inc. v. Boldt*,
    274 F.3d 38 (1st Cir. 2001) ................................................................. 49

*N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*,
    140 S. Ct. 15256 (2020) ....................................................................... 54

*Natale v. Espy Corp.*,
    No. 13-30008, 2015 WL 36322272 n.2 (D. Mass. June 2, 2015) ........................ 54

*New England Data Services, Inc. v. Becher,*
   829 F.2d 286 (1st Cir. 1987) .......................................................................*passim*

*Schmuck v. United States,*
   489 U.S. 705 (1989) ...............................................................................44

*Skilling v. United States,*
   561 U.S. 358 (2010) ...............................................................................40

*Trollinger v. Tyson Foods, Inc.,*
   370 F.3d 602 (6th Cir. 2004) ................................................21, 26, 32

*United States ex rel. Escobar v. Universal Health Servs., Inc.,*
   842 F.3d 103 (1st Cir. 2016) .................................................................41

*United States ex rel. Mackillop v. Grand Canyon Educ., Inc.,*
   No. 18-11192, 2022 WL 4084444 (D. Mass. Sept. 6, 2022) ...............................41

*United States ex rel. Martino-Fleming v. South Bay Mental Health Ctrs.,*
   540 F. Supp. 3d 103 (D. Mass. 2021) ...................................................41

*United States v. Davio,*
   136 F. Supp. 423 (E.D. Mich. 1955) .....................................................40

*United States v. Regeneron Pharms., Inc.,*
   No. 20-11217, 2020 WL 7130004 (D. Mass. Dec. 4, 2020) ...............................40

*United States v. Simon,*
   12 F.4th 1 (1st Cir. 2021) .......................................................................44

*United States v. Teva Pharms. USA, Inc., et al.,*
   No. 23-1958 (1st Cir.) ............................................................................55

*United States v. Triple Canopy, Inc.,*
   857 F.3d 174 (4th Cir. 2017) .................................................................41

*Universal Health Servs., Inc. v. United States ex rel. Escobar,*
   579 U.S. 176 (2016) ...............................................................................41

*Wallach v. Eaton Corp.*,
    837 F.3d 356 (3d Cir. 2016) ............................................................. 34

*Windross v. Barton Protective Servs., Inc.*,
    586 F.3d 98 (1st Cir. 2009) ............................................................. 18

## **Statutes**

18 U.S.C. § 1343 ............................................................................ 40

18 U.S.C. § 1961(4) ....................................................................... 13

18 U.S.C. § 1961(5) ....................................................................... 43

18 U.S.C. § 1962 ................................................................... 1, 13, 20

18 U.S.C. § 1964 ...................................................................... 1, 13

18 U.S.C. § 1964(c) ................................................................ *passim*

28 U.S.C. § 1291 ............................................................................. 1

28 U.S.C. § 1331 ............................................................................. 1

28 U.S.C. § 1367 ............................................................................. 1

31 U.S.C. § 3729 ............................................................................. 6

31 U.S.C. §§ 3729–3733 ................................................................. 7

42 U.S.C. § 1320a-7b(b) ................................................................. 7

42 U.S.C. § 1320a-7b(g) ................................................................. 7

42 U.S.C. § 1395w–12(b)(1) ........................................................ 42

## **Rules**

Fed. R. Civ. P. 9(b) ................................................................. *passim*

Fed. R. Civ. P. 15 ..................................................................................*passim*

Fed. R. Civ. P. 59(e) ...........................................................................14

Fed. R. Civ. P. 60(b) ...........................................................................14

## **Regulations**

42 C.F.R. § 423.322 .............................................................................6

42 C.F.R. § 423.4 ..............................................................................5, 41

42 C.F.R. § 423.505(h)(1) ....................................................................6

42 C.F.R. § 423.505(i) ..........................................................................5

42 C.F.R. § 423.505(i)(3)(iii) ...............................................................6

42 C.F.R. § 423.505(i)(3)(iv) ................................................................5

## **Other Authorities**

70 Fed. Reg. 70623 (Nov. 22, 2005). ..............................................7–8

Pub. L. 91-452, 84 Stat. 922 (1970) ..................................................29

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

The district court dismissed Humana's Complaint based, in part, on its conclusion that 18 U.S.C. § 1964(c) limits standing in RICO cases to direct purchasers. Humana is unaware of any prior decision in this circuit adopting such a rule, and it conflicts with this Court's decisions in *In re Neurontin Marketing & Sales Practices Litigation*, 712 F.3d 21 (1st Cir. 2013), and *In re Celexa & Lexapro Marketing & Sales Practices Litigation*, 915 F.3d 1 (1st Cir. 2019). Indeed, the district court recognized that "*Neurontin* appears to be on all fours with this case," Add.18, but declined to follow that decision, observing that the "direct purchaser" rule's applicability to RICO claims is a decision "fraught with policy judgments that are more properly committed to the Court of Appeals[.]" (Add.24.) This Court's determination of that important issue would benefit from argument.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962, 1964. The district court had supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367. Because Humana appeals from a final judgment dismissing its Complaint and denying leave to amend, this Court has jurisdiction under 28 U.S.C. § 1291.

# STATEMENT OF ISSUES

Defendants Biogen and Advanced Care Scripts ("ACS") engaged in a fraudulent scheme to extract hundreds of millions of dollars from Humana. Biogen, a pharmaceutical manufacturer, illegally subsidized Humana members' copayments for Biogen's expensive Multiple Sclerosis drugs through sham charitable contributions to certain Patient Assistance Programs ("PAPs"), which funneled those donations to Humana members taking the drugs. Because Humana's members were enrolled in Medicare Part D plans, Biogen's contributions violated the federal Anti-Kickback Statute and False Claims Act. Yet Biogen and ACS—a specialty pharmacy in cahoots with Biogen—submitted thousands of electronic claims to Humana seeking payment for Biogen's drugs, falsely certifying that Defendants were in compliance with federal and state laws relating to government-sponsored healthcare.

Humana's Complaint asserted claims against Biogen and ACS under RICO and various state laws. Humana alleged it was the target and primary victim of Defendants' fraudulent scheme, which was designed to increase the number of claims submitted to Humana for payment by discouraging patients from switching to cheaper alternatives. Humana further alleged it was a direct purchaser from ACS, to whom it made direct payments. Humana's allegations were similar to those made by the Department of Justice in 2020 in a case both Defendants ultimately settled.

The Complaint thus gave Defendants sufficient information to prepare a response even though many of the details were in Defendants' or their co-conspirators' exclusive possession.

The district court nevertheless dismissed the Complaint with prejudice, holding that *Illinois Brick's* direct purchaser rule for certain antitrust claims applies equally to all RICO claims and that Humana was an indirect purchaser of Biogen's drugs. The court also held that Humana's allegations of mail and wire fraud failed to satisfy Rule 9(b)'s particularity requirement. The district court denied leave to amend even though months after filing its Complaint Humana had discovered substantial new evidence in a different proceeding that it included in a Proposed Amended Complaint.

The issues presented are:

1. Whether 18 U.S.C. § 1964(c) categorically bars RICO claims asserted by indirect purchasers even when the plaintiff is the primary victim of the defendants' illegal conduct.

2. Whether Humana qualifies as a direct purchaser given its purchases from Defendant ACS, a member of the RICO enterprise with Defendant Biogen.

3. Whether Humana adequately pleaded mail and wire fraud with particularity under Federal Rule of Civil Procedure 9(b) and *New England Data Services, Inc. v.*

*Becher*, 829 F.2d 286 (1st Cir. 1987), which directs that dismissal should not be automatic where key information is in Defendants' exclusive possession.

4. Whether the district court abused its discretion in denying Humana leave to amend when (a) Humana had not previously amended, (b) no court in this Circuit had ever applied the direct purchaser rule to a RICO claim, and (c) Humana proposed amending its complaint with tens of thousands of new instances of mail and wire fraud that it discovered well after the initial complaint was filed.

## STATEMENT OF THE CASE

### I.  STATUTORY FRAMEWORK OF MEDICARE PARTS C AND D

Medicare is a federal healthcare program overseen by the Centers for Medicare & Medicaid Services ("CMS"), a division of the U.S. Department of Health and Human Services ("HHS"). (A17 ¶20.) Medicare consists of four parts: A (hospital insurance), B (medical insurance), C ("Medicare Advantage," under which Part A and B coverage is provided by private companies known as Plan Sponsors), and D (prescription drug coverage, except as covered through one of the other parts). (A17 ¶21.) Humana is a Plan Sponsor and most of its business involves government-sponsored plans, including Medicare Parts C and D, Tricare, and Medicaid. (A14–A15 ¶9.)

All Medicare Advantage and Medicare Part D plans are administered by Plan Sponsors through one-year, annually renewable contracts with the federal

government. *See* 42 C.F.R. § 423.4. (A18–A19 ¶¶24–25.) Under these contracts, a Plan Sponsor makes coverage determinations (*i.e.*, whether to pay or deny claims) for medical goods and services, including for prescription drugs. (A18–A19 ¶25; A53 ¶142.) Plan Sponsors contract with and pay pharmacies to dispense prescription drugs to insureds enrolled in their plans. (A18–A19 ¶¶25–27.) The government pays a portion of the premiums for qualifying insureds. (A18–A19 ¶25.) The government does not make individual coverage determinations and does not reimburse Plan Sponsors on a claim-by-claim basis. Plan Sponsors thus bear significant risks if cost and utilization of prescription drugs exceed what would be expected under normal conditions. (A23 ¶37.)

Entities that subcontract with Part D Plan Sponsors to provide goods and services to Medicare insureds are referred to as "downstream" entities. (A18–A19 ¶25.) *See* 42 C.F.R. § 423.505(i). These include both the first-tier entities that contract directly with Plan Sponsors (e.g., pharmacies) as well as every other entity along the chain of distribution (e.g., wholesale distributors and drug manufacturers). (*Id.*) Such downstream entities must "comply with all applicable Federal laws, regulations, and CMS instructions." *Id.* § 423.505(i)(3)(iv). (A19–A20 ¶28.) Each time a downstream or related entity submits an electronic request for payment to a Plan Sponsor (directly or indirectly through the chain of distribution), that electronic payment request includes a certification that all information associated with each

request for payment is true, accurate, and complete and is the basis for obtaining federal reimbursement for the healthcare products or services reflected therein.[1] The Plan Sponsor, in turn, submits an electronic record of the claim, called a Prescription Drug Event ("PDE"), to CMS. (A19 ¶27.) Generating and submitting PDE data is a condition of CMS's provision of Medicare funds to Part D Plan Sponsors. *See* 42 C.F.R. § 423.322. (*Id.*)

In nearly every kind of insurance coverage, patients bear some financial responsibility through copayments, coinsurance, or deductibles (collectively "copays"). (A12–A13 ¶4.) Patient responsibility is a safeguard against moral hazards such as fraud and overuse, and an economic check on outrageous prices. (*Id.*) Medicare Part D copays can amount to thousands of dollars in annual out-of-pocket costs for a single expensive drug. (A19 ¶26.) But copays are typically a tiny fraction of a drug's total cost (A12–A13 ¶4), and Plan Sponsors like Humana still pay the lion's share. (A36–A37 ¶82.) Thus, if a manufacturer covers the copays itself, it can earn a major return (the Plan Sponsor's payment of most of the drug's

---

[1] All contracts with downstream entities must require "that any services or other activity performed by a first tier, downstream, and related entity in accordance with a contract are consistent and comply with the Part D sponsor's contractual obligations." 42 C.F.R. § 423.505(i)(3)(iii). And one obligation of a Plan Sponsor— and thus, a downstream entity— is to "comply with . . . Federal laws and regulations designed to prevent fraud, waste, and abuse, including but not limited to applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. § 3729 *et seq*.), and the anti-kickback statute (section 1112B(b) of the Act)." *Id*. § 423.505(h)(1).

cost) from a minor investment (the copay) by inducing patients to continue using the drug. (A12–A13 ¶4.) A manufacturer's payment of copays for its own drugs is thus deemed an illegal kickback under the Anti-Kickback Statute ("AKS"). *Cf.* 42 U.S.C. § 1320a-7b(b). (A12–A13 ¶4; A20–A21 ¶31.) Congress has determined that any Medicare claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the False Claims Act ("FCA")]." 42 U.S.C. § 1320a-7b(g); *see also* 31 U.S.C. §§ 3729–3733 (the FCA); (A20 ¶29.)

When Medicare Part D was introduced, the government observed that payments by drug manufacturers of patient copays for their own products "eliminat[e] a market safeguard against inflated prices." Office of Inspector General ("OIG"), Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623, 70625-26 (Nov. 22, 2005) (the "2005 Special Advisory Bulletin"). (A21 ¶32.) Although a manufacturer may donate to charities that fund copays for *all* drugs used to treat a particular condition or illness—including those sold by its competitors—OIG has warned against manufacturers "creating sham 'independent' charities to operate PAPs," and/or "colluding with independent charity programs to ensure that the manufacturer's contributions only or primarily benefit patients using its products." 2005 Special Advisory Bulletin, 70

Fed. Reg. 70623, 70626. (A21–A22 ¶33.) Put simply, a drug company cannot use a PAP as a conduit to pay kickbacks to patients.

OIG has also warned against "seeding programs," which are "problematic programs that offer free goods or other remuneration to prescribers as a means to 'seed' or introduce new products into the marketplace." OIG Advisory Opinion No. 08-04 (Feb. 5, 2008) (the "2008 AO"), at 6. (A22 ¶34.) Such "seeding" can steer patients toward "a particular course of treatment," thus locking in long-term profits for the manufacturer. 2008 AO, at 6. (*Id.*)

## II. BIOGEN'S FRAUDULENT KICKBACK SCHEME

Biogen manufactures Tysabri, Avonex, and Tecfidera, the three multiple sclerosis drugs at issue (the "Biogen Drugs"). Each costs between $50,000 to $80,000 per year, per patient. (A11 ¶1.) Biogen knew that it was illegal to pay the copays for these drugs directly, so it devised a two-part scheme to do so secretly by funneling money through sham charities. (A12–A13 ¶4; A32–A33 ¶¶71–72.)

### A. Part I: Seeding and Sweeping

First, Biogen "seeded" the market by giving free drugs to thousands of patients who lacked sufficient (or any) insurance coverage, knowing that a patient who starts a particular therapy will likely continue that therapy. (A11 ¶2; A25 ¶46; *see* A26–A28 ¶¶51–54.) Biogen then steered or "swept" those patients into Medicare or Medicare Advantage programs that covered the Biogen Drugs, thereby obtaining

payment from the Plan Sponsor—Humana—for the substantial non-copay portion of the drugs' total cost. (A12 ¶3; A25 ¶47.)

## B. Part II: Sham "Charitable" Copay Assistance

Biogen knew that patients who had been swept from its free-drug program to Medicare plans could not likely afford the corresponding thousands of dollars in annual copays for its expensive Biogen Drugs and would likely switch to cheaper generic alternatives or forgo treatment altogether. (A25 ¶47; A28 ¶56.) Instead of lowering its prices, Biogen subsidized only the comparatively small patient portion (*i.e.*, the copay) while leaving insurers to pay the balance of the cost. (A28–A29 ¶57.) Because directly paying copays of Medicare insureds violates the AKS and the FCA, Biogen made "charitable donations" to several nominally charitable PAPs, including the Chronic Disease Fund, Inc. ("CDF") and The Assistance Fund ("TAF"). (*Id.*) Biogen then directed patients using its drugs to these "charities," which funneled Biogen's "charitable" donations to those patients using *Biogen Drugs* in the form of copay assistance. (*Id.*; *see* A29–A31 ¶¶59–68.)

Advanced Care Scripts ("ACS"), a specialty pharmacy that also provides patient-management services to the pharmaceutical industry, aided and abetted the scheme by acting as an information go-between for Biogen and the PAPs. (A30 ¶64; A32 ¶70.) ACS also filled prescriptions for the Biogen Drugs at its specialty pharmacy. (A32 ¶70.)

This scheme benefited Biogen, ACS, and the PAPs. In exchange for significant administrative fees, the PAPs shared detailed reports and information with Biogen that allowed Biogen to coordinate the precise timing and amount of its donations to ensure that its funds went all (or primarily) to patients taking the Biogen Drugs. (A29–30 ¶61; A32 ¶69.) ACS's participation was intended to insulate Biogen from legal risk and to conceal the true purpose of Biogen's contributions. (A32 ¶69.) Besides significant administrative fees, ACS received revenue from filling prescriptions of the Biogen Drugs at its specialty pharmacy (A32 ¶70), for which it billed Humana. (A54–A55 ¶151.)

The scheme allowed Biogen to increase the sales of the Biogen Drugs by mollifying patient concerns about high copays while simultaneously shifting the cost to Humana and other Plan Sponsors. (A28–A29 ¶57.) Biogen expected its supposedly "charitable" contributions to generate a return on investment. (A29 ¶58.) Biogen knew that if it did not make these sham "charitable donations," sales of the Biogen Drugs would decrease because patients would seek lower-cost alternatives or forgo treatment, especially since Biogen had accustomed patients to receiving its drugs for free. (*Id.*)

Biogen's scheme caught the attention of the U.S. Department of Justice ("DOJ"). (A13–A14 ¶7.) In December 2020, DOJ intervened in a whistleblower suit against Biogen, which alleged that Biogen's conduct violated the AKS and the FCA.

(*Id.*) Biogen and ACS paid the government $22 million and $1.4 million, respectively, to settle allegations about their conduct. (*Id.*) The government also reached substantial settlements with the PAPS, including CDF and TAF. (*Id.*)

## III. DEFENDANTS' FALSE CERTIFICATIONS TO HUMANA

As Biogen knows, Humana would not have approved claims for the Biogen Drugs if it knew that Biogen was illegally subsidizing patients' copays through sham "charitable donations" to PAPs. (A37 ¶83.) Accordingly, Biogen and ACS misrepresented to Humana that they were complying with state and federal law, including the AKS and FCA.

Both ACS, as a pharmacy that dispenses drugs to Humana insureds, and Biogen, as a manufacturer that sells drugs to those insureds, are "downstream" entities under CMS regulations. Thus, each claim for payment for the Biogen Drugs submitted to Humana included an implied certification that the claim was not false or fraudulent. (A22 ¶36.) In so certifying, Defendants misrepresented to Humana that they were not inducing Medicare patients to take Biogen's drugs by subsidizing copayments, and that Biogen and ACS were otherwise complying with federal law. (*Id.*) These representations were conveyed directly to Humana by pharmacies, including ACS, via their electronic requests for payment. (A54–A55 ¶151; *see also* A19 ¶27.)

If Biogen or ACS had told Humana that they were unwilling to certify their compliance with law, Humana would have denied all claims for the Biogen Drugs. The scheme thus caused Humana to pay for many more prescriptions of the Biogen Drugs (and associated costs of administering the drugs) than it otherwise would have. (A36–A37 ¶¶82–83.)

From 2011 through 2019, Humana paid over $1.9 billion for the Biogen Drugs, of which Humana paid nearly $350 million directly to ACS. (A37 ¶84.) For the small portion of claims filled through Humana's own pharmacy, Humana could identify claims where the insured received copay assistance from CDF or TAF, and Humana submitted a list of 100 such claims as examples of the fraudulent claims. (A59–A62 (Ex. A).) However, when it filed suit, Humana did not have sufficient information to determine whether, for claims submitted by non-Humana pharmacies, the insured members had received copay assistance through CDF and TAF (though it correctly suspected that thousands had received such copay assistance). (A37–A38 ¶85.) Humana thus could not determine which individual claims for payment were part of Biogen's fraudulent scheme. (*Id.*) Several months after Humana filed this action, Humana obtained critical discovery in a separate RICO action ("*Teva*" or "the *Teva* action") that it brought against ACS and Teva Pharmaceuticals USA, Inc. (another MS drug manufacturer) based on a virtually identical copay subsidy

scheme.[2] This information allowed Humana to determine which claims submitted by non-Humana pharmacies involved illegal copay assistance. (A325 ¶59.)

## IV. THE DISTRICT COURT DISMISSES HUMANA'S COMPLAINT AND DENIES LEAVE TO AMEND

Humana sued Biogen and ACS in September 2021, asserting claims under the RICO Act, 18 U.S.C. §§ 1962, 1964; various state unfair competition, consumer fraud, and deceptive trade practices laws; state insurance fraud statutes; and state law theories of breach of contract, fraud, and unjust enrichment. (A11–A248.) Humana alleged an association-in-fact enterprise consisting of Biogen, ACS, CDF, TAF, and another entity called U.S. Bioservices. 18 U.S.C. § 1961(4). (A39 ¶92.) Humana alleged that the RICO enterprise engaged in a pattern of racketeering activity predicated on mail and wire fraud. (A39–A41 ¶¶92–99.)

The district court granted Defendants' motions to dismiss. (Add.1–Add.35.) Despite observing that "Humana is alleged to have been the target and victim of the alleged scheme," and that Humana was likely "the only injured party," the court held that the Clayton Act's direct purchaser standing requirement for antitrust damages claims also applies to RICO, and that Humana lacked standing to assert a RICO claim because it was an indirect purchaser of the Biogen Drugs (Add.16; Add.18; Add.24.) The court deemed Humana an indirect purchaser notwithstanding its direct

---

[2] *Humana Inc. v. Teva Pharms. USA, Inc., et al.*, No. 6:21-cv-72 (M.D. Fla.).

purchases of Biogen Drugs from ACS, a fact the court noted but did not address. (Add.2.) The court also held that Humana failed to allege mail or wire fraud with sufficient particularity under Federal Rule of Civil Procedure 9(b). (Add.33.) The court declined to exercise supplemental jurisdiction over the state-law claims and refused to allow Humana an opportunity to amend the complaint. (Add.33–Add.35.)

Humana timely moved for reconsideration under Federal Rules of Civil Procedure 59(e) and 60(b). (ECF 55, 56.) Humana argued that the court erred in overlooking allegations that it was a direct purchaser from one of the conspirators—ACS—and erred in its Rule 9(b) ruling. (ECF 56 at 5–10.)

Humana also sought leave to amend. It submitted a Proposed Amended Complaint alleging additional details about the fraud based on discovery that Humana had obtained from CDF and TAF in *Teva*. (*Id.* at 10–20.) The Proposed Amended Complaint also added allegations showing that Humana was a direct purchaser from both ACS and Biogen, detailing Defendants' false certifications (including an exhibit listing the date, amount, sender, and recipient of tens of thousands of fraudulent claims), and explaining Defendants' use of the mail and wires. The court denied the motion in a cursory order that did not substantively address any of Humana's arguments. (Add.36–Add.40.)

## SUMMARY OF THE ARGUMENT

**I.A.** Humana has standing to assert a RICO claim under 18 U.S.C. § 1964(c) because it was the direct victim of Defendants' fraudulent scheme. In *Holmes v. Securities Investment Protection Corp.*, 503 U.S. 258, 267–68 (1992), the Supreme Court held that Congress intended to incorporate common law principles of proximate causation into § 1964(c). Because one aspect of proximate cause is the directness of an injury, a RICO plaintiff lacks standing if its injuries derive from a third party's injuries. *Id.* at 269–70. This Court has twice held that an insurer has standing to assert a RICO claim against a pharmaceutical manufacturer based on mail and wire fraud where the insurer is the "primary and intended victim" of the defendant's scheme. *See In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 36–40 (1st Cir. 2013); *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 915 F.3d 1, 14 (1st Cir. 2019). Here, as the district court recognized, "Humana is alleged to have been the target and victim of the alleged scheme" and was likely "the only injured party." (Add.18; Add.24.) Accordingly, under this Court's precedent, Humana has standing to assert its RICO claims against Biogen and ACS.

The district court nevertheless dismissed Humana's RICO claims for lack of statutory standing, holding that the direct purchaser rule, which applies in certain cases arising under the Clayton Act, applies to RICO and that Humana is not a direct purchaser. That conclusion cannot be reconciled with *Neurontin* and *Celexa*, which

authorized RICO claims by insurers who were *not* direct purchasers. The district court also failed to apprehend that the bright-line direct purchaser rule is simply a context-specific application of the broader "direct injury" rule in classic illegal-overcharge cases. But where, as here, the alleged misconduct is not an overcharge to the direct purchaser (the wholesalers and pharmacies) but rather a complex fraudulent scheme involving illegal kickbacks funneled through sham charities and concealed through false certifications to a federal healthcare program designed to increase the quantity of claims covered *by the insurer*, the direct purchaser rule does not apply. The out-of-circuit cases the district court relied on do not hold otherwise and are not binding on this Court in any event.

**I.B.** Even if the direct purchaser rule applied, Humana adequately alleged that it purchased drugs directly from ACS, Biogen's co-conspirator. Every circuit court that has addressed the question has permitted an antitrust plaintiff to "sue any member of an alleged antitrust conspiracy, so long as the plaintiff is a direct purchaser from at least one member of the conspiracy" and names that member as a defendant. *See, e.g.*, *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 347 (7th Cir. 2022). Some courts refer to this as the co-conspirator exception to the direct purchaser rule, while others consider it a faithful application of *Illinois Brick*. Either way, Humana satisfies the rule because it was the first

purchaser of the Biogen Drugs from ACS, one of the conspirators and a named defendant.

**II.A.** The district court also dismissed the Complaint for failure to plead mail and wire fraud with sufficient particularity. That was error because Humana alleged Defendants' fraudulent scheme in detail, explaining how Defendants knowingly and willfully participated in the scheme and used the mail and interstate wires to further that scheme. The Complaint thus put Defendants on notice of the alleged misconduct—which involved the same misconduct that DOJ had previously investigated—and provided sufficient information for Defendants to file a response. Rule 9(b) requires nothing more.

**II.B.** The district court erred by failing to follow this Court's decision in *New England Data Services, Inc. v. Becher*, 829 F.2d 286 (1st Cir. 1987), which held that "in a RICO mail and wire fraud case," it is unreasonable to dismiss under Rule 9(b) for failure "to plead the time, place and contents of communications between the defendants" when the requisite information is in the defendants' exclusive possession. *Id.* at 290–91. *Becher* is on all fours here. Accordingly, the district court should have denied the motion to dismiss and given Humana an opportunity to conduct discovery.

**III.A.** The district court abused its discretion in denying Humana leave to amend. First, no court in this circuit has ever before dismissed a RICO claim based

on the direct purchaser rule, and the district court should have given Humana leave to file an amended complaint highlighting its direct purchaser status. Second, Humana uncovered critical new evidence through discovery in the *Teva* case—including some discovered after the hearing on the motion to dismiss—that enabled Humana to allege its claims with additional specificity. The district court simply ignored these new allegations.

**III.B.** The amendment would not have been futile because Humana's Proposed Amended Complaint satisfies Rule 9(b) by alleging specific misrepresentations by mail or interstate wires in furtherance of the fraudulent scheme.

**III.C.** Humana did not unduly delay in seeking amendment. Humana sought leave to amend within 28 days of the court's order denying its motion to dismiss, and allowing amendment would not prejudice Defendants or cause inefficiency.

## STANDARD OF REVIEW

This court reviews *de novo* an order dismissing a complaint under Rule 12(b)(6). *Kaufman v. CVS Caremark Corp.*, 836 F.3d 88, 90 (1st Cir. 2016). A district court's denial of a motion for leave to amend is reviewed for abuse of discretion. *Windross v. Barton Protective Servs., Inc.*, 586 F.3d 98, 104 (1st Cir. 2009).

# ARGUMENT

## I. HUMANA HAS STANDING TO ASSERT A CIVIL RICO CLAIM

A RICO plaintiff must adequately allege both but-for and proximate causation. *See Holmes*, 503 U.S. at 268. The district court correctly concluded that Humana adequately alleged proximate causation (Add.18), and Humana also clearly alleged but-for causation. (A41 ¶99.) The district court nevertheless dismissed the Complaint for failure to surmount *an additional hurdle* of alleging direct purchaser status. (Add.23–Add.24.) The court justified that conclusion on the ground that § 1964(c) should be interpreted identically to the Clayton Act, which the Supreme Court has read to include a direct purchaser requirement in certain cases. It also believed that its decision was consistent with decisions from the Third, Sixth, and Seventh Circuits. That was error. Neither the Supreme Court nor this Court has ever held that the direct purchaser rule bars RICO claims where the target and primary victim of defendants' fraudulent scheme is an indirect purchaser (here, an insurer), and the district court misread the out-of-circuit decisions on which it relied. Moreover, Humana *did* adequately allege that it was a direct purchaser from Defendant ACS—a member of the alleged RICO enterprise—so even if the direct purchaser rule applies, Humana has standing to pursue claims against ACS and its co-conspirator Biogen.

**A. Humana Is the Primary Victim of Defendants' Fraudulent Scheme, and the Direct Purchaser Rule Does Not Bar Humana's RICO Claims**

RICO provides a cause of action to "[a]ny person injured in his business or property by reason of a violation of Section 1962." 18 U.S.C. § 1964(c). Section 1962, in turn, prohibits "racketeering activity," which includes mail and wire fraud. *Id.* § 1962. While "[a] literal reading" of this statutory language "is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of" a statutory violation, Congress intended this language to be "construed in the light of its common-law background." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 529, 531 (1984) (construing identical language in the Clayton Act). This includes judge-made "doctrines such as foreseeability and proximate cause, *directness of injury*, certainty of damages, and privity of contract." *Id.* at 532–33 (emphasis added); *see also Holmes*, 503 U.S. at 267–69 (applying the same reasoning to § 1964(c)). Accordingly, the Court has held that neither RICO nor the Clayton Act provides a remedy for indirect *injuries—i.e.*, those that derive from a third party's injuries. *See Associated Gen. Contractors,* 459 U.S. at 540–41; *Holmes*, 503 U.S. at 268–69.

As the Court explained in *Holmes*, the "directness of relationship" requirement is central both to the Clayton Act and to RICO because "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors."

503 U.S. at 268–69. Moreover, "recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." *Id.* at 269. The "general interest in deterring injurious conduct" does not justify adoption of such convoluted rules because "directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Id.* at 269–70.

*Holmes* established a clear rule: only direct victims have statutory standing under RICO, so a plaintiff lacks standing if its injuries are derivative. 503 U.S. at 268–69; *see Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 613 (6th Cir. 2004) ("[T]he Supreme Court's decision in *Holmes* represents a classic statutory-standing case."); *Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 906 (11th Cir. 1998) ("The Supreme Court's decision in *Holmes* … is consistent with the RICO standing analysis we have adopted."). Under *Holmes* and its progeny, a RICO plaintiff must therefore show that its "injuries result directly from the defendant's" racketeering activity. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 653 (2008); *see also Hemi Grp., LLC v. City of New York,* 559 U.S. 1, 10–11 (2010); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006).

*1. This Court's precedent confirms that Humana has standing because it was the "primary and intended victim" of Defendants' racketeering activity.*

The proper inquiry here is thus whether Humana's alleged harm was the direct result of Biogen's fraudulent scheme or "result[ed] 'merely from the misfortunes visited upon a third person by [Defendants'] acts.'" *Bivens*, 140 F.3d at 906 (quoting *Holmes*, 503 U.S. at 267). Contrary to the district court's assertion (Add.19), this Court's decision in *Neurontin* provides a clear answer: Humana suffered direct rather than derivative injuries, and thus has statutory standing.

In *Neurontin*, several health insurance companies asserted RICO claims against Pfizer for fraudulently marketing Neurontin for off-label uses. 712 F.3d at 25–26. This "fraudulent marketing campaign" targeted both doctors and "third-party payors," including Kaiser. *Id.* at 28. The jury and court found that this fraudulent marketing scheme increased prescriptions of Neurontin, *id.* at 29, which injured Kaiser by causing it to pay for claims it otherwise would have avoided, *id.* at 32–33.

On appeal, Pfizer argued that Kaiser could not satisfy the causation requirement of § 1964(c). *Id.* at 33–34. This Court rejected that argument, explaining that one of the factors that bears on the "proximate cause question" is the "directness or indirectness of the asserted injury[.]" *Id.* at 35 (cleaned up). The Court also described the "three functional factors" used "to assess whether proximate cause exists under RICO"—difficulty of ascertaining damages, avoiding multiple recoveries, and the societal interest in deterrence. *Id.* at 35–36. As the Court

explained, "*Holmes* makes it clear that both the directness concern and the three functional factors are part of the proximate cause inquiry." *Id.* at 36.

Applying the direct-injury test, the Court concluded that Kaiser could satisfy RICO's causation requirement because the point of the scheme was "to fraudulently inflate the number of Neurontin prescriptions for which [Kaiser] paid," making Kaiser the "primary and intended victim [] of [Pfizer's] scheme to defraud." *Id.* at 37 (alterations in original) (quoting *Bridge*, 553 U.S. at 650).[3] The Court thus saw no "risk of duplicative recovery" and concluded that Kaiser was "in the best position to enforce the law because [it was] the party that directly suffered economic injury from Pfizer's scheme." *Id.* at 37–38. Because "Kaiser was a primary victim" of the scheme, it "met both the direct relationship and functional tests articulated in *Holmes* and its progeny." *Id.* at 37, 38. The Court warned that adopting Pfizer's position "would undercut the core proximate causation principle of allowing compensation for those who are directly injured, whose injury was plainly foreseeable and was in fact foreseen, and who were the *intended victims* of a defendant's wrongful conduct." *Id.* at 38 (emphasis added).

---

[3] In *Bridge*, the Supreme Court held that where a plaintiff alleges mail and wire fraud as predicate acts, § 1964(c) does not require first-party reliance on the misrepresentations. 553 U.S. at 648–49. Even if the misrepresentations were made to third parties, a plaintiff directly injured thereby has RICO standing. *Id.* at 649.

Six years later, this Court reached the same conclusion in *Celexa*. There, a health care organization that reimbursed consumers for prescription drugs sued a pharmaceutical company for fraudulently promoting off-label uses of Celexa and Lexapro. *Celexa*, 915 F.3d at 7. In reversing an award of summary judgment to the pharmaceutical company, the court held that the plaintiff could maintain a RICO action because it was one of "the primary and intended victims of [the defendant's] scheme to defraud." *Id.* at 14 (quoting *Neurontin*, 712 F.3d at 37).

Humana was likewise the primary and intended victim of Defendants' fraudulent scheme here. As the district court recognized, "in the prescription-drug marketplace, a scheme to defraud often targets the government or third-party payors—the entities that actually pay for the drugs at issue." (Add.22.) It is thus "the payors—the health insurer and the patients—who are the injured parties." (Add.24; *cf.* A37 ¶83.) And because Biogen's scheme "compensated the patients by making their copayment, [Humana] may be the *only injured party*." (Add.24 (emphasis added).) Exactly right. Neither the patients (who received an expensive drug for free), nor the doctors (who had no skin in the game), nor the wholesalers or pharmacies (who benefit from increased volume and sold *more* drugs than they otherwise would have) were injured by Biogen's racketeering activities. Accordingly, Humana's injuries are not derivative of any third party's injuries.

As the primary victim of Defendants' fraudulent scheme, Humana is "in the best position to enforce the law because [it] is the party that directly suffered economic injury from [Defendants'] scheme." *Neurontin*, 712 F.3d at 38. The injury here is even more direct than in *Neurontin* because the misrepresentations in that case were largely directed to the prescribing physicians, whereas here they were made *directly to Humana* by the pharmacies filling the prescriptions. Accordingly, under this Circuit's precedent, Humana has adequately pleaded that it has standing to sue under RICO. *Id.* at 37.

> 2. *The district court's conclusion that the direct purchaser rule bars Humana's RICO claims conflicts with Neurontin, misunderstands the rule's rationale, and fails to appreciate the unique context of the healthcare system in which Humana operates.*

The district court dismissed Humana's RICO claims on the ground that Humana is an "indirect purchaser" of Biogen's drugs. (Add.24; *see also* Add.13 (noting that Humana "did not actually purchase any drugs from Biogen").) The court's decision to apply the direct purchaser rule in this case is wrong for several reasons.

*First*, it cannot be squared with *Neurontin* and *Celexa*. In both cases, the plaintiffs were indirect purchasers who reimbursed patients for their drug purchases, but this Court nevertheless held that § 1964(c) authorized them to sue because they were the "primary victims" of the defendants' fraudulent schemes. If § 1964(c) contained a latent direct purchaser rule applicable to all RICO claims, both cases

25

would have come out the other way. The district court justified its refusal to follow *Neurontin* on the ground that *Neurontin* supposedly addressed only proximate cause and failed to address statutory standing. (Add.19.) But *Neurontin* faithfully applied *Holmes*, and the very Sixth Circuit case the district court cited for the purported distinction between proximate cause and standing—*Trollinger*—described *Holmes* as "a classic statutory-standing case." *Trollinger*, 370 F.3d at 613. *Neurontin*'s conclusion that Kaiser's injury was direct, not derivative, thus established Kaiser's statutory standing. The fact that no party specifically raised the direct purchaser rule does not undermine *Neurontin*'s precedential value on the central question presented here of whether Humana has statutory standing under RICO because it was the intended target and primary victim of Defendants' fraudulent scheme.

*Second*, even if this Court were writing on a blank slate, it would be inappropriate to apply the direct purchaser rule here given the underlying rationale of the Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). In *Illinois Brick*, the Supreme Court "established a bright-line rule" applicable to "classic antitrust claim[s]" where a "monopolistic retailer" or group of conspirators use their monopoly or illicit agreement "to overcharge consumers": direct purchasers have standing to sue but indirect purchasers do not. *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1519–21 (2019) (citing *Ill. Brick*, 431 U.S. at 746). The direct purchaser rule serves the exact same purposes as the "primary victim" test: it avoids duplicative

recoveries, reduces evidentiary complexities in proving damages, encourages vigorous private enforcement by allowing direct victims to recover for their full injuries, and reduces the difficulty of ascertaining the plaintiff's damages. *Compare Ill. Brick*, 431 U.S. at 730, 732, 745–46, *with Holmes*, 503 U.S. at 269.

The direct purchaser rule is thus best understood not as an *additional* requirement but rather as an easily administrable application of the direct injury rule to illegal-overcharge cases. A bright-line rule is appropriate in such cases because the primary victim in an illegal-overcharge cases is *always* the direct purchaser. Even if the direct purchaser passes on some or all of the overcharge to its customers, the customers' injuries necessarily derive from the direct purchaser's payment of the unlawfully manipulated prices. The direct purchaser rule thus "ensure[s] an effective and efficient litigation scheme in antitrust cases" involving illegal overcharges. *Apple,* 139 S. Ct. at 1522. But outside of that context, it is "virtually impossible to announce a black-letter rule that will dictate the result in every case." *Holmes*, 503 U.S. at 272 n.20 (quoting *Associated Gen. Contractors*, 459 U.S. at 536).

Consequently, the Supreme Court has never purported to extend the direct purchaser rule beyond "classic" antitrust claims involving illegal overcharges. For example, in *Associated General Contractors*, a labor union asserted a Clayton Act claim against a multiemployer association and its members, alleging that its members coerced certain third parties and some of the association's members to

enter business relationships with nonunion firms. 459 U.S. at 520. This coercion allegedly diminished the business of certain unionized firms and thereby injured the unions and their members. *Id.* at 520–21. Although the union was not a direct purchaser of defendants' goods or services, the court did not dismiss the claims on that ground—instead, the Court engaged in a case-specific evaluation of "the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them," *id.* at 535, concluding that the plaintiffs were not the "direct victims of the alleged conspiracy," *id.* at 545. The Court pointed to the "tenuous and speculative character of the relationship between the alleged antitrust violation and the Union's alleged injury, the potential for duplicative recovery or complex apportionment of damages, and the existence of more direct victims of the alleged conspiracy[.]" *Id.*

As *Associated General Contractors* demonstrates, while the direct purchaser rule is appropriate for a specific subset of cases—classic illegal-overcharge claims—the "primary victim" test applies to the "infinite variety of claims that may arise" in other contexts. *Id.* at 536. And as the district court recognized, the "practical realities of the health-care marketplace" and the "theory of the injury here" do "not neatly align with a normal antitrust marketplace scenario, in which the monopolist sets an artificially high price." (Add.21–Add.22.) That is because Defendants' illegal kickback scheme was not designed to overcharge the pharmacy middlemen, but

instead was designed to increase the number of prescriptions *that Humana would cover*.[4] As the district court correctly observed, because the third-party payors in the healthcare industry "are the injured parties," no other entity in the chain of commerce has an "incentive to file suit against the drug manufacturer." (Add.23–Add.24.) In short, because Humana's injuries are direct, not derivative, it would make little sense to apply *Illinois Brick*—a decision designed to ensure that only directly injured parties have standing to sue—to bar Humana's claims.

*Third*, the district court erred in concluding that Congress intended § 1964(c) to incorporate the direct purchaser rule. (Add.15.) Although the Supreme Court has "assumed" that Congress intended for § 1964(c) to incorporate traditional notions of proximate causation based on Congress's presumed incorporation of judicial decisions that *preceded* RICO's enactment, *Holmes*, 503 U.S. at 267–68, that logic does not apply to the direct purchaser rule. That is because RICO was enacted in 1970, Pub. L. 91-452, 84 Stat. 922, and the Court did not announce the direct

---

[4] Humana alleges that Defendants' scheme to illegally subsidize the members' copay obligations eliminated any cost considerations that the members otherwise would have weighed in deciding to use Biogen's Drugs, resulting in Humana paying for more prescriptions than it otherwise would have at prices unconstrained by member cost concerns. (*See* A21 ¶32.) Humana does not allege an "anti-trust type injury" where prices to the pharmacies were fixed by the conspirators' unlawful conduct and passed through to Humana.

purchaser rule in *Illinois Brick* until 1977. There is thus no reason to assume that Congress meant to incorporate the direct purchaser rule into RICO.[5]

*Fourth*, the out-of-circuit cases the district court relied on do not support its decision to apply the direct purchaser rule here. In *McCarthy v. Recordex Service, Inc.*, 80 F.3d 842 (3d Cir. 1996), the plaintiffs were patients whose attorneys had requested medical records from hospitals in connection with medical malpractice claims. *Id.* at 845. The hospitals had an exclusive contract with a copy service company to provide photocopies of the records, and the company charged the attorneys $1 per page plus other fees. *Id*. at 846. The patients subsequently filed an action under both the antitrust laws and RICO alleging that the hospitals and copy service company conspired to increase the price of photocopies. *Id.* at 845. The Third Circuit affirmed dismissal of the antitrust claims under *Illinois Brick* because the attorneys—not the patients—were the direct purchasers of the photocopies and the

---

[5] Though *Illinois Brick* relied on the Court's 1968 decision in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), *Hanover Shoe* did not hold that indirect purchasers lack standing. And the lower courts did not uniformly interpret *Hanover Shoe* as implicitly adopting a direct purchaser rule. *See Ill. Brick*, 431 U.S. at 728 n.8 (listing circuit split over this issue); *Illinois v. Ampress Brick Co.*, 536 F.2d 1163 (7th Cir. 1976), *rev'd sub nom Ill. Brick*, 431 U.S. 720 (holding that indirect purchasers could recover treble damages from an illegal overcharge if the overcharge was passed on to them through intervening links in the distribution chain). There is thus no reason to assume that Congress understood in 1970 that the relevant language in the Clayton Act would be interpreted to bar RICO suits by indirect purchasers.

plaintiffs' injuries were thus derivative. *Id.* at 851. The Court concluded that the direct purchaser rule also barred the plaintiffs' RICO claims, which makes sense because the alleged misconduct was an *illegal conspiracy to raise prices*—a classic illegal-overcharge claim. *Id.* at 855. Indeed, the plaintiffs "conceded that, if they lacked antitrust standing, they also lacked RICO standing." *Id.*

*McCarthy* thus stands for the narrow proposition that where the wrongful conduct involves a conspiracy to fix prices and overcharge direct purchasers, the bright-line direct purchaser rule readily identifies the direct victim. *Apple*, 139 S. Ct. at 1523. But where the alleged misconduct does *not* involve an illegal overcharge to the first "purchaser," the direct purchaser rule does not answer the question of "whether the alleged violation led directly to the plaintiff's injuries." *Anza*, 547 U.S at 461. Here, Humana does *not* allege that Biogen's misconduct harmed pharmacies by overcharging them or allege that Humana's injury is derivative of the pharmacies' injuries. Instead, Humana's injury was caused by Biogen's unlawful payment of the members' copays which increased the number of prescriptions Humana paid for. Thus, even if *McCarthy* is correct, it is distinguishable.[6]

---

[6] The Third Circuit's subsequent decision in *Humana, Inc. v. Indivior, Inc.*, Nos. 21-2573 & 21-2574, 2022 WL 17718342 (3d Cir. Dec. 15, 2022) (unpublished), which applied *McCarthy*, is similarly distinguishable. There, the complaint alleged that Defendants engaged in a conspiracy to inflate the price of Suboxone to "wholesalers and retailers," which then "passed on the inflated prices of Suboxone to the Insurers." *Id.* at *2. The Court affirmed dismissal, holding that claims based

*Trollinger* similarly provides no support for the district court's erroneous application of the direct purchaser rule here. In that case, a group of employees sued their employer for conspiring with several employment agencies to hire illegal immigrants, thereby depressing the wages of the employer's hourly employees. 370 F.3d at 605. The Sixth Circuit applied *Holmes*, which "follow[ed] a course marked by a long line of Supreme Court cases denying antitrust standing to plaintiffs who suffer derivative or 'passed-on' injuries." *Id*. at 613 (citing *Ill. Brick*, 431 U.S. at 729). The court rejected the defendant's argument that the union, not the employees, suffered a direct injury. *Id.* at 16. In explaining its conclusion, the court noted that "[w]hile indirect purchasers lack standing under RICO and the antitrust laws to sue for *overcharges* passed on to them by middlemen, direct purchasers do have standing"—"[a]nd if 'direct purchasers' who pay too much 'obviously assert a direct injury,' so do direct employees who receive too little." *Id.* at 616 (emphasis added) (citations omitted). The district court here apparently failed to appreciate that the Sixth Circuit said only that the rule applies in the context of "overcharges passed on to [plaintiffs] by middlemen"—not to every RICO claim. Nothing in *Trollinger*

on the theory that "overcharges at [a] higher level of distribution are passed on to end-payors" are barred by the direct purchaser rule. *Id.* Humana's claims here, by contrast, do not involve allegations that Defendants' copay scheme caused any injury to the pharmacies. To the contrary, Humana alleges that pharmacies *benefitted* from Defendants' conduct by dispensing more Biogen Drug prescriptions. (A32 ¶70.)

suggests that the direct purchaser rule applies to a RICO claim that is not based on passed-on overcharges but rather on a fraudulent scheme specifically targeted at the plaintiff.

The Seventh Circuit's pre-*Holmes* decision in *Carter v. Berger*, 777 F.2d 1173 (7th Cir. 1985), is equally inapposite. That opinion simply explained why § 1964(c) incorporates a direct *injury* rule. After reviewing numerous decisions holding that "an indirectly injured party may not sue," it concluded that "[t]hese principles should apply to RICO cases" and "that the directly injured party should receive a complete recovery, no matter what; an indirectly injured party should look to the recovery of the directly injured party, not to the wrongdoer, for relief." *Id.* at 1175–76. The court then explained how this conclusion was consistent with the rule in *Hanover Shoe* and *Illinois Brick*, which improves deterrence, reduces evidentiary difficulties, and avoids apportionment questions. *Id*. at 1176–77. But the court's conclusion was that the *direct injury rule*—not the direct purchaser rule—applies in RICO cases.

In sum, because Humana adequately alleged that it was the primary victim of Defendants' racketeering activities and that its injuries were direct (not derivative), the district court erred in concluding that Humana lacks statutory standing.

## B. Humana Was a Direct Purchaser From ACS and Thus Has Standing Even if the Direct Purchaser Rule Applies

Even if the direct purchaser rule applied to Humana's RICO claims, Humana would have standing because it alleged that it made direct purchases from ACS and

thus from the RICO enterprise. Humana alleged that ACS dispensed Biogen Drugs to Humana members (A37–A38 ¶85), and in exchange Humana *directly* paid ACS nearly $350 million for the MS Drugs from 2011 through 2019 (A37 ¶84; *see also* A18–A19 ¶¶25, 27). (*See* Add.13–Add.14.)[7]

In the antitrust context, all circuit courts that have addressed the question have permitted an antitrust plaintiff to "sue any member of an alleged antitrust conspiracy, so long as the plaintiff is a direct purchaser from at least one member of the conspiracy" and names that member as a defendant. *Marion Diagnostic*, 29 F.4th at 347.[8] Although this Court has not squarely addressed the question, it previously

---

[7] Other courts have recognized that "health insurers—rather than patients who receive the services—are typically the direct purchasers of healthcare services. Commercial insurers and healthcare providers enter into contracts which set rates and other terms under which the insurers reimburse the providers for services provided to patients." *FTC v. Sanford Health, Sanford Bismarck*, No. 1:17-cv-133, 2017 WL 10810016, at *5 (D.N.D. Dec. 15, 2017), *aff'd sub nom., FTC v. Sanford Health*, 926 F.3d 959 (8th Cir. 2019).

[8] *Accord In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1157 (9th Cir. 2019) ("[W]hen co-conspirators have jointly committed the antitrust violation, a plaintiff who is the immediate purchaser from any of the conspirators is directly injured by the violation."); *Wallach v. Eaton Corp.*, 837 F.3d 356, 362 n.3 (3d Cir. 2016) (describing "the limited co-conspirator exception to the direct purchaser rule, which allows an entity to sue its supplier *and* its supplier's supplier if (1) it sues both at once, and (2) the immediate supplier (i.e., the middleman) was so wrapped up in the conspiracy that it would be barred from seeking antitrust relief against the top-level supplier in a suit of its own"); *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 542 (8th Cir. 2015) (holding that "indirect purchasers may bring an antitrust claim if they allege the direct purchasers are 'party to the antitrust violation' and join the direct purchasers as defendants"); *Lowell v. Am. Cyanamid Co.*, 177 F.3d 1228, 1229–31 (11th Cir. 1999).

declined to exercise interlocutory review over a case in which the district court applied the co-conspirator exception to a civil RICO claim and held that indirect purchaser plaintiffs have standing to pursue claims because they were "the scheme's most direct victims." *Marrero-Rolon v. Autoridad de Energia Electrica de P.R.*, No. 15-1167 (JAG), 2016 WL 9459823, at *1 (D.P.R. Oct. 20, 2016), *appeal denied*, No. 16-8049 (1st Cir. Aug. 7, 2017) (Add.41).[9]

Some courts refer to this rule as a co-conspirator exception. Others describe it as a faithful application of *Illinois Brick* because it permits the first non-conspirator in the chain of distribution to seek relief while avoiding the complications that the indirect purchaser rule was designed to prevent.[10] Regardless of how the rule is characterized, Humana's complaint satisfies it. Humana alleged that ACS and Biogen conspired to defraud Humana by inducing it to buy the Biogen Drugs under false pretenses. (E.g., A30–A32 ¶¶64–67, ¶¶69–70; A39–A40 ¶94.) By purchasing

---

[9] *See also Marrero-Rolon v. Autoridad de Energia Electrica de P.R.*, No. 15-1167, 2015 WL 5719801 (D.P.R. Sept. 29, 2015), *R. & R. adopted*, 2016 WL 9459821 (D.P.R. Mar. 31, 2016).

[10] *Compare Nat'l Football*, 933 F.3d at 1156-58 (*Illinois Brick* not applicable where plaintiff is harmed by the combined efforts of co-conspirators); *Lowell*, 177 F.3d at 1229-31 (characterizing *Illinois Brick* as entirely inapplicable to a vertical conspiracy), *with Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 839 (7th Cir. 2020) ("[I]t is better to think of the right to sue co-conspirators not as an exception to *Illinois Brick*, but instead as a rule inhering in *Illinois Brick* that allocates the right to collect 100% of the damages to the first non-conspirator in the supply chain.").

Biogen Drugs directly from ACS, Humana is the first non-conspirator purchaser of the drugs.

The district court ignored Humana's allegations that it purchased directly from ACS. The court did not conclude that the co-conspirator exception was inapplicable, nor that Humana's purchases from ACS were indirect; it simply made no findings on the question at all. The Court concluded only that Humana was not a direct purchaser *from Biogen*. (Add.21.) That was not for lack of argument on the issue, as Humana raised its direct purchaser status at every opportunity.[11] Even after Humana moved for reconsideration on the ground that the Court erred in ignoring these direct purchaser allegations, the district court still failed to address the point. (Add.37.)

---

[11] ECF 35 (MTD Opposition Brief) at 22 (Defendants' arguments "fail for the simple reason that Humana pleaded that it *was* a direct purchaser from the RICO enterprise (in addition to being its direct victim)" (citing A36 ¶80, A37–A38 ¶85)); ECF 41 (MTD Sur-Reply Brief) at 8 ("Though Defendants gainsay that Humana was a direct purchaser, Biogen does not dispute (and ACS does not address) the fact that Humana paid ACS 'nearly $350 million' for 'more than 76,000' MS Drug prescriptions. This direct payment to ACS of millions of dollars for the MS Drugs makes Humana a direct purchaser under any standard of law or common sense.") (citation omitted); A288 (MTD Hearing Tr.) ("[O]ur complaint does allege that we are a direct purchaser from ACS for hundreds of millions of dollars' worth of these MS drugs, and ACS, of course, is a defendant, an alleged co-conspirator with Biogen, and an alleged member of the RICO enterprise").

This Court should reverse because Humana's allegations that it purchased the Biogen Drugs directly from ACS are sufficient to confer direct purchaser standing even if § 1964(c) incorporates a direct purchaser rule.

## II. HUMANA ADEQUATELY ALLEGED PREDICATE ACTS OF MAIL AND WIRE FRAUD WITH SUFFICIENT PARTICULARITY

To state a civil RICO claim, a plaintiff must allege "(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." *Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 233 (1st Cir. 2003) (citation omitted). "By statute, the 'pattern' element requires a plaintiff to show at least two predicate acts of 'racketeering activity,' which is defined to include violations of specified federal laws, such as the mail and wire fraud statutes." *Id.* (citation omitted). Mail and wire fraud, in turn, "requires proof of: (1) a scheme to defraud, (2) knowing and willful participation in the scheme with the intent to defraud, and (3) the use of the mails or interstate wire in furtherance of the scheme." *Int'l Floor Crafts, Inc. v. Dziemit*, 420 F. App'x 6, 13 (1st Cir. 2011) (unpublished) (citing *Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 66 (1st Cir. 1998)).

Allegations of mail and wire fraud are subject to Rule 9(b)'s pleading requirements. "[T]he primary purposes undergirding Rule 9(b) are 'to place the defendants on notice and enable them to prepare meaningful responses,' 'to preclude the use of a groundless fraud claim as a pretext to discovering a wrong,' and 'to safeguard defendants from frivolous charges which might damage their

reputations.'" *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 51 (1st Cir. 2020) (quoting *Becher*, 829 F.2d at 289). A complaint subject to Rule 9(b) must therefore "contain[] enough factual detail to make it apparent that the plaintiff's claims" are not "groundless" and to enable the defendant "to file a responsive pleading." *Id.* Where key information is in the defendant's exclusive possession, "dismissal of [a] civil [] RICO claim is not necessarily appropriate even where the complaint is not 'faithful in every respect to the requirements of Rule 9(b).'" *AngioDynamics, Inc. v. Clarion Med. Techs.*, No. 18-30038-MGM, 2019 WL 10787926, at *15 (D. Mass. Sept. 25, 2019) (citation omitted); *see also Cordero-Hernández v. Hernández-Ballesteros*, 449 F.3d 240, 244 (1st Cir. 2006) ("[A] court faced with an insufficiently specific claim may permit limited discovery in order to give a plaintiff an opportunity to develop the claim and amend the complaint.").

Here, the district court dismissed Humana's Complaint based, in part, on its conclusion that Humana did not plead mail and wire fraud with sufficient particularly under Rule 9(b). (Add.24–Add.33.) This was error.

## A. The Facts Alleged in the Complaint Sufficiently Demonstrate That Humana's Mail and Wire Fraud Claims Are Not Groundless and Provide Defendants Sufficient Information to File a Response

Humana's Complaint adequately apprises Defendants of the elements of a mail or wire fraud claim: (1) the alleged fraudulent scheme, (2) Defendants' knowing and willful participation in that scheme, and (3) Defendants' use of the mail

and wires in furtherance of that scheme. Since (as alleged in the complaint) Biogen and ACS reached multimillion dollar settlements with DOJ based on the same underlying conduct, Biogen and ACS cannot plausibly be confused or underinformed about the wrongdoing underlying Humana's claims. (A13–A14 ¶7 (fraud alleged by Humana involved the same conduct that gave rise to DOJ's case); A38 ¶87 (Humana's understanding of the relevant facts hinged on the unsealing of DOJ's complaint in 2020).) Defendants thus do not "require[] any further particularity to respond to the complaint." *Dumont v. Reily Foods Co.*, 934 F.3d 35, 39 (1st Cir. 2019); *see also Heater v. Gen. Motors, LLC*, 568 F. Supp. 3d 626, 642 (N.D. W.Va. 2021) (concluding that where a defendant is subject to "substantively identical" litigation that has reached a later procedural stage, it is "uniquely aware of the circumstances under which it must prepare its defense," such that dismissal based on Rule 9(b) is not warranted).

### 1. Humana alleged a detailed fraudulent scheme designed to target Humana.

Humana's Complaint alleged a detailed fraudulent scheme in which Biogen and ACS, through purported "charities," paid illegal kickbacks to Humana's Medicare insureds by covering their copays for Biogen's MS Drugs. *Supra* at Background II. Biogen's certifications to Humana should have disclosed its non-compliance with the AKS. *See supra* at Background I. Yet instead of disclosing its illegal conduct, Biogen submitted false certifications that concealed its non-

compliance from Humana. *See supra* at Background III. This is precisely the type of fraudulent scheme prohibited under the mail and wire fraud statutes.

Wire fraud is not limited to express misstatements of fact but rather prohibits any "scheme or artifice to defraud" using "false . . . pretenses." 18 U.S.C. § 1343. A kickback scheme is one of the oldest forms of an "artifice" made under "false pretenses." *See*, *e.g.*, *Skilling v. United States*, 561 U.S. 358, 408 (2010) (a kickback scheme is "a paradigmatic" example of fraud); *United States v. Davio*, 136 F. Supp. 423, 428 (E.D. Mich. 1955) (in the case of an illegal kickback, "[f]raudulent conduct . . . is presumed"). A kickback is essentially a form of bribery to obtain money from the government or a private principal. *See, e.g.*, *United States v. Regeneron Pharms., Inc.*, No. 20-11217, 2020 WL 7130004, at *8 (D. Mass. Dec. 4, 2020) ("'[T]he heartland of what the AKS is intended to prevent [is] the use of payments to improperly influence decisions on the provision of health care that lead to claims for payment to federal health care programs,' like Medicare.") (quoting *Guilfoile v. Shields*, 913 F.3d 178, 192–93 (1st Cir. 2019)). Here, Biogen bribed Medicare insureds to take its drugs by subsidizing their copays in a scheme to extract the remainder of the cost from Humana, the Medicare Plan Sponsor.

Biogen then concealed that illegal conduct through the submission of false certifications to Humana that accompanied each claim for payment. *See supra* at Background III. The U.S. Supreme Court, this Court, and other federal courts have

recognized that knowingly concealing illegal conduct through "misleading omissions" is actionable fraud under the FCA. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181, 187 (2016) ("*Escobar I*") (confirming liability for implied false certification based upon knowing failure to disclose material noncompliance with statutory, regulatory, or contractual requirements in submission of claims); *see also United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 109–11 (1st Cir. 2016) (applying *Escobar I* to establish that "misrepresentation-by-omission" was material and not a "garden-variety" breach); *United States v. Triple Canopy, Inc.*, 857 F.3d 174, 178 (4th Cir. 2017) (invoices that "contained no falsities on their face" were false because they did not disclose failure to meet contractual obligations).[12]

If kickbacks and misleading omissions are fraudulent when used to extract money from the federal government, then they must also be fraudulent when used to extract payments from a Plan Sponsor, since the Plan Sponsor is the Congressionally authorized offeror of subsidized Medicare insurance. *See* 42 C.F.R. § 423.4. As the Plan Sponsor, Humana decides whether to pay a claim. The government does not evaluate or pay Medicare Part D claims. *United States v. CVS Caremark Corp.*, No.

---

[12] *See also United States ex rel. Mackillop v. Grand Canyon Educ., Inc.*, No. 18-11192, 2022 WL 4084444, at *20 (D. Mass. Sept. 6, 2022) (failure to disclose ineligibility of students); *United States ex rel. Martino-Fleming v. South Bay Mental Health Ctrs.*, 540 F. Supp. 3d 103, 126-27 (D. Mass. 2021) (failure to disclose unlicensed clinicians).

09-4672, 2015 WL 5582553, at *5 (E.D. Pa. Sept. 22, 2015) ("CMS contracts only with Sponsors to administer the Part D benefit; healthcare providers do not bill the government directly for services provided to Part D beneficiaries.") (citing 42 U.S.C. § 1395w–12(b)(1)). In short, Defendants' use of illegal copay subsidies and misleading omissions was a fraudulent scheme designed to extract hundreds of millions of dollars from Humana over nearly a decade.

Yet, despite Humana's detailed description of the fraudulent scheme, the district court concluded that the allegations failed to satisfy Rule 9(b) because Humana's allegations regarding the false certifications "say nothing about the time or place of the communications, their specific content, or even how many such communications took place." (Add.31 (faulting the Complaint for not providing "the actual language of the misrepresentations at issue").) But as Humana has explained, although it knew that *many* of the certifications submitted were fraudulent—*i.e.*, they falsely certified compliance with the law—Humana did not know *exactly which* claims were fraudulent because non-Humana pharmacies do not tell Humana who paid for the copays. (A37–A38 ¶85.)[13] Nevertheless, to substantiate that the alleged

---

[13] Humana subsequently obtained discovery in *Teva* from CDF and TAF that allowed Humana to identify tens of thousands of claims for which CDF and TAF paid the copays of Humana members at ACS and other pharmacies. *See supra* at Background III. Humana obtained much of the information needed to identify those claims *after* briefing on the motion to dismiss was concluded—indeed, some of the information was not discovered until after the hearing on the motion to dismiss.

fraud occurred, Humana did offer specific examples of claims where CDF and TAF illegally paid the copay. Exhibit A to the Complaint contained a sample of 100 claims for Biogen Drugs submitted to Humana through its *own specialty pharmacy* for which CDF or TAF paid the copay. (A37–A38 ¶85; A59–A62 (Ex. A).) Exhibit A contained the date, dollar amount, and payor identity (i.e., which "charity" illegally subsidized the relevant patient's copay) for each of the 100 fraudulent claims. Exhibit A thus demonstrates that there were far more than *two* instances of mail or wire fraud, which is all that is necessary to state a RICO claim. 18 U.S.C. § 1961(5). Exhibit A also demonstrates that Humana's RICO claims are not groundless, and it highlights the type of information that would be revealed as to the *non-Humana pharmacies* through discovery.

The district court disregarded Exhibit A on the ground that it "contains no detail as to who sent the communications." (Add.28.) But Humana did not offer Exhibit A to prove the existence of any specific *communications*—it offered the exhibit as evidence that Humana paid claims where CDF and TAF illegally paid the copays. It was unnecessary to allege who sent the certifications for those 100 examples, as the Complaint makes plain that *Biogen* submitted false certifications in connection with *every* claim.

### 2. Humana specifically alleged that Biogen and ACS were knowing and willful participants in the scheme.

It is undisputed that Humana alleged that Biogen and ACS were knowing and willful participants in the fraudulent scheme. (A39–A40 ¶94.) The district court did not, and could not, dismiss Humana's RICO claims based on this element of mail or wire fraud.

### 3. Humana adequately alleged that Biogen and ACS used the mail and interstate wires in furtherance of their fraudulent scheme.

The final element—use of mail or interstate wires "in furtherance" of the fraudulent scheme—is to be "read broadly." *See United States v. Simon*, 12 F.4th 1, 33 (1st Cir. 2021). A plaintiff need not show that the use of mails and wires was "an essential element of the scheme." *Id.* (quoting *Schmuck v. United States*, 489 U.S. 705, 710 (1989)). Rather, a plaintiff "need only show that the mailing was 'incident to an essential part of the scheme.'" *Id.* (quoting *Schmuck*, 489 U.S. at 711). This element is easily satisfied in most RICO cases. Indeed, "[i]n this day and age, it is difficult to perceive how [] defendants [in a civil RICO action] would have communicated without the use of the mail or interstate wires." *Becher*, 829 F.2d at 291. Humana alleged that Defendants used the mail and/or wires *every time* they submitted an electronic claim for the Biogen Drugs. (A19–A20 ¶¶27–29.) Humana also alleged that Defendants communicated with each other about their fraudulent scheme using the mail and interstate wires. (A36 ¶80; e.g., A30–A31 ¶65, A33 ¶74.)

The district court nevertheless concluded that Humana failed to satisfy Rule 9(b) because it did not allege *specific communications* by Defendants with one another through the mail or wires. (Add.27–Add.28.) But Humana's primary allegation was that Defendants caused claims for payment to be submitted *directly to Humana*—and Humana plainly alleged that these claims were submitted by mail or interstate wire. (A36 ¶80.) And though Humana also alleged that Defendants used the mail and interstate wires to coordinate their scheme, Humana lacked access to those communications and should have been given an opportunity to conduct limited discovery and file an amended complaint. *See infra* at Argument III.A.

The district court further concluded that Humana's allegations were deficient because Humana used the disjunctive "or" in alleging that the claims were submitted to Humana "over the wires or by mail" and did not specify for each claim whether the claim was sent by mail or by wire. (Add.28.) But the court cited no authority— and Humana is aware of none—for such a requirement.

The district court also faulted Humana for not alleging the "technical requirement of the wire-fraud statute, that the communication be transmitted 'in interstate or foreign commerce.'" (*Id.*) But this Court has suggested that the interstate nature of communications can be *inferred* from the different state citizenship and residence of parties to a transaction, *Becher*, 829 F.2d at 291, and Humana is headquartered in Kentucky, Biogen in Massachusetts, ACS in Ohio, TAF in Florida,

and CDF in Texas. (A14–A17 ¶9, ¶¶12–15; *see also* A36 ¶80 (alleging "nationwide" activity).)[14] The alleged mail and wire communications were thus all presumptively interstate.

*　　*　　*

In short, Humana adequately alleged that Defendants "knowingly made a false statement" each time they "certified that [they were] in compliance with federal and state laws" because they "knew at the time" each statement was made "that [their] co-pay assistance violated federal statutes[.]" *See Humana Inc. v. Mallinckrodt ARD LLC*, No. CV19-06926, 2020 WL 3041309, at *10 (C.D. Cal. Mar. 9, 2020) (holding that Humana adequately pleaded wire fraud as a RICO predicate act under Rule 9(b) where it "alleged that each time Defendant certified that it was in compliance with federal and state laws, it knowingly made a false statement because it knew at the time it made the statements that its co-pay assistance violated federal statutes").

---

[14] Because the only reasonable inference is that these communications were transmitted interstate, the district court should have granted leave to replead even if this technical deficiency warranted dismissal. *See*, *e.g.*, *In re Lupron Mktg & Sales Pracs. Litig.*, 295 F. Supp. 2d 148, 171 (D. Mass. 2003) (permitting leave to replead because despite technical pleading deficiencies, it was doubtful that defendants relied on "bicycle messengers or verbal communications" to complete their transactions) (punctuation omitted).

## B. Because Key Information About the Fraudulent Scheme Was in the Defendants' Exclusive Possession, the District Court Erred by Not Affording Humana an Opportunity to Obtain Discovery

Even if Humana's Complaint technically failed to satisfy Rule 9(b), the district court should have denied Defendants' motion to dismiss because the information the court believed was missing from the Complaint was exclusively in Defendants' possession. This Court has precedent directly on point: "in a RICO mail and wire fraud case," a complaint should not be dismissed on Rule 9(b) grounds for failure to allege the "details of just when and where the mail or wires were used" if "the specific allegations of the plaintiff make it likely that the defendant used interstate mail or telecommunications facilities, and the specific information as to use is likely in the exclusive control of the defendant," such that discovery would empower the plaintiff to cure its complaint through amendment. *Becher*, 829 F.2d at 290.

Here, as in *Becher*, Humana's complaint "clearly set[s] out a general scheme, which very plausibly was meant to defraud the plaintiff" and clearly "involved interstate commerce." *Id.* at 291. (*See* A14–A17 ¶¶9–15.) Further, as in *Becher*, there are multiple Defendants (and co-conspirators), and Humana "was not directly involved" in the alleged communications among Defendants, so "the burden on the plaintiff to know exactly when the defendants called each other or corresponded with each other, and the contents thereof, is not realistic." *Id.* Nor did Humana have

information as to precisely *which* claims were part of Defendants' fraudulent scheme—*i.e.,* it did not know which members had their copays reimbursed by CDF or TAF. Nevertheless, Humana's complaint "provided an outline of the general scheme to defraud and established an inference that the mail or wires was used to transact this scheme." *Id.* Humana further alleged that the requisite details "were peculiarly within the defendants' control." *Id.* (A37–A38 ¶85.) Accordingly, "requiring [Humana] to plead the time, place and contents of communications between the defendants"—without allowing discovery and potentially amending its complaint—was "unreasonable." *Id.*

The district court declined to apply the "more flexible" standard endorsed in *Becher* because it incorrectly believed that Humana's "mail and wire fraud predicates [] rest entirely on the adequacy of Exhibit A." (Add.28.) Humana's Complaint expressly stated otherwise, noting both that there were mail and wire communications *between* Defendants (which the district court disregarded). It also alleged that Exhibit A represented only a fraction of the fraudulent claims that Humana received from Defendants via mail or interstate wires, and was limited to examples of claims tied to insureds who happened to fill their prescriptions at a Humana pharmacy.

Given the plausibility of its claims and the locus of relevant supporting material, Humana should have been given the opportunity to investigate and

supplement its allegations.[15] Accordingly, even if the district court were correct that the initial Complaint did not technically satisfy Rule 9(b), this Court should reverse and remand with instructions to allow discovery. Humana can then file an amended complaint that satisfies Rule 9(b).

## III. THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING LEAVE TO AMEND

Though the district court erred in dismissing the original complaint, it compounded that error by denying Humana leave to file even one amended complaint. Humana should not be that rare plaintiff called out after a single strike.

Rule 15 directs that a district court should "freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). This Court has long been "mindful" that because of "Rule 15(a)'s admonition," it "will not affirm the denial" of leave to amend "unless there appears to be an adequate reason for the

---

[15] The cases cited by the district court as justification for declining to apply *Becher* are materially distinguishable from Humana's complaint. In some cases, the plaintiffs were given leave to replead, which Humana was not. *See Metro. Prop. & Cas. Ins. Co. v. Savin Hill Family Chiropractic, Inc.*, No. 15-12939, 2016 WL 11004383 (D. Mass. June 15, 2016). In others, the court dismissed because the plaintiffs had access to the relevant information without discovery, which Humana did not. *See Cordero-Hernandez*, 449 F.3d at 244. (A37–A38 ¶85.) In still other cases, the plaintiffs failed to allege that they lacked access to relevant information, which Humana *did* allege. *See N. Bridge Assocs., Inc. v. Boldt*, 274 F.3d 38, 43 (1st Cir. 2001); *Ahmed v. Rosenblatt*, 118 F.3d 886, 889 (1st Cir. 1997); *Feinstein v. Resol. Tr. Corp.*, 942 F.2d 34, 42 (1st Cir. 1991). (A37–A38 ¶85.) And in at least one case, the court previously had given the plaintiff leave to amend, which the district court here did not. *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996). (*See* Add.25–Add.29.)

denial." *Grant v. News Grp. Boston, Inc.*, 55 F.3d 1, 5 (1st Cir. 1995). The Supreme Court instructs that "adequate reason" for denial includes "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

The district court's cursory order denying leave to amend asserted (1) that Humana did not lack "critical information" when it filed its initial complaint, (2) that amendment would be futile, and (3) that amendment after dismissal would be unfair, inefficient, and prejudicial. The district court made no attempt to substantiate these assertions, and none is correct. Accordingly, if this Court declines to reverse the district court's dismissal, it should reverse the order denying leave to amend and remand with directions to grant Humana leave to file its First Amended Complaint.

## A. Humana Obtained Critical Information Months After Filing Its Initial Complaint, Which Humana Included in the Proposed Amended Complaint

The district court originally denied Humana leave to amend in a footnote to its first order, concluding in a half-sentence disposition that this was not a case where "the critical information is not in the plaintiff's possession." (Add.28 n.17 (citing *Becher*, 829 F.2d at 290–92).) The court also suggested that the missing allegations "concern matters that are, or ought to be, within the knowledge of Humana," thus

providing "no apparent reason why this Court should overlook the omissions or permit Humana to fill the gaps after a period of discovery." (Add.33.) This determination was factually incorrect.

Months after filing this action, Humana obtained critical discovery in the *Teva* action about the mechanics and nature of Defendants' fraudulent scheme. Humana obtained detailed information developed by DOJ, as well as financial information from CDF and TAF, which Humana matched against its own records to produce Exhibit G to the Proposed Amended Complaint, a list of 49,029 fraudulent claims electronically submitted to Humana through interstate wires. (A325 ¶59.)

Yet when Humana submitted its Proposed Amended Complaint, which alleged specific details for tens of thousands of claims involving false certifications, the district court again denied leave to amend without even evaluating or commenting on the new information. (Add.39.) The district court thus put Humana in a no-win situation: its original dismissal order suggested that amendment would be futile because "critical information" might be in Humana's possession (Add.28 n.17)—but then when Humana subsequently demonstrated through its motion for leave to amend that it had acquired new information not previously available, the court simply ignored it. The district court's denial of leave to amend under these circumstances violated Rule 15 and basic fairness principles.

## B. Amendment Would Not Have Been Futile

In its order denying leave to amend, the district court stated that "[t]here is no suggestion here that 'amendment would be anything other than futile.'" (Add.39 (quoting *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 247 (1st Cir. 2015)).) The court did not explain *why* amendment would be futile, leaving Humana to guess at the court's reasoning. In their responses to Humana's motion for leave to amend, Defendants argued that the Proposed Amended Complaint did not adequately allege that Humana was a direct purchaser and that Humana's Proposed Amended Complaint still failed to satisfy Rule 9(b). (ECF 63, at 10–16; ECF 64, at 1.) Neither of those arguments is correct.

### 1. The Proposed Amended Complaint includes detailed allegations confirming Humana's RICO standing as a direct purchaser.

Even assuming the direct purchaser rule applied to RICO claims, amendment would not have been futile because Humana marshalled new evidence that enabled it to adequately plead that it was a direct purchaser.

Humana's original complaint adequately alleged that it directly purchased the Biogen Drugs from ACS and that Biogen and ACS were co-conspirators in the RICO scheme. *See supra* Argument I.B. Nevertheless, the Proposed Amended Complaint includes additional facts about Humana's purchases from ACS (A323–A325 ¶¶57–58) and facts establishing a direct purchaser relationship between Humana and Biogen. (A320–A323 ¶¶51–56.) Specifically, the Proposed Amended Complaint

alleges that while Biogen set the list price of its MS Drugs, it negotiated that price directly with Humana and with Humana Pharmacy. (A320 ¶51.) Thus, between January 1, 2006, and December 31, 2017, Humana and Biogen had one or more operative contracts governing Humana's purchases of Avonex and, after its approval in 2013, Humana's purchases of Tecfidera. (*Id.*; *see* A320–A322 ¶¶52–55.) Those contracts determined the price that Humana paid various pharmacies for Avonex and Tecfidera and governed the flow of millions of dollars between Biogen and Humana. (A320 ¶51.)

Humana also negotiated a *purchase price* discount *from Biogen* on purchases by Humana Pharmacy of the Biogen Drugs. (A322–A323 ¶56.) Furthermore, Humana contracted directly with ACS about the prices and terms under which it would pay ACS for dispensing the Biogen Drugs.[16] (A324–A325 ¶58.) Humana attached those contracts as Exhibits A–F of its proposed FAC. (A320–A325 ¶¶52–58.) These new allegations, which clarify the nature of the contractual relationships between Humana and ACS and between Humana and Biogen, confirm that Humana has direct purchaser standing to assert RICO claims against *both* Defendants.

---

[16] As the dissent in *Apple* summarized, that case's holding turned on "contractual privity" and allowed suits under *Illinois Brick* where a plaintiff "contract[ed] directly with the defendant." 139 S. Ct. at 1526 (Gorsuch, J., dissenting). The Proposed Amended Complaint here alleges exactly such contractual relationships with both ACS and Biogen pertaining to the purchases of the Biogen Drugs at issue here. (A320–A325 ¶¶52–58.)

Leave to amend was especially warranted here because the district court's decision appears to be the first in this Circuit to apply the antitrust direct purchaser rule to civil RICO claims. The court itself acknowledged that this was a novel and vexing question, particularly in view of this Court's decision in *Neurontin*. (Add.16– Add.18.) A "change in the legal framework governing the case" is precisely the type of development that justifies leave to amend or to further develop the record. *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1526 (2020) (cleaned up); *see also Natale v. Espy Corp.*, No. 13-30008, 2015 WL 3632227, at *2 n.2 (D. Mass. June 2, 2015) ("Plaintiff is entitled, at this early stage of the case, before discovery has begun in earnest, to seek leave to amend her complaint to conform to a change in the law that she could not reasonably have anticipated."). It was manifestly unjust to impose a novel pleading requirement and then deny Humana an opportunity to amend in order to meet that new requirement.

### 2. The Proposed Amended Complaint includes newly discovered facts regarding ACS's and Biogen's fraudulent scheme.

To the extent the original complaint failed to allege sufficient facts regarding the fraudulent scheme, the Proposed Amended Complaint remedies that defect. The Proposed Amended Complaint adds details about ACS and Biogen's misconduct unveiled by the testimony of ACS's founder and its employees (A335–A338 ¶¶88– 89, 92–96)—evidence produced in the DOJ's investigation into ACS (which resulted in a multimillion-dollar settlement) and through discovery in the *Teva* matter.

Humana obtained copies of testimony from ACS (and TAF) founder Edward Hensley, in which he admitted that he had engaged in the same pattern of misconduct with Biogen as he had with Teva.[17] (A338 ¶96.) The Hensley testimony was corroborated by testimony from ACS employee David Blanc. (*Id.*) The Biogen-specific testimony was developed by the DOJ and produced to Humana by Teva. (ECF 56 at 20.)

For example, the Proposed Amended Complaint alleges that Hensley and Blanc specifically designed a program to provide support copays for Tysabri and Tecfidera (A336 ¶92); to provide financial incentives ("success-based billing") for every patient moved from Biogen's free drug program to PAP support (A336–A337 ¶93); and to calibrate donations with batch files of patient enrollments, which were then used to calculate specific donations from Biogen to the PAPs (A337–A338 ¶¶94–96). Such detailed facts regarding the mechanics of the RICO enterprise's illegal subsidization scheme were (until discovery in *Teva*) in the exclusive possession of ACS, Biogen, and the co-conspirator PAPs.

---

[17] DOJ is currently prosecuting Teva for conspiring with ACS to violate the Anti-Kickback Statute and the False Claims Act. The case will head to trial after this Court decides what evidentiary standard applies to the government's claims. *See United States v. Teva Pharms. USA, Inc., et al.*, No. 23-1958 (1st Cir.).

*3. The Proposed Amended Complaint alleges with particularity tens of thousands of communications Defendants made by mail and interstate wires in furtherance of their fraudulent scheme.*

The district court dismissed, in part, based on its conclusion that Humana had failed to sufficiently allege the who, what, where, and when of Defendants' misrepresentations made by mail or interstate wires. The Proposed Amended Complaint cures that purported defect. The false certifications Biogen made to Humana both in its contracts and in *every* claim it submitted were a core component of Defendants' fraudulent scheme, *see supra* at Background III, and the Proposed Amended Complaint provides additional details regarding these false certifications. (A343–A344 ¶¶107–111.) Exhibit G to the Proposed Amended Complaint specifies details for *tens of thousands* of instances of wire fraud that form the basis of Humana's RICO claims, including the date, location, patient, pharmacy, physician, the amount paid by Humana and its members, and the amount of the illegal subsidy paid by Defendants. (A325 ¶59)

The Proposed Amended Complaint also adds details about other communications through interstate wires that Defendants used to effectuate their scheme. (E.g., A342 ¶106.) For example, Exhibit H to the Proposed Amended Complaint (also previously unavailable until obtained in *Teva*) lists the date, amount, and recipient of each interstate wire transfer of copay funds that Biogen sent (from Massachusetts) to CDF (in Texas) and TAF (in Florida) between 2006 and 2018.

(*Id.*) None of the foregoing information was, could have been, or "ought" to have been within Humana's knowledge before it was discovered in *Teva*.

The Proposed Amended Complaint further alleges that Defendants fraudulently induced Humana to enter contracts in which they agreed to comply with federal and state antikickback laws even though they had no intention of actually doing so. (A351 ¶130.) The Proposed Amended Complaint specifically identifies the contracts by parties, date, and purpose, identifies key amendments, and specifically quotes the compliance provisions. (A320–A325 ¶¶51–56, ¶58.)

This is a fraud suit, and Humana cannot know every fact—but surely the foregoing details are collectively sufficient to place Defendants on notice of the alleged fraud, which is all that Rule 9(b) is intended to accomplish. Rule 15(a) cooperates in that purpose by permitting plaintiffs to cure pleading errors so that cases may be resolved on the merits. *Benitez-Allende v. Alcan Aluminio do Brasil, S.A.*, 857 F.2d 26, 36 (1st Cir. 1988) ("The policy of Rule 15(a) in liberally permitting amendments to facilitate determination of claims on the merits circumscribes the exercise of the trial court's discretion.") (cleaned up) (citations omitted). Humana met that purpose here, providing the information the district court asked for, which the court then ignored in a clear abuse of discretion.

### C. Humana Did Not Unduly Delay Seeking Leave to Amend, and Granting Leave to Amend Would Not Have Prejudiced Defendants

The district court noted that "the 'practice of seeking leave to amend after the case has been dismissed' is 'discouraged,'" and denied Humana leave to amend because "[s]uch a practice is inefficient, unfair to defendants, and burdensome to the court." (Add.39 (citing *Abiomed*, 778 F.3d at 247).) But the district court did *not* find that Humana unduly delayed or failed to exercise diligence in seeking leave to amend, and its suggestion of prejudice has no support in the record.

Humana acknowledges that plaintiffs are generally encouraged to amend before a dismissal order is entered. *See Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 38 n.6 (1st Cir. 2022). But this is "not a case in which the plaintiff's complaint contained such an obvious defect that it was unreasonable to wait until the district court ruled on the motion to dismiss before moving to amend." *Id.* at 39. With respect to standing, no court in this Circuit had ever before dismissed a RICO claim based on the direct purchaser rule, so Humana had no reason to believe amendment was necessary to address that standard.

With respect to Rule 9(b), Humana did *not* wait until after dismissal to seek leave to amend. At oral argument on the motion to dismiss, Humana's counsel specifically requested leave to replead to add additional specificity if the district court considered the allegations inadequate. (A287–A288.) Humana also acted diligently in assembling and identifying tens of thousands of claims that were

accompanied by false certifications based on the newly discovered information. Humana lodged its Proposed Amended Complaint within 28 days of the district court's dismissal order. Amending immediately after the hearing on the motion to dismiss would have short-circuited the district court's deliberations (which Humana did not expect to take 11 months) and necessitated a new round of briefing that Humana had reason to believe was unnecessary. Indeed, it would have been *inefficient* to amend before seeing the dismissal order because any such amendment would not have accounted for the district court's novel requirement to plead direct purchaser status in the RICO claim.

Finally, neither Defendant contended that leave to amend would cause inefficiency or unfairness. Nor could they. Defendants are sophisticated corporate entities capable of addressing a complaint more than once, as they have against the government and in similar disputes in other forums.

In a case such as this one—involving complex legal principles, substantial amounts of alleged wrongdoing over a long period, and the district court's first-in-this-Circuit application of antitrust principles to RICO cases—Humana should not be the rare plaintiff confined to a single bite at the apple. *Amyndas*, 48 F.4th at 38–39 (court should consider "whether a proposed amendment is a first attempt" and remember that "the 'when justice so requires' standard of Rule 15(a) puts a thumb on the scale in favor of allowing amendments in non-frivolous cases") (citation

omitted). If the dismissal is upheld, Humana should be granted leave to file an amended complaint.

## CONCLUSION

For these reasons, the Court should reverse the district court's dismissal order. In the alternative, the Court should reverse the district court's order denying leave to amend with instructions to allow Humana to file the First Amended Complaint.

Dated: March 8, 2024   Respectfully submitted,

*/s/ Robert E. Dunn*

Sarah H. Catalano
EIMER STAHL LLP
10 East Doty St., Ste. 621
Madison, WI 53703
608-620-8574
scatalano@eimerstahl.com

Justin P. O'Brien
LOVETT O'BRIEN LLP
125 High Street, Suite 2611
Boston, MA 02110
617-603-0748
jobrien@lovettobrien.com

Robert E. Dunn
EIMER STAHL LLP
1999 S. Bascom Ave., Ste. 1025
Campbell, CA 95008
(408) 889-1690
rdunn@eimerstahl.com

Scott C. Solberg
James W. Joseph
Benjamin E. Waldin
Gregory M. Schweizer
EIMER STAHL LLP
224 S. Michigan Ave., Ste. 1100
Chicago, IL 60604
(312) 660-7600
ssolberg@eimerstahl.com
jjoseph@eimerstahl.com
bwaldin@eimerstahl.com
gschweizer@eimerstahl.com

*Attorneys for Plaintiff-Appellant Humana Inc.*

# CERTIFICATE OF COMPLIANCE

I, Robert E. Dunn, hereby certify that this brief is compliant with Rule 32(a)(5)–(6) of the Federal Rules of Appellate Procedure and the Court's Order issued on February 28, 2024, granting Humana leave to file an oversized opening brief. This brief is compliant with Rule 32(a)(5)–(6) because it was prepared in a proportionally spaced typeface using 14-point Times New Roman. This brief is compliant with the Court's order granting Humana leave to file on opening brief containing up to 14,500 words because it contains 14,486 words, not counting items excluded under Rule 32(f) of the Federal Rules of Appellate Procedure.

Dated: March 8, 2024                    */s/ Robert E. Dunn*

## CERTIFICATE OF SERVICE

I, Robert E. Dunn, certify that on March 8, 2024, this motion was electronically filed and therefore served upon all counsel of record via CM/ECF e-filing notifications, pursuant to Federal Rules of Appellate Procedure Rule 25(c)(2) and First Circuit Local Rule 25.0(c)(1).

*/s/ Robert E. Dunn*

# APPELANT HUMANA INC.'S ADDENDUM
## TABLE OF CONTENTS

**District Court Item**                                             **Page No.**

Mar. 31, 2023 Memorandum and Order on Defendants' Motion to Dismiss (ECF 53) ................................................................................................Add.1

Mar. 31, 2023 Order of Dismissal (ECF 54) ....................................................Add.35

Dec. 4, 2023 Memorandum and Order on Humana Inc.'s Motion for Reconsideration and Leave to Amend (ECF 70)............................................Add.36

Aug. 7, 2017 Order Denying Appeal in *Marrero-Rolon v. Autoridad de Energia Electrica de P.R.*, No. 16-8049 (1st Cir.) .........................................................Add.41

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
HUMANA, INC.,                                       )
                                                    )
                    Plaintiff,                      )
                                                    )          Civil Action No.
           v.                                       )          21-11578-FDS
                                                    )
BIOGEN, INC. (f/k/a BIOGEN IDEC,                    )
INC.) and ADVANCED CARE                             )
SCRIPTS, INC.,                                      )
                                                    )
                    Defendants.                     )
_____)

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTIONS TO DISMISS

SAYLOR, C.J.

       This is an action arising out of an alleged scheme to increase the number of prescriptions

of drugs used to treat multiple sclerosis ("MS") through improper charitable contributions.

Plaintiff Humana, Inc. is a health-insurance company.  Defendant Biogen, Inc. is a biotechnology

company and manufacturer of three different drugs used to treat MS.  Defendant Advanced Care

Scripts, Inc. ("ACS") is a specialty pharmacy company.  According to the complaint, Biogen

made unlawful donations to different charities to fund patient copays of its MS drugs, thereby

increasing the sales of those drugs.

       The complaint alleges ten counts:  a claim for violation of the civil provisions of the

Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1961 *et seq*.

(Count 1); a claim for RICO conspiracy (Count 2); claims under the unfair-competition laws of

22 states (Count 3); claims under the consumer-fraud and deceptive-trade-practice laws of 20

states (Count 4); claims for insurance fraud under the laws of five states (Count 5); breach of

contract (Count 6); tortious interference with contractual relations (Count 7); fraud (Count 8); conspiracy to commit fraud (Count 9); and unjust enrichment (Count 10).  Because the counts lump together state-law claims that should have been broken out separately, the complaint in fact asserts 54 claims, only two of which arise under federal law, and the remainder under the laws of 30 different states.  Defendants have moved to dismiss the complaint as to all counts.

The complaint is simultaneously over-pleaded and under-pleaded.  It is over-pleaded, among other reasons, because it purports to assert 52 state-law claims arising under the laws of 30 different jurisdictions.  And it is under-pleaded because it takes a somewhat indifferent approach to the technical requirements of pleading a civil RICO claim and the underlying predicates of mail and wire fraud.  The complaint also presents other challenges, including a serious question as to whether it was timely filed.

The principal issue, however, is whether Humana has standing to assert a civil RICO claim.  Although Humana was the ultimate payor of the prescription drugs at issue—putting to one side the requirement of a patient copay—it did not purchase the drugs directly from Biogen. Instead, it paid pharmacies for the drugs, who had purchased the drugs from wholesalers or distributors (or possibly from Biogen itself).  Humana was thus an "indirect" purchaser.

Under the "indirect purchaser rule," first developed by the Supreme Court in the antitrust context, only a direct purchaser of goods has standing to assert a claim for violation of the antitrust laws.  Every circuit to have considered the issue has held that the rule also applies to civil RICO actions, and that indirect purchasers therefore do not have standing to assert RICO claims.  The First Circuit has not yet addressed the question.  While there may be practical and policy reasons to question the application of that rule in the health-insurance context, for the reasons that follow, this Court will follow the majority rule.  It will therefore dismiss the civil

Add.2

RICO claims for failure to state a claim on that basis.  In addition, it will dismiss those claims on the alternate ground that the complaint fails to comply with the technical requirements of the RICO statute and Fed. R. Civ. P. 9(b), and decline to exercise supplemental jurisdiction over the state-law claims.

## I.   <u>Background</u>

### A.   <u>Factual Background</u>

The facts are set forth as alleged in the complaint unless otherwise noted.

#### 1.   <u>The Parties</u>

Humana, Inc. is a Delaware corporation with a principal place of business in Louisville, Kentucky.  (Compl. ¶ 9).  It provides health insurance and prescription drug coverage to more than eight million people in the United States.  (*Id.*).

Biogen, Inc. is a Delaware corporation with a principal place of business in Cambridge, Massachusetts.  (*Id.* ¶ 12).  Among other things, Biogen manufactures Avonex, Tysabri, and Tecfidra, three drugs used to treat MS.  (*Id.* ¶¶ 39-45).  An annual course of treatment for each of these drugs can cost between $50,000 and $80,000 per patient.  (*Id.* ¶ 39).

Advanced Care Scripts, Inc. ("ACS") is a Florida corporation with a principal place of business in Cincinnati, Ohio.  (*Id.* ¶ 13).  It operates as a specialty pharmacy and provides patient-management services to pharmaceutical companies.  (*Id.*).

#### 2.   <u>Other Relevant Entities</u>

The Assistance Fund, Inc. ("TAF") is a Delaware not-for-profit corporation with a principal place of business in Orlando, Florida.  (*Id.* ¶ 14).  It provides copay assistance to patients for pharmaceuticals.  (*Id.*).

Add.3

Chronic Disease Fund, Inc. ("CDF") is a New Jersey not-for-profit corporation with a principal place of business in Frisco, Texas.  (*Id.* ¶ 15).  It also provides copay assistance for pharmaceuticals.  (*Id.*).

### 3. Medicare Parts C and D

Medicare is a government health-insurance program that primarily covers people aged 65 and over and others with certain disabilities or illnesses.  (*Id.* ¶ 20).  Medicare consists of four parts:  A (hospital insurance), B (medical insurance), C (a combination of part A and B coverage that is provided by private insurance companies—referred to as "Medicare Advantage"), and D (prescription drug coverage).  (*Id.* ¶ 21).  Humana is a provider of Medicare Advantage (Part C) and Medicare Part D insurance plans.  (*Id.* ¶¶ 24-25).

Under Medicare Part C, Humana is paid at a capitated rate for each insured.  (*Id.* ¶ 30).  Part C plan sponsors do not submit claims directly to the government, although they are subject to various reporting requirements.  (*Id.*).

Premiums for Part D plans are split between insureds and Medicare funds generated by taxpayers.  (*Id.* ¶ 25).  In addition to the cost of premiums, Part D insureds may need to pay for some portion of the cost of their prescription drugs in the form of a copay or deductible.  (*Id.* ¶ 26).  Thus, when a pharmacy dispenses pharmaceuticals to an insured, the individual may need to provide a copay.  (*Id.*).  The pharmacy then submits a reimbursement claim to the insurer (here, Humana) for the remaining portion of the drug cost.  (*Id.* ¶ 27).

### 4. The Scheme

According to the complaint, Biogen and ACS engaged in a two-part scheme with TAF and CDF that caused both the number of prescriptions and the price of the MS drugs to increase and, in turn, caused Humana to overpay for those drugs.  (*Id.* ¶¶ 1-3).

In the first part of the alleged scheme, Biogen would "seed" the market.  (*Id.* ¶ 2).  In

4

Add.4

order to increase the use of the MS drugs throughout the market, Biogen would provide free drugs to patients who lacked insurance coverage or whose coverage did not extend to its MS drugs.  (*Id.* ¶¶ 46, 51).  According to the complaint, this is because once a patient starts a particular therapy, he or she is more likely to continue that therapy.  (*Id.* ¶ 46).  The complaint alleges that Biogen did this because it anticipated that a large portion of patients in its free-drug program would eventually enroll in a government or private drug-coverage program, and this would enable it to make a profit on the insurance reimbursements for its MS drugs.  (*Id.* ¶ 54).

In the second part of the alleged scheme, Biogen worked with TAF and CDF to move patients from its free-drug program into Medicare.  (*Id.* ¶¶ 47, 56-70).  To do this, Biogen's Patient Services Department ("PSD"), or a third party, identified which patients in the free-drug program were eligible for Medicare.  (*Id.* ¶ 59).  The PSD would then contact eligible patients to obtain their consent to being enrolled in the government-funded program.  (*Id.*).

To keep the MS drugs affordable for patients (and, therefore, increase the likelihood that they continue treatment with the MS drugs), Biogen allegedly coordinated with CDF and TAF to enroll patients using the MS drugs into their patient-assistance programs ("PAPs").  (*Id.* ¶¶ 47, 60).  PAPs cover drug copayments for patients.  (*Id.*).  According to the complaint, Biogen would make grant donations to CDF and TAF in exchange for their commitment to enroll patients using the MS drugs into their PAPs.  (*Id.* ¶ 60).  After receiving Biogen's grant donations, the PAP would approve the applications of MS drug patients and cover the costs of their copays.  (*Id.* ¶ 64).  Medicare insurers such as Humana would then reimburse Biogen for the remaining portion of the drug cost that was not paid.  (*Id.*).  The complaint alleges that Biogen tracked every prescription and knew precisely which Medicare prescriptions were covered by a PAP.  (*Id.* ¶ 61).

The complaint alleges that Biogen also coordinated its donations to the PAPs through ACS.  (*Id.* ¶¶ 64-68).  It alleges that ACS would transfer patients using the MS drugs from Biogen's free-drug program to a PAP.  (*Id.*).  Using specific information provided by Biogen about its Medicare-eligible patients currently using MS drugs, ACS would send a "batch file" of that patient information to the PAPs.  (*Id.*).  The complaint alleges that ACS participated in the scheme because it derived revenue from transitioning patients to the PAPs and filling prescriptions of the MS drugs through its specialty pharmacy.  (*Id.* ¶ 70).

The complaint alleges that Humana incurred significant losses because of Biogen's scheme to inflate the price and use of its MS drugs.  (*Id.* ¶ 81).  It alleges that Biogen and ACS provided false certifications asserting that they were complying with federal and state law, including the Anti-Kickback Statute and False Claims Act.  (*Id.* ¶¶ 35, 83, 132).  It alleges that from 2011 to 2019, Humana paid more than $1.9 billion for prescriptions of the MS drugs, with ACS accounting for nearly $350 million of that spending.  (*Id.* ¶ 84).

### B.    <u>Procedural Background</u>

On September 24, 2021, Humana filed this action against Biogen and ACS.  As noted, the complaint asserts ten counts, two of which arise under the civil RICO statute, 18 U.S.C. § 1964(c), and the remainder under various state laws.

Defendants have moved to dismiss the complaint as to all counts, contending that all of the claims are time-barred and the complaint fails to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6).

## II.    <u>Standard of Review</u>

To survive a motion to dismiss, the complaint must state a claim that is plausible on its face.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the

assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). When determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences. *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Médico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

**III.    Analysis**

**A.    Statute of Limitations**

Defendants first contend that all claims, both federal and state, are barred by the applicable statutes of limitations.

RICO has a four-year statute of limitations. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 152 (1987). The state-law claims are subject to a variety of different statutes of limitations; it appears that the longest potentially applicable period is six years. *See, e.g.*, Mass. Gen. Laws ch. 260, § 2.

The complaint in this action was filed on September 24, 2021. It does not allege that defendants took any actions within the preceding four years (that is, after September 24, 2017). Instead, it alleges that defendants undertook a variety of different acts in furtherance of the scheme to defraud, the latest of which occurred at "the end of 2014 and beginning of 2015." (Compl. ¶ 77). Exhibit A to the complaint, which is captioned "Examples of 100 Biogen

Subsidized Copayments," lists various payments made between January 7, 2011, and March 23, 2016.  Accordingly, all of the federal claims, and most (if not all) of the state claims, are time-barred unless (1) the claims accrued at a later date or (2) equitable tolling of the limitations period applies.[1]

Humana contends that under the discovery rule, its claims did not accrue, and the limitations period did not begin to run, until December 17, 2020, when the Department of Justice settlement was unsealed.  (Compl. ¶ 87).  It further contends that the running of the limitations period should be equitably tolled under the fraudulent concealment doctrine.

### 1.    The Discovery Rule

Under federal law, the limitations period begins to run from the time "when a plaintiff knew or should have known of his injury."  *Rotella v. Wood*, 528 U.S. 549, 553 (2000); *Álvarez-Maurás v. Banco Popular of Puerto Rico*, 919 F.3d 617, 625 (1st Cir. 2019).  Once there are "sufficient facts . . . available to provoke a reasonable person in the plaintiff's circumstances to inquire or investigate further," the plaintiff is on "inquiry notice" of his or her claims.  *McIntyre v. United States*, 367 F.3d 38, 51-52 (1st Cir. 2004); *see also Álvarez-Maurás*, 919 F.3d at 626 (stating that a plaintiff "should know" of an injury when there are "storm warnings" that would put a reasonable plaintiff on "inquiry notice"); *Sanchez v. United States*, 740 F.3d 47, 52 (1st Cir. 2014) ("To delay commencement of the running of the statute of limitations, the factual basis for the cause of action must have been inherently unknowable [that is, not capable of detection through the exercise of reasonable diligence] at the time of injury." (alteration in original) (cleaned up)).  A plaintiff on inquiry notice is "charged with the knowledge of what he or she

---

[1] Humana does not contend that the wrongful activity continued beyond September 2017, under a "continuing tort" theory or otherwise.  *See Dagi v. Delta Airlines, Inc.*, 961 F.3d 22, 30 n.9 (1st Cir. 2020).

would have uncovered through a reasonably diligent investigation." *McIntyre*, 367 F.3d at 52.

Inquiry notice focuses on the injury itself, not the other elements of a potential claim. *See Rotella*, 528 U.S. at 555 ("[D]iscovery of the injury, not discovery of the other elements of a claim, is what starts the clock."); *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 802 (1st Cir. 1987) ("Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself."). Thus, in a RICO case, the limitations period will begin to run even if the plaintiff has not discovered "the underlying RICO pattern." *Rotella*, 528 U.S. at 557.

The standard is objective—that is, whether the information available to a reasonable person in plaintiff's position would have "provoke[d]" that person "to inquire or investigate further." *McIntyre*, 367 F.3d at 52. Accordingly, in appropriate circumstances, the issue of accrual may be decided on a motion to dismiss or for summary judgment.

Humana argues that the claim did not accrue when it was on inquiry notice, but only after it had developed sufficient information to file a complaint. (Pl. Opp. at 12 (arguing that a claim accrues "not when a plaintiff has enough information to begin an investigation, but rather enough facts on which to plead a viable complaint.")). But that argument conflates the inquiry standard (whether a plaintiff is on sufficient notice that he or she should begin an investigation) with the Rule 11 pleading standard (whether the plaintiff has a good-faith basis to file a complaint). And that is not the law of this circuit.[2]

Defendants have submitted hundreds of pages of material—including media reports, government filings, and SEC filings by Biogen—suggesting that Humana was, or reasonably should have been, on inquiry notice of a potential claim by 2016 at the latest. Those materials

---

[2] To the extent that the opinion in *Massachusetts Mutual Life Insurance Co. v. DB Structured Products, Inc.*, 2015 WL 3964560, at *8 (D. Mass. June 19, 2015) suggests otherwise, this Court respectfully disagrees with that conclusion.

are outside the pleadings, which normally means that the court may not consider them in resolving a motion to dismiss.  *See* Fed. R. Civ. P. 12(d).

It is true that the court may, in its discretion, consider documents outside the pleadings where there is no dispute as to their authenticity.  *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001).  It is also true that Humana does not dispute the authenticity of those items (although it disputes what inferences may be reasonably drawn from them).  Nonetheless, the Court will not resolve the issue on the pleadings.

As is set forth below, the complaint fails to plead fraudulent concealment with the requisite specificity.  Even so, as Humana notes, this case does not involve obviously "self-revealing" injuries, such as an investment loss or a personal injury.  (Pl. Opp. at 2).  When Humana was placed on inquiry notice may therefore involve a substantial factual question, centering on what the corporation knew or reasonably should have known about a potential injury.  Because it is a large (and presumably sophisticated) corporation, that knowledge might have been gleaned from multiple sources, in multiple ways.  And that might be true even if no one corporate employee had the requisite knowledge; under the "collective knowledge" doctrine, the "knowledge" attributable to a corporation is normally the sum of all of the knowledge possessed by all of its employees, regardless of their position.  *See United States v. Bank of New England, N.A.*, 821 F.2d 844, 856 (1st Cir. 1987).

In any event, whether Humana was on inquiry notice at some point prior to September 24, 2017, is a fact-intensive question that is best resolved, at a minimum, on a more complete evidentiary record.  Accordingly, the Court will not dismiss the complaint for failure to state a claim on statute of limitations grounds.

### 2.    Fraudulent Concealment

Humana further contends that the doctrine of fraudulent concealment applies to toll the

limitations period.  "[T]he statute of limitations may be temporarily tolled during such time that the perpetrator purposefully and successfully conceals [its] misconduct from its victim." *Álvarez-Maurás*, 919 F.3d at 626.  A plaintiff may invoke fraudulent concealment by showing "1) wrongful concealment by defendants of their actions; and 2) failure of the [plaintiff] to discover, within the limitations period, the operative facts which form the basis of the cause of action; 3) despite the [plaintiff]'s diligent efforts to discover the facts."  *Id.*

The requirements of Fed. R. Civ. P. 9(b)—that fraud be pleaded with particularity—apply to claims of fraudulent concealment.  *See Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 189 (1st Cir. 2006) (holding that under Rule 9(b), "it is incumbent upon the plaintiff to plead with particularity the facts giving rise to the fraudulent concealment claim" (internal quotation marks and citation omitted)); *MSP Recovery Claims, Series LLC v. Warner Chilcott PLC*, 2019 WL 1333269, at *6 (D. Mass. Mar. 22, 2019) (rejecting as "conclusory" the assertion that "[a]ll applicable statutes of limitations have also been tolled by Defendants' knowing and active fraudulent concealment" (alteration in original) (citation omitted)).[3]

The issue of fraudulent concealment overlaps to a considerable extent with the issue of accrual under the discovery rule.  Both require, among other things, that the plaintiff exercise reasonable diligence in investigating his or her potential claim.  *See Gonzalez v. United States*, 284 F.3d 281, 292 (1st Cir. 2002) (fraudulent concealment requires that a plaintiff (1) "remains in ignorance of" a defendant's fraud (2) "without any fault or want of diligence or care on [its] part");  *Broderick*, 919 F. Supp. 2d at 182 ("[F]raudulent concealment requires not only that the defendant concealed crucial facts, but also that the plaintiff lacked the means to uncover these

---

[3] Massachusetts state law requires proof of an affirmative act of fraud to establish fraudulent concealment. *See, e.g.*, *Broderick v. PNC Fin. Serv. Grp.*, 919 F. Supp. 2d 178, 182 (D. Mass. 2013) ("In Massachusetts, fraudulent concealment generally requires an affirmative act of fraud.").

facts."); *Salois v. Dime Sav. Bank of New York, FSB*, 128 F.3d 20, 26 (1st Cir. 1997) ("[A]llegations of fraudulent concealment do not modify the requirement that plaintiffs must have exercised reasonable diligence.").

The complaint here does not plead fraudulent concealment with the necessary particularity under Rule 9(b). It simply alleges in general terms that "Biogen concealed its arrangements with CDF and TAF" and "did this while certifying to Humana that it was following federal law." (Compl. ¶ 86). That conclusory statement is not sufficient to satisfy the requirements of Rule 9(b). Accordingly, to the extent that Humana relies on a theory of fraudulent concealment to toll the running of the limitations period, the allegations of the complaint are inadequate.

### B.    Federal Claims

#### 1.    Count 1:  RICO

##### a.    General Principles

Count 1 alleges a substantive civil RICO violation. RICO makes illegal any "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *See Feinstein v. Resolution Tr. Corp.*, 942 F.2d 34, 41 (1st Cir. 1991) (citing 18 U.S.C. § 1962). "Racketeering activity" is defined in 18 U.S.C. § 1961(1) to include a variety of predicate offenses, including, among other things, violations of the mail-fraud statute, 18 U.S.C. § 1341, and the wire-fraud statute, 18 U.S.C. § 1343.[4] The complaint here alleges both wire- and mail-fraud predicates.[5]

---

[4] A "pattern of racketeering activity" means the commission of at least two related acts of racketeering activity during a period of ten years. 18 U.S.C. § 1961(5); *see In re Lupron Mktg. & Sales Pracs. Litig.*, 295 F. Supp. 2d 148, 164 (D. Mass. 2003) (citing *Schultz v. Rhode Island Hosp. Tr. Nat'l Bank, N.A.*, 94 F.3d 721, 731-32 (1st Cir. 1996)).

[5] The complaint here also alleges that the predicate acts include "acts indictable under 18 U.S.C. [§] 1952 (use of interstate facilities to conduct unlawful activity)." (Compl. ¶ 98). Other than that passing reference, it contains no allegations concerning § 1952 or the specific elements of that offense. It is doubtful, to say the least,

The civil-suit provision of the RICO statute grants the right to sue to "[a]ny person injured in his business or property by reason of a violation of" the substantive provisions of the statute. 18 U.S.C. § 1964(c). Civil RICO claims "must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000). "[I]n cases alleging civil RICO violations, particular care is required to balance the liberality of the Civil Rules with the necessity of preventing abusive or vexatious treatment of defendants." *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991). "Civil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device. The very pendency of a RICO suit can be stigmatizing and its consummation can be costly." *Id.* Accordingly, "courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990).

### b.      The Indirect Purchaser Rule

The principal issue presented is whether Humana, as an indirect purchaser, has standing to assert a claim under the civil RICO statute.

Humana is (at least principally) a health insurer. It did not actually purchase any drugs from Biogen. Instead, it appears that in the normal course, (1) a physician would recommend or select a course of treatment for a patient that would include a Biogen prescription drug; (2) the prescription would be communicated from the physician's office to the patient's pharmacy; (3) the pharmacy would fill the prescription from its inventory; (4) the patient would pick up the drug at the pharmacy, either making a copay at that point or receiving a bill for the copay at a

---

whether the complaint plausibly alleges one or more predicate acts under § 1952, but defendants have not moved to dismiss on that basis.

later time; (5) the pharmacy would bill Humana for the remaining cost of the drug; and (6)

Humana would pay the pharmacy.[6]  Although the complaint does not so allege, it appears that

Biogen sold the drug to the pharmacy, either directly or through one or more layers of

wholesalers or distributors.  In any event, the complaint does not allege that Biogen sold the

product directly to Humana.[7]

Humana is, therefore, an indirect purchaser.  That status has substantial implications for

its ability to bring a civil suit under the RICO statute—in particular, whether its claims are barred

by the "indirect purchaser" rule.

### (1)      The Genesis of the Rule

The "indirect purchaser" rule is a doctrine developed by the Supreme Court in the

antitrust context.  A plaintiff asserting a claim under the Clayton Act cannot demonstrate an

actionable injury if it only made indirect purchases.  *Illinois Brick Co. v. Illinois*, 431 U.S. 720,

737 (1977).  The indirect purchaser rule is "a bright-line rule that authorizes suits by *direct*

purchasers but bars suits by *indirect* purchasers."  *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520

(2019) (emphasis in original).  The Supreme Court has explained that the reasons for barring

indirect-purchaser suits are "(1) facilitating more effective enforcement of antitrust laws; (2)

avoiding complicated damages calculations; and (3) eliminating duplicative damages against

antitrust defendants."  *Apple*, 139 S. Ct. at 1521, 1524.

The indirect purchaser rule applies in antitrust cases even in situations where the plaintiff

contends that the full cost of the product—and therefore the full amount of any overcharge—had

---

[6] One of the three drugs, Tysabri, is administered intravenously.  (Compl. ¶ 42).  For the sake of simplicity, the Court will confine its discussion to prescription drugs dispensed through a pharmacy.

[7] The manner in which Humana is compensated by the government may have a bearing on the nature and amount of any injury it may have suffered, but it appears to be irrelevant to the application of the indirect purchaser rule.

been passed on to it. *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 216 (1990). The Supreme Court explained that "[a]lthough the rationales of . . . *Illinois Brick* may not apply with equal force in all instances, we find it inconsistent with precedent and imprudent in any event to create an exception" to the indirect purchaser rule. *Id.* at 208. The court recognized that proof of passed-on costs would overly burden antitrust litigation with complicated evidentiary questions. *Id.* at 216-17.

The civil-suit provision of RICO, 18 U.S.C. § 1964(c), which provides a right of action to "[a]ny person injured in his business or property by reason of" a violation of the statute, was modeled on the federal antitrust laws. Because of that, the Supreme Court held in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 267-68 (1992), that civil RICO plaintiffs are required to prove both but-for causation and proximate causation, as antitrust plaintiffs are required to do. *See id.* at 268 ("We may fairly credit the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used first in § 7 of the Sherman Act, and later in the Clayton Act's § 4. It used the same words, and we can only assume it intended them to have the same meaning that courts had already given them." (citations omitted)); *Hemi Grp., LLC. v. City of New York*, 559 U.S. 1, 9 (2010).

Two subsequent Supreme Court decisions are also noteworthy. First, in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), the court held that a plaintiff asserting a civil RICO claim predicated on mail fraud need not show that it relied on the defendant's alleged misrepresentation. The court reaffirmed that the civil RICO statute, having been modeled on the antitrust laws, required a plaintiff to prove both but-for and proximate causation. *Id.* at 654. It further held, however, that the proximate-cause requirement did not require first-party reliance on the alleged misrepresentation, provided that there was "a sufficiently direct relationship

between the defendant's wrongful conduct and the plaintiff's injury." *Id*. at 657. The court did not, however, address the indirect purchaser rule, or otherwise address the issue of standing.[8]

Second, in *Apple*, the Supreme Court reaffirmed the indirect purchaser rule in the context of an antitrust claim. Among other things, the court stated, as it had in *Utilicorp*, that the "bright-line rule of *Illinois Brick* means that there is no reason to ask whether the rationales of *Illinois Brick* apply with equal force in every individual case," and that the court "should not engage in an unwarranted and counterproductive exercise to litigate a series of exceptions." *Apple*, 139 S. Ct. at 1524 (internal quotation marks omitted).

Since the Court's decision in *Holmes*, two circuits, following its reasoning, have concluded that the indirect purchaser rule applies in all civil RICO actions. *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 616 (6th Cir. 2004); *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996); *see also Carter v. Berger*, 777 F.2d 1173, 1177 (7th Cir. 1985) (adopting a similar conclusion in a case preceding *Holmes*). No circuit opinion has concluded otherwise.[9]

The First Circuit has yet to decide the issue. *See Marrero-Rolon v. Autoridad de Energia Electrica de P.R.*, 2016 WL 9459823, at *2 (D.P.R. Oct. 20, 2016) (certifying an interlocutory appeal regarding application of the indirect purchaser rule in the First Circuit), *appeal denied*, (1st Cir. Aug. 7, 2017).

---

[8] The *Bridge* case did not arise in a typical commercial context, but from an alleged scheme to violate a "Single, Simultaneous Bidder Rule" imposed by a county in connection with the public auction of tax liens on delinquent taxpayers' property. The rule was intended to prevent any one buyer from obtaining a disproportionate share of the liens; the plaintiffs were disappointed bidders who contended that the actions of the defendants, who violated the rule, deprived them of their fair share of such liens. 553 U.S. at 642-44.

[9] At least one circuit, without directly addressing the indirect purchaser rule, has concluded that civil RICO standing is governed by principles of proximate causation, so that if the alleged RICO violation was the proximate cause of the plaintiff's injury, the plaintiff had standing. *See Bivens Gardens Off. v. Barnett Banks of Fla.*, 140 F.3d 898, 906 (11th Cir. 1998). That interpretation conflates the concepts of standing and proximate causation, which are distinct, if overlapping, doctrines. *See Trollinger*, 370 F.3d at 612.

### (2)   The *Neurontin* Case

The issue is whether this Court should follow the lead of other courts and conclude that the RICO claim here is barred by the indirect purchaser rule.  That question is complicated considerably by the First Circuit's decision in *In re Neurontin Marketing & Sales Practices Litigation*, 712 F.3d 21 (1st Cir. 2013).

In *Neurontin*, a pharmaceutical company (Pfizer) engaged in unlawful marketing practices to boost off-label sales of a drug (Neurontin).  A health insurer (Kaiser) brought suit under the civil RICO statute, alleging that it had incurred higher costs as a result of the inflated sales.  *Id.* at 41.  After a jury verdict in favor of Kaiser, Pfizer appealed.

On appeal, Pfizer argued that proximate causation had not been proved "because there are too many steps in the causal chain connecting its misrepresentations to the injury to Kaiser."  *Id.* at 35.

The First Circuit, following *Holmes* and *Bridge*, held that plaintiff had proved both but-for and proximate causation.  The court noted that under *Holmes*, proximate causation requires a "direct relation" between the RICO violation and the injury and that it should consider "three functional factors" to assess the existence of proximate causation.  *Id.* at 35-36.

The court found that Pfizer's marketing activities had a direct relationship with Kaiser's injuries because they influenced the prescribing decisions of physicians, who do not pay for the drugs they prescribe.  *Id.* at 39.  Although Pfizer argued that physicians may have prescribed Neurontin for reasons other than its marketing, the court characterized that as "a damages question," not a proximate causation question.  *Id.*  And Pfizer's violation also satisfied the three functional factors in *Holmes*.  First, Kaiser was able to present sufficient evidence to ascertain Pfizer's share of its damages.  *Id.* at 38.  Second, none of the other parties to whom Pfizer had made misrepresentations—physicians and formulary committee members—had paid money for a

Neurontin prescription.  *Id.* at 37.  Accordingly, there was no risk of multiple recovery.  *Id.*
Third, Kaiser was the party in the best position to enforce the law because it, unlike the other
parties, had directly suffered economic injury from Pfizer.  *Id.* at 38.

### (3)   **Analysis**

At first blush, *Neurontin* appears to be on all fours with this case:  it involved a claim by
a health insurer against a pharmaceutical company arising out of an unlawful scheme to promote
sales of a drug, leading to unnecessary prescriptions and therefore increased payments.  And the
opinion addressed the issues of but-for and proximate causation in some detail, concluding that
the requirements had been satisfied.

To the extent the issue here is one of proximate causation, the complaint appears to be
sufficiently plausible to withstand a motion to dismiss.  It pleads that there was a direct
relationship between the injury claimed by Humana and the actions of defendants.  Defendants
contend that the independent decisions of doctors to prescribe MS drugs are an intervening cause
that severed the link of proximate causation (as well as but-for causation).  It is true that here,
unlike in *Neurontin*, the complaint does not allege that defendants directly lobbied doctors to
prescribe drugs.  *See Neurontin*, 712 F.3d at 40-41.  However, the complaint alleges that Biogen
knew that its scheme would "capture patients because having begun a medication, patients are
likely to stay on it."  (Compl. ¶ 53).  While that issue may pose difficult issues of proof, for
present purposes, the complaint pleads the required direct relationship.

The three functional factors from *Holmes* also support a finding of proximate causation.
Although Humana's damages may be difficult to prove, at this stage it is at least plausible that it
will be able to present such proof.  Humana is alleged to have been the target and victim of the
alleged scheme, and therefore there may be little risk of multiple recoveries.  And Humana is
plausibly the party in the best position to enforce the law—better positioned, at least, than any

Add.18

patients, physicians, pharmacy, or nonparty co-pay assistance programs.

The difficulty arises from the fact that the *Neurontin* court addressed only the issues of but-for and proximate causation; it did not address the indirect purchaser rule, or indeed the question of standing, at all. Proximate causation and standing are distinct, if overlapping issues. As the Sixth Circuit has explained:

> Like the antitrust laws, RICO's civil-suit provision imposes two distinct but overlapping limitations on claimants—standing and proximate cause. Standing poses a threshold question involving constitutional, prudential and (as in this case) statutory limitations on who may sue, regardless of the merits of that person's claim. Proximate cause poses a merits question involving common-law and prudential limitations on the consequences for which the law will hold a defendant accountable, regardless of the plaintiff's standing to sue.

*Trollinger*, 370 F.3d at 612 (citations omitted). The court went on to observe:

> [T]he two concepts overlap and that is particularly true in the context of civil RICO claims. As a general matter, they overlap because a plaintiff who lacks standing to vindicate a derivative injury also will be unable to show proximate cause. And as a matter of RICO law, the two concepts overlap because they both grow out of the "by reason of" limitation in RICO—namely, the requirement that claimants establish that their injury was "by reason of" a RICO predicate act violation. The "by reason of" limitation, in other words, bundles together a variety of "judicial tools," some of which are traditionally employed to decide causation questions and some of which are employed to decide standing questions.

*Id.* at 613.

Presumably, the *Neurontin* court did not address the issue of standing, or the indirect purchaser rule, because the defendant pharmaceutical company did not raise it. And this Court cannot, of course, assume that the *Neurontin* court implicitly considered the standing issue and rejected it. *Neurontin* therefore is not controlling precedent as to the question of standing and the potential application of the indirect purchaser rule. Nonetheless, in light of its rough similarities to the present case, the opinion gives this Court considerable pause.

The court in *Humana, Inc. v. Indivior Inc.*, 2021 WL 3101593 (E.D. Pa. July 22, 2021),

faced a somewhat analogous situation.  *Indivior* involved a civil RICO claim by a health insurer (Humana) against a pharmaceutical company (Indivior) for unlawful promotion of a drug, resulting in reimbursement for medically unnecessary prescriptions and the payment of higher prices for the drug.  As here, the defendants moved to dismiss the RICO claim on the ground that Humana was an "end payor[] or indirect purchaser[] in the distribution chain who [paid] for drugs purchased by a pharmacy, wholesaler, or [its] insured," and that therefore the claims were barred by the indirect purchaser rule.  *Id.* at *7 (internal quotation marks omitted).

In resolving that issue, the district court had to address a potential conflict between two Third Circuit opinions:  *McCarthy*, 80 F.3d at 851-55, which held that the indirect purchaser rule applied to all civil RICO claims, and *In re Avandia Marketing Sales Practices & Product Liability Litigation*, 804 F.3d 633 (3d Cir. 2015), which upheld a civil RICO claim by third-party payors (union health and welfare funds) against a drug manufacturer arising out of unlawful conduct that increased sales.  *Indivior*, 2021 WL 3101593, at *9.  Among other things, the court concluded that *Avandia* addressed only the issue of proximate causation; that the "concepts or standing under the indirect purchaser rule and proximate causation" were distinct; and therefore *Avandia* did not disturb the conclusion of *McCarthy* that "an indirect purchaser/end-payor lacks standing to pursue RICO claims."  *Id.* at *10.[10]  And the court noted that other district courts in the Third Circuit had reached similar conclusions.  *See, e.g.*, *Hu v. BMW of N. Am. LLC*, 2021 WL 1138123, at *3 (D.N.J. Mar. 24, 2021).

Following that reasoning, while *Neurontin* is controlling as to the issue of but-for and proximate causation, it is not as to the application of the indirect purchaser rule.  The question,

---

[10] The *Indivior* court also distinguished *Avandia* on its facts, on the ground that the alleged injury there was "based on their inclusion of the product at issue in their formulatory decisions at favorable rates rather than covering the competitor's less expensive drugs."  *Indivior*, 2021 WL 3101593, at *10.

then, is whether this Court should apply that rule here.

The argument in favor of applying the rule is straightforward.  According to the three circuits that have considered the issue, that result is dictated by statutory history and the Supreme Court's jurisprudence.  *See, e.g.*, *McCarthy*, 80 F.3d at 855 ("Significantly, antitrust standing principles apply equally to allegations of RICO violations.  The precepts taught by *Illinois Brick* and *Utilicorp* apply to RICO claims, thereby denying RICO standing to indirect victims." (citations omitted)).  Put simply, if the indirect purchaser rule applies to claims under § 4 of the Clayton Act, it necessarily applies to civil RICO claims under § 1964(c).  And because the rule has no exceptions in the antitrust context—even where, as a practical matter, it means that a violation will go unremedied—it likewise has no exceptions in the civil RICO context.

There are, to be sure, potential pathways around the application of the rule.  One is to conclude that Humana is not, in fact, an indirect purchaser.  The problem with that is that it does not appear to be true:  Humana is an insurer, and there is no allegation in the complaint that it actually paid anything directly to Biogen.  Another is to conclude that the question of standing is subsumed within the question of proximate causation.  Although the Eleventh Circuit seems to have reached such a conclusion in *Bivens Gardens*, 140 F.3d at 906, it did so without any real analysis, and that reasoning would simply conflate the doctrines of standing and proximate cause into a single inquiry.

Finally, the Court could take a direct approach—based on the practical realities of the health-care marketplace and the nature of the claim asserted here—and formulate an exception to the indirect purchaser rule, or perhaps conclude that the rule should not apply at all in civil RICO actions outside the antitrust context.  While that approach has some superficial appeal, that, too, is problematic.

It is certainly true that the concept of a "purchaser" does not transfer neatly from the antitrust context to the health-care context.  Antitrust cases typically involve a marketplace scenario with multiple levels, with payment for and title to goods passing from one participant to another at each level—for example, a manufacturer sells to a wholesaler, who sells to a retailer, who sells to a customer.  In the antitrust marketplace, therefore, the ultimate consumer makes the decision to buy a product, pays for it, and uses it.

In the prescription-drug marketplace, those purchasing functions are normally split three ways:  the physician effectively makes the decision to buy the product; the health insurer effectively pays for it (although the patient is required to make a copay); and the patient owns and uses it.[11]  For that reason, in the prescription-drug marketplace, a scheme to defraud often targets the government or third-party payors—the entities that actually pay for the drugs at issue.

The theory of the injury here likewise does not neatly align with a normal antitrust marketplace scenario, in which the monopolist sets an artificially high price.  Instead, the core allegation appears to be that the medication was over-prescribed.[12]  Specifically, it alleges that some portion of the patient population would have used a different type of therapy, such as one provided by a Biogen competitor.[13]  In other words, the theory of the complaint seems to be that

---

[11] Other factors may complicate the analysis:  for example, the potential ability of a pharmacist to substitute a generic or similar product, or the potential ability of an insurer to negotiate prices directly with the drug manufacturer.  And here the facts alleged in the complaint appear to suggest a more complex process than usual for dispensing of the drugs to the patient.  For example, the complaint alleges that ACS is a "specialty pharmacy that also provides patient-management services to the pharmaceutical industry."  (Compl. ¶ 13).  How, if at all, it performed any role in purchasing or dispensing the drugs to patients is not set out in the complaint.  Furthermore, and as noted, Tysabri is infused intravenously by a medical provider at a location such as a hospital, doctor's office, or infusion center.  (*Id.* ¶¶ 42, 84).  Presumably, the dispensing of that medication, and its billing, does not follow the typical pattern for prescription drugs.

[12] The complaint does *not* allege that any drugs were prescribed to patients for whom they were medically unnecessary.  Nor does it seem to allege that patients who needed treatment for MS, and could not afford the copays, should have been left to suffer without such treatment.

[13] The complaint is short on detail as to those alternate therapies, including their availability, cost, and effectiveness.  Instead, it simply makes three vague references to "cheaper alternatives," (Compl. ¶ 6), "less expensive MS therapies, including generic drugs," (*id.* ¶ 56), and "other multiple sclerosis drugs," (*id.* ¶ 94).  And it

some number of qualified candidates who needed MS therapy were diverted to Biogen therapies from less-expensive alternate therapies provided by another company.[14]

The complaint also alleges that Biogen "inflate[d] both the number and price of prescriptions for MS Drugs," leading to artificially inflated "price reimbursements by third-party payors," including "private insurers of Medicare Part D and Medicare Advantage [Part C] plans," such as plaintiff.  (Compl. ¶¶ 2, 4); (*see id.* ¶ 83 ("But for the scheme, Humana would have paid for fewer MS Drugs prescriptions (and associated costs of administering the drug), and it would have paid less for each covered prescription.")).   It is unclear precisely what is meant by that—whether the alleged higher prices were solely due to the unnecessary prescription of expensive medications, or whether the prices were somehow inflated on top of that.[15]  If it is the latter, the theory of the complaint is much closer to an antitrust-type injury, in which higher prices charged by Biogen were passed on to wholesalers and distributors, pharmacies, and ultimately Humana.

To the extent, however, that the theory of injury is that the scheme caused the writing of a greater number of expensive prescriptions, the wholesaler (the direct purchaser) may have no

---

is silent as to the interchangeability (if any) of those therapies and the roles of the physician, the pharmacist, and the patient in selecting a precise type (or brand) of drug a patient will take.

[14] To illustrate the concept, consider two hypothetical drugs:  an expensive alternative ("Cadillac") and a cheaper alternative ("Chevrolet").  The normal result of an antitrust violation is the charging of an unfairly high monopolistic price, so that the "Chevrolet" is priced like a BMW, and the "Cadillac" is priced like a Rolls-Royce.  Those higher prices are typically passed on from the monopolistic manufacturer to the wholesaler (the direct purchaser), and from there to the retailer and the consumer (the indirect purchaser).  Under that scenario, and according to the indirect purchaser rule, only the direct purchaser (the wholesaler) has standing to sue under the antitrust laws.

Here, by contrast, the claim is not (or does not seem to be) that the prices of the "Cadillacs" and the "Chevrolets" were inflated by the unlawful behavior.  Rather, the claim is that the mix of prescriptions was altered, so that too many "Cadillac" prescriptions were written—to use hypothetical percentages, the mix should have been 50% "Cadillacs" and 50% "Chevrolets," but instead was 75% "Cadillacs" and only 25% "Chevrolets."

[15] The complaint alleges that Humana paid higher costs in connection with the intravenous administration of Tysabri, which are not higher costs for the drug *per se*, but higher associated costs.  (Compl. ¶ 84).

incentive to file suit against the drug manufacturer.  The wholesaler is selling a higher quantity of the expensive drugs, probably at a higher margin than the cheaper alternatives, and likely has suffered no injury.  Instead, it is the payors—the health insurer and the patients—who are the injured parties.  And because the scheme here compensated the patients by making their copayment, the insurer may be the only injured party.

In any event, while there may be reasons to carve out an exception to the indirect purchaser rule, or to conclude that it should not apply, such a decision is fraught with policy judgments that are more properly committed to the Court of Appeals rather than a single District Judge.  Under the circumstances, this Court will follow the lead of every circuit to have considered the issue, and apply the indirect purchaser rule.

Accordingly, because Humana is an indirect purchaser of the pharmaceutical products at issue in this case, it does not have standing to assert a civil RICO claim.  Count 1 will therefore be dismissed.

### c.      **Adequacy of RICO Allegations**

For the sake of completeness, the Court will address two additional issues that warrant dismissal of the RICO claims, independent of the standing issue.

### (1)      **Predicate Offenses – Mail and Wire Fraud**

### (a)      **Mail and Wire Fraud Generally**

As noted, the RICO claim here is based on predicate acts of mail and wire fraud.  The mail-fraud statute prohibits the use of the mails in connection with a "scheme or artifice to defraud."  18 U.S.C. § 1341.  "To establish the commission of this offense, the government must show a scheme to defraud using false pretenses, the defendant's knowing and willing participation in the scheme with the intent to defraud, and the use of the mails in furtherance of that scheme."  *United States v. Simon*, 12 F.4th 1, 33 (1st Cir. 2021).  The wire-fraud statute

differs only in that the government must prove the use of a wire in interstate or foreign

commerce in furtherance of the alleged scheme.  18 U.S.C. § 1343; *Simon*, 12 F.4th at 33.

Both statutes require the use of the mails or wire facilities in furtherance of the scheme to

defraud.  "The 'in furtherance' requirement is to be read broadly."  *Simon*, 12 F.4th at 33.  The

government need not show that the mail or wire communication actually contains the fraudulent

misrepresentation, only "that the mailing was 'incident to an essential part of the scheme.'"  *Id.*

### (b)      Application of Rule 9(b)

 Civil RICO claims based on predicates of mail or wire fraud must meet the heightened

pleading standard of Rule 9(b).  Accordingly, for civil RICO claims, "under Rule 9 'the pleader

is required to go beyond a showing of fraud and state the time, place and content of the alleged

mail and wire communications perpetrating that fraud.'"  *Cordero-Hernandez v. Hernandez-*

*Ballesteros*, 449 F.3d 240, 244 (1st Cir. 2006) (internal quotation marks omitted) (quoting *North*

*Bridge Assocs., Inc. v. Boldt*, 274 F.3d 38, 43 (1st Cir. 2001)); *see Ahmed v. Rosenblatt*, 118 F.3d

886, 889 (1st Cir. 1997) (noting that it is "well settled law in this circuit that RICO pleadings of

mail and wire fraud must satisfy the particularity requirements of Rule 9(b)"); *Doyle v. Hasbro,*

*Inc.*, 103 F.3d 186, 194 (1st Cir. 1996)) ("Rule 9 imposes a heightened pleading requirement for

allegations of fraud in order to give notice to defendants of the plaintiffs' claim, to protect

defendants whose reputation may be harmed by meritless claims of fraud, to discourage 'strike

suits,' and to prevent the filing of suits that simply hope to uncover relevant information during

discovery.").

Thus, for example, in *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 42 (1st Cir.

1991), the First Circuit affirmed the dismissal of a civil RICO claim based on mail and wire

fraud predicates where the complaint failed to comply with Rule 9(b).  *Id.* at 42.  The court noted

that the complaint alleged mail and wire fraud violations in general terms, but did not "supply

any additional detail as to when the [mail and wire] communications occurred, where they took

place, or what they contained."  *Id.*

> Absent this rudimentary information, the complaint fell measurably short of meeting Rule 9(b)'s specificity requirement.  It is not enough for a plaintiff to file a RICO claim, chant the statutory mantra, and leave the identification of predicate acts to the time of trial.

*Id.*; *see also Ahmed*, 118 F.3d at 889 (noting that the complaint did not meet the requirements of

Rule 9(b) because it "contains only the bald assertion that the defendants (unspecified) used the

U.S. mails to fraudulently convey their interests in [plaintiff's] properties, that the defendants

(again unspecified) used the U.S. Postal Service by mailing unspecified materials, and that the

defendants used wire communications").[16]

### (2)   Allegations of Mail or Wire Communications

The allegations in the complaint concerning the use of mails or interstate wires consist, in

their entirety, of the following:

> Throughout the relevant period, Biogen, ACS, CDF, and TAF used thousands of mail and interstate wire communications to create and manage their scheme, which involved nationwide distribution of the MS Drugs through ACS at the direction of Biogen.  Biogen communicated with ACS, US Bioservices, and the

---

[16] Similarly, in *Metropolitan Property & Casualty Insurance Co. v. Savin Hill Family Chiropractic, Inc.*, 2016 WL 11004383 (D. Mass. June 15, 2016), the court observed:

> Because the Plaintiffs' fraud, RICO and conspiracy claims all rely upon allegations that the Defendants engaged in a fraudulent scheme to inflate medical bills submitted to Metropolitan and Commerce, they must plead with particularity specific individual bills which are fraudulent based on particular facts alleged, e.g., on a certain date a bill sought payment for spinal manipulations not performed as evidenced by the patient's assertion that she received no such treatment.

*Id.* at *3.  The court noted that the complaint came close to pleading with the requisite specificity that certain medical bills were premised on material misrepresentations, because those allegations contained the name of the chiropractor defendant who recorded administering treatment that was not rendered, the initials of the Metropolitan claimant, the claim number, and the date of loss.  *Id.*  In some instances, the allegations also contained the date of the purported treatment.  *Id.*  That is, the "alleged misrepresentations identif[ied] who made the misrepresentations, what the misrepresentations were, where the misrepresentations in recording and billing were made, and when they occurred."  *Id.*  But the "critical missing component" was the specificity regarding the bills that resulted from the misrepresentations.  *Id.*  The opinion noted that the complaint needed to identify with particularity the fraudulent bills arising from the misrepresentations alleged.  *Id.* at *3-4.

foundations through the mail and wires, causing thousands of reimbursement requests to be submitted to Humana over the wires or mail, and used the wires and mail to effectuate their receipt of payments and contributions.  For example, from 2011 through 2019, ACS submitted requests to Humana for reimbursement of more than 76,000 prescriptions worth nearly $350 million for the MS Drugs using the wires or the mail.

(Compl. ¶ 80).

False representations of compliance with federal and state laws were made to Humana for payment over the wires or by mail.  These false representations were made directly to Humana and were a condition of reimbursement for all the MS Drugs claims submitted to Humana.  The illegally obtained payments were sought through, and sent over, the wires or by mail.  The claims for reimbursement submitted for payment to Humana over the wires or by mail identified in Exhibit A attached to this Complaint are examples of the MS Drugs Enterprise's fraud on Humana.

(*Id.* ¶ 95).

Defendants and their co-conspirators have sought to and have engaged in the commission of overt acts, including the following unlawful racketeering predicate acts:

a.     Multiple instances of mail fraud in violation of 18 U.S.C. §§ 1341 and 1346; and

b.     Multiple instances of wire fraud in violation of 18 U.S.C. §§ 1343 and 1346.

(*Id.* ¶ 109).

Exhibit A to the complaint, which is identified in Paragraph 95, is captioned "Examples of 100 Biogen Subsidized Copayments."  It has four columns, labeled "Rx Fill Date," "Copay Foundation," "Drug Cost," and "Copay Subsidy."  Beneath those headings, respectively, are a date (for example, "1/7/2011"), the name of one of the foundations (either The Assistance Fund or the Chronic Disease Fund), the cost of the drug (for example, "$6,982.21"), and the amount of the copay (for example, "$997.30").

Apart from Exhibit A, the complaint clearly fails to state the mail and wire fraud

predicates with the requisite detail.  Courts have routinely held that generalized statements concerning mailings or wire communications are not sufficient to satisfy the pleading requirements.  *See, e.g.*, *Feinstein*, 942 F.2d at 42.  Thus, for example, the general allegation that "Biogen, ACS, CDF, and TAF used thousands of mail and interstate wire communications to create and manage their scheme" does not reveal which specific defendant or entity made the communications, when they were made, what they contained, or even whether they were made by mail or wire.  (*See* Compl. ¶ 80).

The mail and wire fraud predicates thus rest entirely on the adequacy of Exhibit A. Notably, Exhibit A does not specifically identify which (if any) of the communications were made by mail, and which were made by wire; Paragraph 95, which describes Exhibit A, uses a disjunctive phrase to describe all 100 communications:  "[t]he claims for reimbursement submitted for payment to Humana *over the wires or by mail* identified in Exhibit A . . . are examples of the MS Drugs Enterprise's fraud on Humana."  (*Id.* ¶ 95 (emphasis added)).  And Exhibit A contains no detail as to who sent the communications (other than "Humana's own specialty pharmacy").  (*See id.* ¶ 85).  It does not even allege the technical requirement of the wire-fraud statute, that the communication be transmitted "in interstate or foreign commerce." *See* 18 U.S.C. § 1343.

The absence of further detail in Exhibit A is particularly puzzling, in that the communications in question were apparently made by a Humana subsidiary ("Humana's own specialty pharmacy") to Humana itself.  (Compl. ¶ 85).[17]  And there are no specifics whatever as

---

[17] For that reason, there is no basis to apply a "more flexible" pleading standard, as may be appropriate when critical information is in the custody of the defendant or a third party.  *See, e.g.*, *United States v. Regeneron Pharms., Inc.*, 2020 WL 7130004, at *15 (D. Mass. Dec. 4, 2020) (applying a more flexible standard in a case involving claimed violations of the False Claims Act and Anti-Kickback Statute because it was alleged that defendant caused a third party to submit a false claim to the government, rather than submitting the claim itself). Similarly, there is no basis to permit Humana leave to amend, as may be the case when the critical information is not in the plaintiff's possession.  *See New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 290-92 (1st Cir. 1987)

to any communications between ACS and Humana, despite the fact that the complaint expressly alleges that "from 2011 through 2019, ACS submitted requests to Humana for reimbursement of more than 76,000 prescriptions worth nearly $350 million for the MS Drugs using the wires or the mail." (*Id.* ¶ 80). Regardless, the complaint does not allege a single specific instance of a mail or interstate wire communication—at best, it only alleges that certain specific communications were sent by "the wires *or* by mail." (*E.g.*, *id.* ¶ 95).

### (3)  Allegations of Misrepresentation

The theory of fraudulent misrepresentation alleged in the complaint is that defendants "caused the submission of false certifications to Humana . . . causing it to pay millions of dollars in reimbursements for the MS Drugs that Humana would not have otherwise paid." (*Id.* ¶ 8). More specifically, the complaint alleges:

> False representations of compliance with federal and state laws were made to Humana for payment over the wires or by mail. These false representations were made directly to Humana and were a condition of reimbursement for all the MS Drugs claims submitted to Humana.

(*Id.* ¶ 95; *see id.* ¶ 35 ("In order to effectuate their scheme . . . Defendants misrepresented to Humana that they were complying with state and federal law, including laws related to kickbacks and false claims . . . ."); *id.* ¶ 50 (alleging that the scheme included "misconduct specifically directed to Humana:  namely, specific misrepresentations that those participating in the deceptive scheme were complying with the very laws that they were in fact flouting")).

---

(holding that because of the "difficulties in specifically pleading mail and wire fraud as predicate acts," the district court should make a "determination as to whether the claim as presented warrants the allowance of discovery," and if so, should "provide an opportunity to amend the defective complaint," and stating that one of the factors to consider is whether "the specific information as to use is likely in the exclusive control of the defendant").

Two additional paragraphs suggest that the certifications were set forth, at least in part, in one or more contracts between Humana and Biogen and/or ACS:

> Biogen and its agent ACS made such certifications [of compliance with state and federal law] and therefore directly misrepresented to Humana that they were not inducing Medicare patients to take Biogen's drugs by subsidizing copayments, and that Biogen and ACS were otherwise complying with federal law.  Biogen also made contractual representations to Humana in connection with its non-Medicare insurance policies that it would comply with the laws including, among others, those related to fraud, abuse, and prohibiting kickbacks.

(*Id.* ¶ 36).

> Humana's agreements with its providers include a provision that requires the provider to certify its compliance with state and federal law, as well as rules promulgated by government entities such as CMS.  These contractual provisions are essential for Humana to ensure that it receives prompt payments and reimbursements from CMS for valid claims, and to ensure that it does not pay invalid claims that might increase costs to both itself and Medicare.  Humana also relies on these representations in approving not only Medicare, but also commercial insurance claims and claims under other plan types for payment.

(*Id.* ¶ 38).

In addition, Paragraphs 135 and 136 of the complaint—which are part of Count 6, the claim for breach of contract, but not expressly incorporated in the RICO claim—allege that Humana and Biogen entered into a contract with an effective date of January 1, 2006, "in which Humana promised to cover Biogen's MS Drugs on its commercial (non-Medicare) insurance formulary and provide it with a preferred position" in exchange for Biogen's promise to pay rebates on purchases.  (*Id.* ¶ 135).  As part of that 2006 contractual agreement, Biogen agreed to "comply with any and all applicable federal, state and local laws, regulations and ordinances," including those concerning "health care anti-fraud and abuse laws."  (*Id.* ¶ 136).

Accordingly, the alleged falsehoods at issue are not that the prescriptions themselves were phony, or that the treatment was medically unnecessary; rather, it is the representation, in one or more "certifications," that defendants were in compliance with the law.

To be clear, the theory of the complaint is *not* that Biogen (or ACS) made misrepresentations to the federal government (or to physicians or pharmacies), and that those misrepresentations to others were the proximate cause of harm to Humana.  *See Bridge*, 553 U.S. at 649 (first-party reliance is not an element of proximate causation in a private RICO claim predicated on mail fraud); *Neurontin*, 712 F.3d at 36-37 (same).  Rather, it is that Biogen (and ACS) made misrepresentations "*directly*" to Humana.  (*See, e.g.*, Compl. ¶ 36).[18]

The misrepresentations at issue are thus alleged to be certifications, made directly to Humana, that Biogen and ACS were in compliance with federal law.  Nonetheless, although those certifications are at the very heart of the RICO claim, the complaint does not state when they were made and how they were made, and does not provide the actual language of the misrepresentations at issue.

To the extent the complaint alleges in general terms that Biogen and ACS made certifications of compliance to Humana—or, more vaguely, that certifications "were made," (Compl. ¶ 95)—it does not appear to comply with the requirements of Rule 9(b).  Those allegations describe who made the fraudulent communications (Biogen and ACS), their general content (certifications of compliance with federal, state, and local law), and the recipient (Humana).  But they say nothing about the time or place of the communications, their specific content, or even how many such communications took place.  *See Cordero-Hernandez*, 449 F.3d

---

[18] The complaint also contains the following allegation:  "CMS regulations require 'downstream' entities [defined to include "pharmacies dispensing medication and manufacturers selling medication," (Compl. ¶ 28)] that generate and submit PDE [Prescription Drug Event] claims data ["a condition of payment for CMS's provision of Medicare funds to Part D Plan sponsors," (*Id.* ¶ 27)] to certify that such data is true, accurate, and complete and that the PDE data is the basis for obtaining federal reimbursement for the healthcare products or services reflected therein." (*Id.* ¶ 29).  But the complaint alleges elsewhere, on multiple occasions, that the relevant misrepresentations were made by Biogen or ACS "directly" to Humana—*not* that they were made by Biogen, ACS, or other entities to CMS.  The relevance of that allegation is therefore far from clear.  And although the complaint alleges that "downstream" entities who participate in Part C are required to comply with the law, (*id.* ¶ 30), there is no parallel allegation that those entities are required to make a similar certification.

at 244 (noting that complaint alleging wire fraud failed to make "the requisite allegations identifying specific interstate phone calls by time, place, and content"); *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 557 (8th Cir. 2006) (requiring plaintiff to provide *some* "representative examples of [defendants'] alleged fraudulent conduct, specifying the time, place, and content of their acts and the identity of the actors"). *But see Humana Inc. v. Mallinckrodt ARD LLC*, 2020 WL 3041309, at*10 (C.D. Cal. Mar. 9, 2020) (concluding, without analysis, that false certifications of compliance with state and federal law sent to Humana were sufficient to satisfy Rule 9(b)).[19]

There is one place in the complaint where the alleged misrepresentation is pleaded in somewhat greater detail.  As noted, Paragraphs 135 and 136—which, as a technical matter, are not pleaded under the RICO counts—allege that Biogen and Humana entered into a contract with an effective date of January 1, 2006, that contained a provision in which Biogen agreed that it "shall comply" with applicable federal laws.  That allegation supplies, at least in rough terms, an approximate time and place of the alleged communication.  And Paragraphs 36 and 38 refer (albeit vaguely) to contractual provisions applicable to Biogen, which apparently refer to the 2006 contract.

---

[19] *Mallinckrodt* involved a claim by Humana against a pharmaceutical manufacturer alleging an unlawful co-pay scheme similar in many respects to the claim asserted here.  The complaint alleged, among other things, that the defendant "directly misrepresented" to Humana that it was "complying with state and federal law, including laws related to bribery, kickbacks, and false claims," when it submitted data for prescription drug event ("PDE") claims "certifying that such data is true, accurate, and complete."  *Id.* at *10.  The court's Rule 9(b) analysis was as follows:

> Defendant asserts in conclusory fashion that this allegation lacks sufficient particularity to satisfy Rule 9(b).  Plaintiff has alleged that each time Defendant certified that it was in compliance with federal and state laws, it knowingly made a false statement because it knew at the time it made the statements that its co-pay assistance violated federal statutes and its doctor payments violated state law.  This is sufficient.

*Id.* (internal quotation marks and citation omitted).  The *Mallinckrodt* court also denied a motion to dismiss the civil RICO claims without addressing the indirect purchaser rule, holding only that the complaint was sufficient to satisfy the but-for and proximate causation requirements.  *Id.* at *14-16.

The complaint does not include any allegations as to how Humana's contractual relationship with Biogen for its private commercial insurance business has any relevance to the alleged scheme at issue here.  And if the critical misrepresentation is set forth in a contract, there is no obvious reason why the complaint cannot allege the actual date of the contract and the precise contractual language.  Accordingly, while the allegations in Paragraphs 135 and 136 are more specific than the general allegations found elsewhere in the complaint, they do not appear to have any clear connection to the alleged scheme to defraud.

### (4)     Conclusion

The lack of specificity in the complaint as to those issues, taken as a whole, is sufficient to warrant dismissal of Count 1.  They may amount to no more than violations of technical pleading requirements, but that is what the rules—at least the rules for pleading a civil RICO action with mail and wire fraud predicates—require.  And because they concern matters that are, or ought to be, within the knowledge of Humana, there is no apparent reason why this Court should overlook the omissions or permit Humana to fill in the gaps after a period of discovery.  Accordingly, on that additional ground, Count 1 fails to state a claim upon which relief can be granted.

### 2.     Count 2:  RICO Conspiracy

Because the complaint fails to plead a substantive RICO claim, its claim for conspiracy to commit RICO must also be dismissed.  *See Efron*, 223 F.3d at 21 (holding that if the pleadings fail to state a substantive RICO claim, then the conspiracy claim also fails); *Langan v. Smith*, 312 F. Supp. 3d 201, 205 (D. Mass. 2018) (same).

### C.     Supplemental Jurisdiction

In light of the dismissal of Counts 1 and 2, the Court will decline to exercise supplemental jurisdiction over the remaining claims.  Where a complaint fails to state a viable

claim under federal law and jurisdiction over the remaining claims is based solely on supplemental jurisdiction, 28 U.S.C. § 1367, a "district court has discretion to decline to exercise supplemental jurisdiction."  *Uphoff Figueroa v. Alejandro*, 597 F.3d 423, 431 n.10 (1st Cir. 2010); 28 U.S.C. § 1367(c).  In so doing, the court "must take into account considerations of judicial economy, convenience, fairness to the litigants, and comity."  *Delgado v. Pawtucket Police Dep't*, 668 F.3d 42, 48 (1st Cir. 2012); *see Wilber v. Curtis*, 872 F.3d 15, 23 (1st Cir. 2017) ("[I]t can be an abuse of discretion—if no federal claim remains—for a district court to retain jurisdiction over a pendent state law claim when that state law claim presents a substantial question of state law that is better addressed by the state courts.").

Here, the two federal claims have been dismissed.  What remains are 52 state-law claims, brought under the laws of 30 states.  Apart from the complaint and motions to dismiss, no substantial litigation has occurred.  Under the circumstances, the Court will decline to exercise supplemental jurisdiction over the remaining state-law claims.

## IV.     <u>Conclusion</u>

For the foregoing reasons, the motions of defendants Biogen, Inc., and Advanced Care Scripts, Inc., to dismiss for failure to state a claim upon which relief can be granted are GRANTED as to Counts 1 and 2.  The Court declines to exercise supplemental jurisdiction over the claims set forth in Counts 3 through 10, which are accordingly DISMISSED without prejudice.

**So Ordered.**

/s/ F. Dennis Saylor IV<br>
F. Dennis Saylor IV<br>
Chief Judge, United States District Court

Dated:  March 31, 2023

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**Humana, Inc.**
          Plaintiff

           V.

**Biogen, Inc. et al**
          Defendant

CIVIL ACTION

NO.  1:21-11578-FDS

## **ORDER OF DISMISSAL**

Saylor, C. J.

     In accordance with the Court's Memorandum and Order dated March 31, 2023, it is hereby ORDERED that the above-entitled action be and hereby is DISMISSED.

                   By the Court,

 3/31/2023                  /s/ Flaviana de Oliveira
     Date                     Deputy Clerk

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ | ) |
| **HUMANA, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **BIOGEN, INC. (f/k/a BIOGEN IDEC,** | ) |
| **INC.) and ADVANCED CARE** | ) |
| **SCRIPTS, INC.,** | ) |
| | ) |
| **Defendants.** | ) |
| _____ | ) |

**Civil Action No.**
**21-11578-FDS**

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR**
<u>**RECONSIDERATION AND LEAVE TO AMEND**</u>

**SAYLOR, C.J.**

Plaintiff Humana Inc. has moved for reconsideration of the Court's Memorandum and

Order of March 31, 2023, granting the motions of defendants Biogen, Inc., and Advanced Care

Scripts, Inc., to dismiss for failure to state a claim upon which relief can be granted.  Plaintiff

Humana Inc. has also moved for leave to file an amended complaint.

Motions for reconsideration are extraordinary remedies that should be granted sparingly.

*Villanueva-Mendez v. Nieves-Vazquez*, 360 F. Supp. 2d 320, 324 (D.P.R. 2005); 11 Charles Alan

Wright & Arthur R. Miller, Federal Practice and Procedure § 2810.1 at 128 ("because of the

narrow purposes for which they are intended, . . . motions [for reconsideration] typically are

denied").  When faced with such motions, courts must balance the need for finality of decision

against its duty to render just decisions.  *Davis v. Lehane*, 89 F. Supp. 2d 142, 147 (D. Mass.

2000).

In order to accommodate these competing interests, motions for reconsideration should be granted only upon a showing of (1) a "manifest error of law," (2) new evidence, or (3) a misunderstanding or other error "not of reasoning but apprehension." *Ruiz Rivera v. Pfizer Pharm.*, LLC, 521 F.3d 76, 81-82 (1st Cir. 2008). A motion for reconsideration is not a vehicle for a party to "repeat old arguments previously considered and rejected, or to raise new legal theories that should have been raised earlier." *Nat'l Metal Finishing Co., Inc. v. BarclaysAmerican/Commercial, Inc.*, 899 F.2d 119, 123 (1st Cir. 1990); *see also Davis v. Lehane*, 89 F. Supp. 2d 142, 147 (D. Mass. 2000); *Villanueva-Mendez*, 360 F. Supp. 2d at 324. Nor is it a forum to highlight a point of disagreement between a litigant and the court or to vent dissatisfaction with the court's reasoning or decision. *Davis*, 89 F. Supp. 2d at 149; *Waye v. First Citizen's National Bank*, 846 F. Supp. 310, 314 n.3 (M.D. Pa. 1994).

Humana has failed to show that reconsideration is warranted. Its latest motion largely repeats arguments that this Court previously rejected. First, it contends that "the Court overlooked or misapprehended the allegations of the complaint—highlighted both in its briefs and at oral argument—that Humana was a direct purchaser from co-conspirator Defendant Advance Care Scripts, Inc." (Docket No. 56 at 1). As Biogen notes, Humana does not now "argue[] that the Court was wrong in its understanding of the pharmaceutical distribution chain, nor cites any case finding that an insurer is a direct purchaser under these circumstances." (Docket No. 63 at 4). Instead, Humana simply directs the Court's attention to statements made in its complaint, the opposition brief, and the sur-reply brief. (Docket No. 56 at 3-4). The Court, however, addressed each of these allegations in its March 31, 2023, Memorandum and Order when it held that Humana was an "indirect purchaser." *See Humana, Inc. v. Biogen, Inc.*, No. 21-cv-11578-FDS, 2023 WL 2743307, at *2-3, *7-13 (D. Mass. Mar. 31, 2023).

Second, Humana submits that the Court "erred when it dismissed the complaint for lack of particularity under Rule 9(b)." (Docket No. 56 at 1). More specifically, it contends that the Court "misapprehended [its] complaint, which alleged that Humana lacked access to the particulars of the fraud because that information was in the possession or control of Defendants and their co-conspirators." (*Id.* at 7). It states that the Court should have "accept[ed] Humana's factual allegations as to its lack of knowledge as true." (*Id.* at 14). The Court, however, *did* consider the "entirety" of those allegations. *Biogen, Inc.*, 2023 WL 2743307, at *14. In doing so, the Court found that the complaint "clearly fail[ed] to state the mail and wire fraud predicates with the requisite detail." (*Id.* at *15). The Court noted that the failure was "particularly puzzling," given that the information in question should have been in Humana's possession. (*Id.*). Indeed, the complaint repeatedly directed attention to Exhibit A, a collection of "communications . . . made by a Humana subsidiary . . . to Humana itself." (*Id.*). The Court found "no basis to apply a 'more flexible' pleading standard, as may be appropriate when critical information is in the custody of the defendant or a third party." (*Id.* at *15 n.17).

Finally, Humana asserts in a notice of supplemental authority that the recent decision of a court in this district in *United States v. Teva Pharms. USA, Inc.* supports its position that if a kickback is "*per se* fraudulent as to the federal government, then it must be *per se* fraudulent as to a plan sponsor as well." (Docket No. 68 at 2). The *Teva* decision does not require reconsideration. Humana simply points to the *Teva* court's affirmation of existing First Circuit precedent concerning the materiality of violations of the Anti-Kickback Statute for False Claims Act purposes. *See United States v. Teva Pharms. USA, Inc.*, No. CV 20-11548-NMG, 2023 WL 4565105, *4 (D. Mass. July 14, 2023) (citing *Guilfoile v. Shields*, 913 F.3d 178 (1st Cir. 2019)). The decision does not impact this Court's determination that Humana was as an "indirect

purchaser" or the standard for pleading mail fraud or wire fraud with particularly under Rule 9(b).

Humana further contends that the Court should now grant it leave to file a first amended complaint.  The proposed amended complaint would "allege[] a direct-purchaser relationship between Humana and Biogen" as well as "add[] allegations of fact about Defendant's mail and wire fraud schemes."  (Docket No. 56 at 16).  The proposed amended complaint would also "reduce[] the number of . . . claims . . . and the number of jurisdictions" in an effort to address the Court's concern that the complaint was, in some respects, "over-pleaded."  (*Id.* at 16 n.14); *see also Biogen, Inc.*, 2023 WL 2743307, at *1.

At the time of the Memorandum and Order, the Court found "no basis to permit Humana leave to amend."  *Biogen, Inc.*, 2023 WL 2743307, at *15 n.17.  The Court still finds no basis to revisit that issue.  There is no suggestion here that "amendment would be anything other than futile."  *Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228, *247 (1st Cir. 2015).  Moreover, as the First Circuit has stated, the "practice of seeking leave to amend after the case has been dismissed" is "discouraged."  *Id.*  Such a practice is inefficient, unfair to defendants, and burdensome to the court.  Accordingly, the request for leave to amend will be denied.

For the foregoing reasons, the motion of plaintiff Humana Inc. for reconsideration of the Court's Memorandum and Order of March 31, 2023, is DENIED.  Plaintiff's motion for leave to file an amended complaint is also DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  December 4, 2023                    Chief Judge, United States District Court

# United States Court of Appeals
## For the First Circuit

————————————

No. 16-8049

ISMAEL MARRERO-ROLON; ANNE CATESBY JONES; JORGE VALDES LLAUGER;
PUERTO RICO BATHROOM REMODELING, INC.; PERFORMANCE CHEMICALS
COMPANY, INC.,

Plaintiffs - Respondents,

v.

SHELL TRADING (US) COMPANY,

Defendant - Petitioner,

AUTORIDAD DE ENERGIA ELECTRICA, a/k/a Puerto Rico Electric Power Authority;
WILLIAM RODNEY CLARK; EDWIN RODRIGUEZ; CESAR TORRES-MARRERO;
INSPECTORATE AMERICA CORPORATION; BUREAU VERITAS HOLDING, INC.;
CORE LABORATORIES, N.V., d/b/a Saybolt; ALTOL CHEMICAL ENVIRONMENTAL
LABORATORY, INC., d/b/a Alchem Laboratory; ALTOL ENVIRONMENTAL SERVICES,
INC., d/b/a Altol Enterprises; PETROBRAS AMERICA, INC.; PETROLEO BRASILEIRO,
S.A.; CARLOS R. MENDEZ & ASSOCIATES; PUMA ENERGY CARIBE, LLC; PUMA
ENERGY INTERNATIONAL, B.V.; TRAFIGURA, A.G.; TRAFIGURA BEHEER, B.V.;
PETROWEST, INC.; VITOL, S.A., INC.; VITOL, INC.; TRAFIGURA LIMITED;
TRAFIGURA ARGENTINA SA; JOHN DOE 1-100,

Defendants.

————————————

Before

Howard, <u>Chief Judge</u>,
Thompson and Kayatta, <u>Circuit Judges</u>.

————————————

**JUDGMENT**

Entered: August 7, 2017

The petition for permission to file an interlocutory appeal under 28 U.S.C. § 1292(b) is
denied without prejudice to reconsideration on a fuller record at a later stage of the district court
proceedings.

By the Court:

/s/ Margaret Carter, Clerk

cc:
Steve W. Berman, Elizabeth Anne Fegan, Jane A. Becker Whitaker, Andrew J. Gordon, Daniel John Kurowski, Mark T. Vazquez, Andres W. Lopez, Arturo Diaz-Angueira, Victoria D. Pierce-King, Maraliz Vazquez-Marrero, Daniel J. Perez Refojos, Guillermo Fernando De-Guzman-Vendrell, Ivan Manuel Fernandez, Harold D. Vicente-Gonzalez, Litza J. Melendez-Reyes, Angel A. Valencia-Aponte, Oreste Ricardo Ramos-Pruetzel, Nestor Mendez-Gomez, David R. Kolker, Kevin A. Ewing, Michael Craig Hefter, Seth M. Cohen, Jose O. Ramos-Gonzalez, Stephanie L. Miller, Rolando Emmanuelli-Jimenez, Camelia Montilla-Alvarado, Arturo J. Garcia-Sola, Carmen Marie Alfonso-Rodriguez, Myrgia M. Palacios-Cabrera, Ramon E. Dapena, Ivan Llado-Rodriguez Salvador J. Antonetti-Stutts, Carla Garcia-Benitez, Carlos A. Valldejuly-Sastre, Janice Mariette Ramirez-Velez, Kenneth C. Suria-Rivera, Alberto G. Estrella, David Michael Orta, Jorge R. Quintana-Lajara, Michael C. McCall, Neal S. Manne, Alexander L. Kaplan, Michael Craig Kelso, Weston L. O'Black