No. 24-1012

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

HUMANA INC.,

*Plaintiff-Appellant*,

*v.*

BIOGEN INC.; ADVANCED CARE SCRIPTS, INC.,

*Defendants-Appellees.*

On Appeal from the United States District Court for the District of Massachusetts
in Case No. 1:21-cv-11578-FDS, Judge F. Dennis Saylor, IV

## BRIEF FOR DEFENDANT-APPELLEE BIOGEN INC.

MARK C. FLEMING
MARK A. FORD
FELICIA H. ELLSWORTH
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
Mark.Fleming@wilmerhale.com
Mark.Ford@wilmerhale.com
Felicia.Ellsworth@wilmerhale.com

*Attorneys for Defendant-Appellee
Biogen Inc.*

May 23, 2024

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure,

Defendant-Appellee Biogen Inc. states that it does not have a parent corporation

and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ...............................................................................iv

STATEMENT REGARDING ORAL ARGUMENT ...............................................1

INTRODUCTION .............................................................................................1

STATEMENT OF ISSUES .................................................................................2

STATEMENT OF THE CASE..............................................................................2

    A.    Humana's Allegations ...........................................................2

    B.    Procedural History.................................................................5

SUMMARY OF THE ARGUMENT ......................................................................8

STANDARD OF REVIEW .................................................................................11

ARGUMENT ..................................................................................................12

I.    THE DISTRICT COURT CORRECTLY RULED THAT HUMANA
    LACKS STANDING TO PURSUE CIVIL RICO CLAIMS .......................................12

    A.    The Direct Purchaser Rule Of *Hanover Shoe* And *Illinois
        Brick* Applies To Civil RICO Claims ...................................13

        1.    RICO's statutory language compels application of
            the direct purchaser rule of *Hanover Shoe* and
            *Illinois Brick*..............................................................14

        2.    Cases clarifying RICO's proximate cause
            requirements do not abrogate the direct purchaser
            rule...........................................................................20

        3.    Humana's attempts to confine the direct purchaser
            rule fail .....................................................................26

B.    Humana Has Shown No Exception To The Direct Purchaser Rule ........................................................29

II.  HUMANA FAILED TO PLEAD ITS CIVIL RICO CLAIMS WITH SUFFICIENT PARTICULARITY UNDER RULE 9(B) .............................35

A.    Humana Failed To Plead A Scheme To Defraud Using False Pretenses With Particularity ........................................37

B.    Humana Failed To Plead Use Of The Mail Or Wires With Particularity ................................................................42

C.    The District Court Did Not Err In Dismissing The Complaint Without Allowing Discovery ............................44

III.  THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION IN DENYING HUMANA'S POST-DISMISSAL MOTION FOR LEAVE TO AMEND ..................................................................................45

A.    The District Court Acted Within Its Discretion In Ruling That Humana Failed To Plead Information That It Itself Possessed ................................................................................46

B.    The District Court Acted Within Its Discretion In Ruling That Humana's Proposed Amendments Were Futile ........................47

1.    Humana's proposed amendments do not cure its lack of standing ........................................................47

2.    Humana's proposed amendments still fail to comply with Rule 9(b) ............................................49

C.    The District Court Acted Within Its Discretion In Ruling That Humana's Belated Proposed Amendment Was Inefficient And Unfair ........................................................52

CONCLUSION ........................................................................54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*ACA Financial Guaranty Corp. v. Advest, Inc.*,
  512 F.3d 46 (1st Cir. 2008)................................................................12, 54, 55

*Ahmed v. Rosenblatt*,
  118 F.3d 886 (1st Cir. 1997)...........................................................37, 39, 44, 52

*Amyndas Pharmaceuticals, S.A. v. Zealand Pharma A/S*,
  48 F.4th 18 (1st Cir. 2022)..............................................................53, 55

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006)................................................................................23

*Apple Inc. v. Pepper*,
  139 S. Ct. 1514 (2019)......................................................................24, 49

*Associated General Contractors of California, Inc. v. California State
  Council of Carpenters*,
  459 U.S. 519 (1983)................................................................................22

*Blue Shield of Virginia v. McCready*,
  457 U.S. 465 (1982)................................................................................25

*Boston Parent Coalition for Academic Excellence Corp. v. School
  Committee for City of Boston*,
  89 F.4th 46 (1st Cir. 2023).....................................................................12

*Bridge v. Phoenix Bond & Indemnity Corp.*,
  553 U.S. 639 (2008)................................................................................23

*California v. ARC America Corp.*,
  490 U.S. 93 (1989)................................................................................15

*Campos v. Ticketmaster Corp.*,
  140 F.3d 1166 (8th Cir. 1998) ............................................................29

*Carter v. Berger*,
  777 F.2d 1173 (7th Cir. 1985) .........................................................17, 18

*Cheng v. Neumann,*
  51 F.4th 438 (1st Cir. 2022)................................................................12

*Cook v. Gates,*
  528 F.3d 42 (1st Cir. 2008)................................................................43

*Cordero-Hernandez v. Hernandez-Ballesteros,*
  449 F.3d 240 (1st Cir. 2006)..............................................................37

*Counts v. General Motors, LLC,*
  606 F. Supp. 3d 678 (E.D. Mich. 2022) ............................................19

*County of Oakland v. City of Detroit,*
  866 F.2d 839 (6th Cir. 1989) ..............................................16, 18, 20

*Dickson v. Microsoft Corp.,*
  309 F.3d 193 (4th Cir. 2002) .............................................................30

*Douglas v. Hirshon,*
  63 F.4th 49 (1st Cir. 2023), *cert. denied,* 144 S. Ct. 621 (2024).................11, 52

*Efron v. Embassy Suites (Puerto Rico), Inc.,*
  223 F.3d 12 (1st Cir. 2000)................................................................42

*Faria v. Harleysville Worcester Insurance Co.,*
  852 F.3d 87 (1st Cir. 2017)................................................................12

*Feinstein v. Resolution Trust Corp.,*
  942 F.2d 34 (1st Cir. 1991), *abrogated on other grounds by*
  *United States v. Velazquez-Fontanez,* 6 F.4th 205 (1st Cir.
  2021) ........................................................37, 39, 44, 45, 53

*Fiala v. B&B Enterprises,*
  738 F.3d 847 (7th Cir. 2013) ......................................................20, 21

*Fire & Police Pension Association of Colorado v. Abiomed, Inc.,*
  778 F.3d 228 (1st Cir. 2015).....................................................8, 12, 47, 53

*Foisie v. Worcester Polytechnic Institute,*
  967 F.3d 27 (1st Cir. 2020)................................................................42

*Greenwood Trust Co. v. Massachusetts,*
  971 F.2d 818 (1st Cir. 1992).......................................................17, 19

*Hanover Shoe, Inc. v, United Shoe Machine Corp.*,
   392 U.S. 481 (1968)................................................................*passim*

*Hemi Group, LLC v. City of New York*,
   559 U.S. 1 (2010)..............................................................................23

*Hernandez-Lara v. Lyons*,
   10 F.4th 19 (1st Cir. 2021)................................................................25

*Hochendoner v. Genzyme Corp.*,
   823 F.3d 724 (1st Cir. 2016)..............................................................55

*Holmes v. Securities Investor Protection Corp.*,
   503 U.S. 258 (1992).............................................................15, 17, 22

*Howard Hess Dental Laboratories Inc. v. Dentsply International, Inc.*,
   424 F.3d 363 (3d Cir. 2005) ..................................................31, 32, 35

*HSBC Realty Credit Corp. (USA) v. O'Neill*,
   745 F.3d 564 (1st Cir. 2014)..............................................................50

*Humana Inc. v. Mallinckrodt ARD LLC*,
   No. CV 19-06926 DSF (MRW), 2020 WL 3041309 (C.D. Cal.
   Mar. 9, 2020)...............................................................................39, 40

*Humana, Inc. v. Indivior, Inc.*,
   No. 21-2573, 2022 WL 17718342 (3d Cir. 2022) ......................*passim*

*Humana, Inc. v. Indivior Inc.*,
   No. 20-5014, 2021 WL 3101593 (E.D. Pa. July 22, 2021) ................19

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977)....................................................................*passim*

*In re Asacol Antitrust Litigation*,
   907 F.3d 42 (1st Cir. 2018)................................................................28

*In re Avandia Marketing, Sales Practices & Product Liability
   Litigation*,
   804 F.3d 633 (3d Cir. 2015) ..............................................................19

*In re Brand Name Prescription Drugs Antitrust Litigation*,
   123 F.3d 599 (7th Cir. 1997) .............................................................34

*In re Celexa & Lexapro Marketing & Sales Practices Litigation*,
915 F.3d 1 (1st Cir. 2019)..............................................................21, 26

*In re Curran*,
855 F.3d 19 (1st Cir. 2017)......................................................................48

*In re National Football League's Sunday Ticket Antitrust Litigation*,
933 F.3d 1136 (9th Cir. 2019) .................................................................34

*In re Neurontin Marketing & Sales Practices Litigation*,
799 F. Supp. 2d 110 (D. Mass. 2011)......................................................25

*In re Neurontin Marketing & Sales Practices Litigation*,
712 F.3d 21 (1st Cir. 2013)...............................................21, 22, 25, 26

*In re New Motor Vehicles Canadian Export Antitrust Litigation*,
533 F.3d 1 (1st Cir. 2008)...............................................................*passim*

*Insulate SB, Inc. v. Advanced Finishing Systems, Inc.*,
797 F.3d 538 (8th Cir. 2015) ...................................................................33

*Kader v. Sarepta Therapeutics, Inc.*,
887 F.3d 48 (1st Cir. 2018)......................................................................54

*Kansas v. Utilicorp United*,
497 U.S. 199 (1990)..................................................................................17

*KPH Healthcare Services, Inc. v. Mylan N.V.*,
No. 20-2065-DDC, 2022 WL 3153687 (D. Kan. Aug. 8, 2022).......................30

*Lowell v. American Cyanamid Co.*,
177 F.3d 1228 (11th Cir. 1999) ...............................................................34

*Marion Diagnostic Center, LLC v. Becton Dickinson & Co.*,
29 F.4th 337 (7th Cir. 2022) ....................................................................34

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
952 F.3d 832 (7th Cir. 2020) ...................................................................33

*Marrero-Rolon v. Autoridad de Energia Electrica de Puerto Rico*,
No. 15-1167-JAG, 2015 WL 5719801 (D.P.R. Sept. 29, 2015) ................. 33-34

*Marrero-Rolon v. Autoridad de Energia Electrica de Puerto Rico*,
No. 15-1167-JAG, 2016 WL 9459823 (D.P.R. Oct. 20, 2016).........................30

*McCarthy v. Recordex Service, Inc.*,
80 F.3d 842 (3d Cir. 1996) .............................................................18, 23, 25, 29

*McCloskey v. Mueller*,
446 F.3d 262 (1st Cir. 2006)................................................................................43

*McKee v. Cosby*,
874 F.3d 54 (1st Cir. 2017)...................................................................................11

*Merican, Inc. v. Caterpillar Tractor Co.*,
713 F.2d 958 (3d Cir. 1983) ...............................................................................29

*Miranda v. Ponce Federal Bank*,
948 F.2d 41 (1st Cir. 1991), *abrogated on other grounds by United States v. Velazquez-Fontanez*, 6 F.4th 205 (1st Cir. 2021).........................42, 55

*MSP Recovery Claims, Series LLC v. Pfizer, Inc.*,
No. 22-cv-1419-DLF, 2024 WL 1344446 (D.D.C. Mar. 30, 2024)............*passim*

*New England Data Services, Inc. v. Becher*,
829 F.2d 286 (1st Cir. 1987).........................................................................45, 46

*North Bridge Associates, Inc. v. Boldt*,
274 F.3d 38 (1st Cir. 2001)..................................................................................37

*Palmer v. Champion Mortgage*,
465 F.3d 24 (1st Cir. 2006)..................................................................................12

*Paper Systems Inc. v. Nippon Paper Industries Co.*,
281 F.3d 629 (7th Cir. 2002) ..............................................................................31

*Redfern v. Napolitano*,
727 F.3d 77 (1st Cir. 2013)....................................................................................4

*Roma Construction Co. v. aRusso*,
96 F.3d 566 (1st Cir. 1996)..................................................................................31

*Santiago v. Puerto Rico*,
655 F.3d 61 (1st Cir. 2011)....................................................................................2

*SAS of Puerto Rico Inc. v. Puerto Rico Telephone Co.*,
    48 F.3d 39 (1st Cir. 1995)...............................................................23, 24

*Securities & Exchange Commission v. Tambone*,
    597 F.3d 436 (1st Cir. 2010).................................................................51

*Sports Racing Services, Inc. v. Sports Car Club of America, Inc.*,
    131 F.3d 874 (10th Cir. 1997) ..............................................................31

*Sullivan v. National Football League*,
    34 F.3d 1091 (1st Cir. 1994)..................................................................31

*Taggart v. Lorenzen*,
    139 S. Ct. 1795 (2019)..................................................................... 16-17

*Trollinger v. Tyson Foods, Inc.*,
    370 F.3d 602 (6th Cir. 2004) ................................................................18

*United Healthcare Services, Inc. v. United Therapeutics Corp.*,
    No. DLB-22-2948, 2024 WL 1256266 (D. Md. Mar. 25, 2024)...... 20-21, 41, 51

*United States v. Simon*,
    12 F.4th 1 (1st Cir. 2021).......................................................37, 45, 53

*United States v. Zannino*,
    895 F.2d 1 (1st Cir. 1990)......................................................................43

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ...................................................... 34-35

*Wallach v. Eaton Corp.*,
    837 F.3d 356 (3d Cir. 2016) ..................................................................33

*Warren General Hospital v. Amgen Inc.*,
    643 F.3d 77 (3d Cir. 2011) ............................................................49, 50

## STATUTES, REGULATIONS, AND RULES

15 U.S.C. § 15(a) ..............................................................................8, 15

18 U.S.C.
    § 1961(1)(B)......................................................................................37
    § 1964(c) ...............................................................................8, 15, 18

70 Fed. Reg. 70623-03 (Nov. 22, 2005) ....................................................................4

Fed. R. Civ. P. 9(b) .............................................................................................*passim*

## OTHER AUTHORITIES

Amended Complaint, *In re Celexa & Lexapro Marketing & Sales Practices Litigation*, No. 09-MD-2067-NMG, 2016 WL 769585 (D. Mass. Jan. 15, 2016) ......................................................................................26

Complaint, *United States ex rel. Nee v. Biogen Inc.*, No. 1:17-cv-10192-FDS (D. Mass. Mar. 21, 2017) (ECF No. 5) .............................................3

Notice of Intervention, *United States ex rel. Nee v. Biogen Inc.*, No. 1:17-cv-10192-FDS (D. Mass. Dec. 17, 2020) (ECF No. 47).............................3

United States Department of Justice, Press Release, *Biogen Agrees To Pay $22 Million To Resolve Alleged False Claims Act Liability For Paying Kickbacks* (Dec. 17, 2020), *available at* https://www.justice.gov/opa/pr/biogen-agrees-pay-22-million-resolve-alleged-false-claims-act-liability-paying-kickbacks...............................3

## STATEMENT REGARDING ORAL ARGUMENT

Appellee Biogen Inc. believes that oral argument would assist the Court and requests to be heard.

## INTRODUCTION

In 2020, without any admission of liability, Biogen resolved a Department of Justice ("DOJ") investigation, based on a *qui tam* complaint, into whether donations Biogen made to charities providing copay assistance to Medicare patients were kickbacks and violated the False Claims Act.  Humana Inc., a health-insurance company with Medicare insureds, filed the present action attempting to shoehorn the allegations in the *qui tam* complaint into a civil claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO").  The district court correctly dismissed Humana's complaint for failure to state a claim on two independent bases.  First, the court held that, because Humana did not directly purchase Biogen's drugs, it lacked standing to assert a civil RICO claim.  Add.24, 34.  Second, the court found that the complaint's RICO allegations fell woefully short of Federal Rule of Civil Procedure 9(b)'s specificity requirement, failing to include necessary details concerning allegedly fraudulent misrepresentations made directly to Humana, or use of the mail or wires in perpetrating the alleged scheme.  Add.33.  The district court subsequently denied Humana's post-dismissal motion seeking reconsideration of its decision and leave to amend the complaint.

Humana's appeal fails to identify any error or abuse of discretion in the district court's decisions. The dismissal order should be affirmed.

## STATEMENT OF ISSUES

1.      Whether the district court correctly dismissed the complaint because the direct purchaser rule bars Humana from asserting a civil RICO claim.

2.      Whether the district court correctly dismissed the complaint on the alternative ground that Humana failed to plead any predicate acts of mail or interstate wire fraud with sufficient particularity under Federal Rule of Civil Procedure 9(b).

3.      Whether the district court acted within its discretion in denying Humana's post-dismissal motion for leave to file an amended complaint.

## STATEMENT OF THE CASE

### A.    Humana's Allegations[1]

Biogen is a pharmaceutical company and manufacturer of Tysabri, Avonex, and Tecfidera, each of which is indicated for the treatment of multiple sclerosis ("MS") (the "MS Drugs"). A16(¶12); A23(¶39). Advanced Care Scripts, Inc. ("ACS") is a specialty pharmacy that provides patient-management services to pharmaceutical companies, including dispensing drugs requiring specialized

---

[1] As required in this appeal from the grant of a motion to dismiss, Biogen takes the complaint's allegations as true without admitting their accuracy. *See Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011).

patient support.  A16(¶13).  Under Medicare Part C (also known as Medicare Advantage) and Part D, private insurers such as Humana offer prescription drug plans, and their insureds often have certain copay obligations.  A18(¶24); A21(¶32); A23(¶37).

In 2017, a relator brought a *qui tam* action under the False Claims Act alleging that Biogen violated the Anti-Kickback Statute ("AKS") by making donations to charitable foundations that provided copay assistance to patients.  *See* A13(¶7); Compl., *United States ex rel. Nee v. Biogen Inc.*, No. 1:17-cv-10192 ¶ 8 (D. Mass. Mar. 21, 2017) (ECF No. 5).  The United States intervened in part for settlement purposes only, and Biogen and the United States settled with no admission of fault.  *See* A13(¶7); *see also* Notice of Intervention, *United States ex rel. Nee v. Biogen Inc.*, No. 1:17-cv-10192 (D. Mass. Dec. 17, 2020) (ECF No. 47).[2]  Humana's complaint in this case relies heavily on the allegations from that case.  *See* A13(¶7); A38(¶87).  Indeed, at times, Humana's allegations are pulled directly from the *qui tam* complaint.  *See* ACS Br. Statement of the Case Part D.

Humana admits that manufacturer support of copay assistance is not "inherently improper" and that drug manufacturers are not "barred from making

---

[2] Humana's complaint (A14(¶8)) cites to the DOJ's press release following the settlement.  This press release expressly states that "there has been no determination of liability."  https://www.justice.gov/opa/pr/biogen-agrees-pay-22-million-resolve-alleged-false-claims-act-liability-paying-kickbacks.

genuinely charitable donations for copay assistance." A25(¶48).[3] Humana alleges, however, that Biogen made improper donations to two charitable foundations—the Chronic Disease Fund ("CDF") and The Assistance Fund ("TAF") (collectively, the "Foundations")—and that alleged "co-conspirators" Biogen, ACS, CDF, and TAF schemed to steer Biogen's donations to patients who were prescribed Biogen's MS Drugs. *See, e.g.*, A16-17(¶¶14-15); A29-30(¶¶59-61).

Humana claims it was injured because, but for the alleged scheme, Biogen would have reduced its price to compete with other therapies and some patients might have switched to a cheaper alternative treatment. A13(¶6); A28-29(¶¶56-57). Humana acknowledges, however, that it does not purchase drugs directly from Biogen. Instead, Humana admits on appeal and in its pleadings that there is a "chain of distribution" that includes at least "wholesale distributors" that first purchase the drugs from Biogen. Br. 5, 16, 24; *see also* A18-19(¶25); A312-313(¶31). Those distributors later sell the drugs to pharmacies or physicians for

---

[3] In 2005, the Office of Inspector General of the Department of Health and Human Services ("OIG") issued a Special Advisory Bulletin recognizing the "importance of ensuring that financially needy [Part D] beneficiaries … receive medically necessary drugs" and providing guidance about how manufacturers could provide such assistance without violating the AKS. *See* 70 Fed. Reg. 70623-03, 70624, 70626 (Nov. 22, 2005); *see also* A21(¶32). OIG's guidance explained how manufacturers could donate to independent charities that provide copay assistance without implicating AKS concerns. The Court may take judicial notice of material published in the Federal Register. *See Redfern v. Napolitano*, 727 F.3d 77, 83 n.4 (1st Cir. 2013).

supply to patients; insurers like Humana then reimburse the pharmacy or physician for the cost of the drug (less any copay already collected). A19(¶27); A312-313(¶31); A322-323(¶56).

Humana alleges that, by its copay assistance activity, Biogen violated federal anti-kickback laws. A11(¶2). Humana seeks to leverage that allegation to support claims for violation of RICO, conspiracy to violate RICO, and violations of various state laws. A38-56(¶¶88-162). Humana's RICO claims are based on alleged fraudulent misrepresentations of compliance with federal law, transmitted via wire or mail.

## B.    Procedural History

Biogen and ACS separately moved to dismiss the complaint, explaining that Humana's claims were time-barred, that Humana lacked standing to bring civil RICO claims because it did not directly purchase the MS Drugs, and that Humana failed to adequately allege the required RICO elements of an enterprise, pattern of racketeering activity, proximate causation, and injury. *See* A6-7(Dkt. 29-30).[4]

The district court granted the motions to dismiss on two independent bases. First, the court found that Humana lacked standing to sue under RICO. Add.24, 34. Specifically, the court ruled that Humana, as an insurer, was barred from

---

[4] Biogen also moved to dismiss Humana's state law claims as insufficiently pled and argued that the district court should decline to exercise supplemental jurisdiction if it dismissed Humana's RICO claims. *See* A7(Dkt. 30).

asserting a civil RICO claim because Humana did not purchase the allegedly overpriced drugs directly from Biogen; rather, Humana admitted that its reimbursements for Biogen's drugs followed purchases by upstream wholesalers and distributors or by pharmacies. Add.13-14. The district court also explained that "[b]ecause the complaint fails to plead a substantive RICO claim, its claim for conspiracy to commit RICO must also be dismissed." Add.33.

The court also ruled that Humana failed to allege the fraud underlying its RICO claims with sufficient particularity under Rule 9(b). Add.33. The court explained that Humana's general allegations of mail or wire fraud failed to reveal which Defendant made which communication, when each was made, what it contained, and whether it was by mail or interstate wire. Add.28. Even Humana's sample list of communications to its own specialty pharmacy (Exhibit A to the complaint) failed to specify who made each communication and whether it was made by mail or by interstate wire—an omission the court found "particularly puzzling." Add.28. The court further explained that, while Humana alleged that the Defendants made misrepresentations in the form of false certifications submitted directly to Humana, the complaint failed to state how, when, and where the false certifications were made and the actual language constituting each misrepresentation. Add.31. To the extent that Humana based its misrepresentation allegations on a contract between Humana and Biogen, the court stated that the

complaint failed to allege with particularity the contract's date, the specific contractual language at issue, and the connection between the contract and the alleged scheme. Add.33.

Although Humana had not moved to amend its complaint, the district court noted that there was "no basis to permit Humana leave to amend, as may be the case when the critical information is not in the plaintiff's possession." Add.28 n.17. The court declined to exercise supplemental jurisdiction over Humana's state-law claims. Add.33-34.

Humana sought to set aside the dismissal by way of a motion for reconsideration and for leave to file an amended complaint. *See* A9(Dkt. 55-56). The district court denied Humana's motion, ruling that Humana's request for reconsideration "largely repeats arguments that this Court previously rejected" and that Humana failed to establish an error of law or a misapprehension of the facts warranting reconsideration. Add.37, 39. The district court also ruled that there was "no basis to revisit" its prior decision denying Humana leave to amend, since any such amendment would be futile. Add.39. The court explained that "the 'practice of seeking leave to amend after the case has been dismissed' is 'discouraged'" because it is "inefficient, unfair to defendants, and burdensome to the court." Add.39 (quoting *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 247 (1st Cir. 2015)).

## SUMMARY OF THE ARGUMENT

1.     The district court properly held that Humana lacks standing to assert

its RICO claim because it is not a direct purchaser of the MS Drugs.  While the

"direct purchaser rule" first emerged in the antitrust context, it applies with equal

force to RICO because Congress borrowed the operative language from the very

antitrust provision the Supreme Court construed when establishing the direct

purchaser rule in *Hanover Shoe, Inc. v. United Shoe Machine Corp.*, 392 U.S. 481

(1968), and *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  Under both statutes,

a plaintiff must show that it was "injured in [its] business or property."  15 U.S.C.

§ 15(a); 18 U.S.C. § 1964(c).  As an interpretation of statutory text, the direct

purchaser rule is a "bright line" rule that bars damages actions by indirect

purchasers on the ground that only the first, direct purchaser is "injured" within the

meaning of the statute.  *In re New Motor Vehicles Canadian Export Antitrust

Litig.*, 533 F.3d 1, 3 (1st Cir. 2008); *see also Illinois Brick*, 431 U.S. at 729.

Humana itself alleges (Br. 5, 16, 24; A312-313(¶31)) that Biogen first sold

the MS Drugs to wholesalers or distributors, who then sold to pharmacies or

medical providers, who then filled or administered a prescription to a patient; only

thereafter was Humana allegedly injured by reimbursing for the prescription.

These facts render Humana at best an indirect purchaser, not a direct purchaser.

*See Humana, Inc. v. Indivior, Inc.*, No. 21-2573, 2022 WL 17718342, at *2 (3d

Cir. 2022) (describing Humana as an "end payor" who is "barred from recovery in a RICO action by the indirect-purchaser rule"); *MSP Recovery Claims, Series LLC v. Pfizer, Inc.*, No. 22-cv-1419-DLF, 2024 WL 1344446, at *10 (D.D.C. Mar. 30, 2024) (holding that direct purchaser rule barred plaintiffs' RICO claim because "Pfizer's distributors paid those increased prices first and suffered injury as a result").

Humana attempts to rely on its reimbursement of Appellee ACS for patients' purchases of MS Drugs to confer standing. But even if reimbursements qualified as "purchases," *see* ACS Br. Part I, the direct purchaser rule would still apply. While some courts make an exception allowing RICO claims by a plaintiff that directly purchases from one conspirator, that "co-conspirator exception" only applies where ***all*** purchasers ahead of the plaintiff in the distribution chain conspired with the manufacturer to cause the overcharge and were named as defendants. Those circumstances are not present here, as Humana itself alleges there are non-conspiring purchasers (such as wholesalers or distributors) between Biogen and Humana.

2. This Court may affirm the district court's judgment without relying on the direct purchaser rule, however, because Humana also failed to plead the fraud underlying its RICO claims with particularity under Rule 9(b). Humana's bald allegations that Biogen "used thousands of mail and interstate wire

communications to create and manage their scheme" and "caus[ed] thousands of reimbursement requests to be submitted to Humana over the wires or by mail," A36(¶80), are exactly the kind of conclusory assertions Rule 9(b) forecloses.  Even the specific claims for reimbursement on which Humana relies fail to state the time, place, and content of the communications, as well as whether the communication occurred by mail or wire.  Humana cannot claim that it lacked pertinent information, as its own complaint establishes that it possessed information related to claims for reimbursement from its *own* specialty pharmacy that it inexplicably failed to include.

Humana's assertions that Biogen made alleged misrepresentations likewise fail to comply with Rule 9(b).  Despite alleging that Biogen made false certifications of compliance with federal law directly to Humana, the complaint fails to identify when, where, and how the supposedly false certifications were made or the specific language alleged to be misleading.  The complaint obliquely references a 2006 contract related to commercial insurance, but Humana does not explain the contract's significance to the scheme it alleges.  The district court correctly concluded that Humana's failure to comply with Rule 9(b) independently warranted dismissal.

3.     Humana's challenges to the district court's denial of Humana's post-dismissal motion for leave to amend the complaint also fail.  The court properly

concluded that Humana's proposed amended complaint was futile because it failed to remedy Humana's original pleading failures. Even with its added allegations, the proposed amended complaint cannot overcome the presence of innocent intermediaries between Biogen and Humana, which firmly establish that Humana is not a direct purchaser. Nor does the proposed amended complaint remedy the Rule 9(b) deficiencies, as it still fails to identify how and when Biogen made any supposed misrepresentations, the specific misleading language, who sent the claims for reimbursement submitted to Humana, whether they were sent by mail or interstate wire, and how the added references to wire transfers are relevant, if at all, to the alleged scheme.

This Court should affirm the district court's dismissal order.

## STANDARD OF REVIEW

This Court reviews the complaint's dismissal *de novo*. *Douglas v. Hirshon*, 63 F.4th 49, 54-55 (1st Cir. 2023), *cert. denied*, 144 S. Ct. 621 (2024). The Court "accept[s] as true the complaint's well-pleaded factual allegations, and draw[s] all reasonable inferences in favor of the non-moving party." *McKee v. Cosby*, 874 F.3d 54, 59 (1st Cir. 2017). The Court "do[es] not credit legal labels or conclusory statements, but rather focus[es] on the complaint's non-conclusory, non-speculative factual allegations and ask[s] whether they plausibly narrate a claim for relief." *Cheng v. Neumann*, 51 F.4th 438, 443 (1st Cir. 2022).

The Court reviews the denial of leave to amend the complaint for abuse of discretion, the same deferential standard which would have applied to review of the district court's denial of Humana's motion for reconsideration under Rules 59 and 60 (which Humana chose not to appeal). *Palmer v. Champion Mortg.*, 465 F.3d 24, 30 (1st Cir. 2006); *see Faria v. Harleysville Worcester Ins. Co.*, 852 F.3d 87, 90 (1st Cir. 2017); *Boston Parent Coal. for Acad. Excellence Corp. v. School Comm. for City of Bos.*, 89 F.4th 46, 62 (1st Cir. 2023). This Court "discourage[s] th[e] practice of seeking leave to amend after the case has been dismissed." *Abiomed, Inc.*, 778 F.3d at 247 . "[T]he district court enjoys significant latitude in deciding whether to grant leave to amend." *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 55 (1st Cir. 2008). A district court's decision will be affirmed "so long as the record evinces an adequate reason for the denial," such as "undue delay, bad faith, futility, [or] the absence of due diligence on the movant's part." *Palmer*, 465 F.3d at 30 (quotation marks omitted).

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY RULED THAT HUMANA LACKS STANDING TO PURSUE CIVIL RICO CLAIMS

Under the direct purchaser rule, only the first purchaser in the chain of distribution may bring a claim for alleged overpayments suffered due to a RICO violation. Humana repeatedly alleges that Biogen inflated drug prices and boosted demand for its MS Drugs over less expensive alternatives. A11(¶2); A28-29(¶57);

A42-43(¶¶110-111). But while Humana alleges that it ultimately had to pay out more money in reimbursements, it admits that it did not purchase any allegedly price-inflated drugs directly from Biogen. Br. 33-34, 36. Instead, Humana asserts, Biogen first sold its drugs to wholesalers or distributors, who then sold to pharmacies or medical providers, who then filled (or administered) a prescription for patients;[5] only then did Humana reimburse for the drug. *See* A312-313(¶31); A322-323(¶56); A351(¶130); *see also* Br. 5 (stating the "chain of distribution" includes "wholesale distributors"). As this Court held in *New Motor Vehicles*, recovery of such a "passed on" overcharge is what the "bright line" direct purchaser rule forecloses. 533 F.3d at 3 (discussing *Hanover Shoe* and *Illinois Brick*).

### A. The Direct Purchaser Rule Of *Hanover Shoe* And *Illinois Brick* Applies To Civil RICO Claims

As first explained in the antitrust context, the "direct purchaser rule" embodies two interrelated concepts. First, as the Supreme Court held in *Hanover Shoe*, it provides that a direct purchaser is injured by the full amount of the overcharge it paid, regardless of whether it passes the overcharge on to downstream customers. 392 U.S. at 489-490. Second, as the Supreme Court confirmed in *Illinois Brick*, those downstream "indirect purchasers" may not claim

---

[5] Because Tysabri is injected intravenously, it is administered by a medical provider, rather than a pharmacy. A24(¶42).

passed-on overcharges as damages. 431 U.S. at 728-729. In effect, the Court held that an overcharge passed on from a direct purchaser to an indirect purchaser could not be used either "defensively" (by a defendant to reduce a direct purchaser's damages) or "offensively" (by downstream purchasers seeking damages based on it). *Id.*; *New Motor Vehicles*, 533 F.3d at 3. This case involves the operation of that second aspect of the direct purchaser rule, namely the bar on indirect purchaser claims.

Humana invites this Court to become the first court of appeals in the Nation to hold the indirect purchaser bar inapplicable to RICO and thereby split from the three other courts of appeals that have decided the question. Humana goes so far as to argue that this Court has already done so implicitly—in the context of two cases in which the Court was never even asked to apply the indirect purchaser bar. Humana's arguments are inconsistent with the statutory language and context, misconstrue governing precedent, and contradict the complaint's own factual allegations.

### 1. RICO's statutory language compels application of the direct purchaser rule of *Hanover Shoe* and *Illinois Brick*

As three other courts of appeals have held, the text of RICO's damages provision, 18 U.S.C. § 1964(c), shows that Congress meant to incorporate the antitrust law's direct purchaser rule. RICO authorizes a damages claim by any person "injured in his business or property by reason of" a RICO violation. *Id.*

Congress "modeled" that provision on—and indeed borrowed word-for-word from—Section 4 of the Clayton Act, 15 U.S.C. § 15(a), which provides that any person "injured in his business or property by reason of" an antitrust violation may sue. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 267-268 (1992). And the holdings in *Hanover Shoe* and *Illinois Brick* arose from the Supreme Court's construction of the phrase "injured in his business or property." *See California v. ARC Am. Corp.*, 490 U.S. 93, 102-103 (1989) ("As we made clear in *Illinois Brick*, the issue before the Court in both that case and in *Hanover Shoe* was strictly a question of statutory interpretation—what was the proper construction of § 4 of the Clayton Act.").

In *Hanover Shoe*, decided two years before RICO's enactment in 1970, the Supreme Court held that the words "injured in his business or property" concentrated the right to sue for overcharges in the first purchaser in the distribution chain, regardless of whether that purchaser passed any overcharge on to downstream purchasers. 392 U.S. at 488-490. The Court observed that the principle of allowing direct purchasers to recover the full overcharge was firmly entrenched. *Id.* at 488-490 & n.8 ("The general tendency of the law, in regard to damages at least, is not to go beyond the first step." (quotation marks omitted)); *see also County of Oakland v. City of Detroit*, 866 F.2d 839, 851 (6th Cir. 1989) (the drafters of the antitrust laws were "unsympathetic to the view" that an indirect

purchaser could sue). Thus, even Humana's amici agree that *Hanover Shoe* involved "statutory construction of § 4 of the Clayton Act." Scholars' Br. 5.

The Supreme Court reiterated this construction nine years later in *Illinois Brick*, which affirmed that "a direct purchaser suing for treble damages under § 4 of the Clayton Act is injured within the meaning of § 4 by the full amount of the overcharge paid by it." 431 U.S. at 724-725. The Court explained that *Hanover Shoe* dictated the indirect purchaser bar as a matter of statutory interpretation: "[W]e decline to abandon the construction given § 4 in *Hanover Shoe* that the overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party 'injured in his business or property.'" *Id.*

Congress's use of the same words in RICO—"injured in his business or property"—compels the conclusion that RICO incorporates the direct purchaser rule recognized in *Hanover Shoe* as well. It is a "longstanding interpretive principle" that "when a statutory term is obviously transplanted from another legal source, it brings the old soil with it." *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (quotation marks omitted); *see also Greenwood Tr. Co. v. Massachusetts*, 971 F.2d 818, 827 (1st Cir. 1992) (where "Congress borrows language from one statute and incorporates it into a second statute, the language of the two acts should be interpreted the same way," which "includes prior judicial interpretations of the transplanted language"). It is thus "fair[] [to] credit the 91st Congress, which

enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used first." *Holmes*, 503 U.S. at 267-268.

The incorporation of the antitrust laws' direct purchaser rule into RICO makes eminent sense. By allowing the direct purchaser, and only the direct purchaser, to claim the entirety of an overcharge as damages, the rule minimizes the "risk of multiple liability for defendants," *Illinois Brick*, 431 U.S. at 730, "eliminate[s] the complications of apportioning overcharges between direct and indirect purchasers," *Kansas v. Utilicorp United*, 497 U.S. 199, 208 (1990), and increases the deterrent effect of the antitrust laws, *Hanover Shoe*, 392 U.S. at 494. Those principles benefit the enforcement of RICO as well. *See Carter v. Berger*, 777 F.2d 1173, 1176-1177 (7th Cir. 1985) (Easterbrook, J.) (application of direct purchaser rule to RICO "promotes deterrence" and avoids "the difficulties of apportioning the recovery between the direct and indirect purchasers").

Accordingly, every court of appeals to address the issue (the Third, Sixth, and Seventh Circuits) has concluded that the direct purchaser rule applies to RICO. *Carter*, 777 F.2d at 1175-1176 ("[*Illinois Brick*] should apply to RICO cases, not the least because the damages provision in § 1964(c) is practically verbatim the damages provision in the antitrust laws."); *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996) ("The precepts taught by *Illinois Brick* and *Utilicorp* apply to RICO claims, thereby denying RICO standing to indirect victims.");

*County of Oakland*, 866 F.2d at 851 (applying *Hanover Shoe* and *Illinois Brick* to RICO claim because RICO was "patterned directly on § 4 of the Clayton Act"); *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 613 (6th Cir. 2004) (explaining that *Holmes* incorporated into RICO "a long line of Supreme Court cases denying antitrust standing to plaintiffs who suffer derivative or 'passed-on' injuries"); *see also Humana*, 2022 WL 17718342, at *3 ("We later recognized in *McCarthy* that the same policy concerns [underpinning *Illinois Brick*] apply to RICO cases. Thus, the indirect purchaser rule is applicable here.").

Humana and its amici provide no basis for this Court to break off from every other court of appeals to address the matter. Humana and its amici cite no decision holding that the direct purchaser rule does not apply to RICO. Their arguments instead are premised on misreading Supreme Court precedent and erroneously construing clear holdings of sister circuits as "dicta."[6]

---

[6] Humana's observation that *Illinois Brick* postdated RICO's passage (Br. 29-30) is immaterial, since *Hanover Shoe* predated RICO. As the Supreme Court made clear, *Hanover Shoe* itself construed Section 4 of the Clayton Act to provide that the "overcharge direct purchaser, and not others in the chain of manufacture or distribution, is the party 'injured in his business or property.'" *Illinois Brick*, 431 U.S. at 729. Indeed, even Humana's amici concede (at 5) that the indirect purchaser bar confirmed in *Illinois Brick* "has its roots in *Hanover Shoe*." And the relative timing of *Illinois Brick* ultimately does not matter, as the Court should still interpret the same statutory language in the same way. *Greenwood*, 971 F.2d at 827.

Humana's amici erroneously argue (at 20) that the decisions of the Third Circuit in *McCarthy*, the Sixth Circuit in *Trollinger*, and the Seventh Circuit in *Carter* are dicta. Courts in the Third Circuit disagree. *See Humana, Inc. v. Indivior Inc.*, No. 20-5014, 2021 WL 3101593, at *12 (E.D. Pa. July 22, 2021). Indeed, the Third Circuit itself recently applied *McCarthy* in finding the direct purchaser rule barred Humana's standing in a similar case where it claimed to have been the victim of passed-on inflated costs first charged to wholesalers. *Humana*, 2022 WL 17718342, at *2 (Humana's allegations "fit[] the description of a 'third-party payor' who is barred from recovery in a RICO action by the indirect-purchaser rule").[7]

Similarly, courts in the Sixth Circuit have not treated *Trollinger* as dicta. *E.g.*, *Counts v. General Motors, LLC*, 606 F. Supp. 3d 678, 703 (E.D. Mich. 2022) ("The Sixth Circuit has extended *Illinois Brick*'s antitrust rule to RICO."). In any event, *County of Oakland* squarely held that *Hanover Shoe* and *Illinois Brick* extended to RICO. 866 F.2d at 851. Nor is it the case that *Carter* "no longer appears to be the law in the Seventh Circuit" (Scholars' Br. 22); the Seventh Circuit has reiterated that the direct purchaser rule "applies to RICO claims as

---

[7] Nor is there any "tension" between *McCarthy* and *In re Avandia Marketing Sales Practices & Product Liability Litigation*, 804 F.3d 633 (3d Cir. 2015) (Scholars' Br. 21). *Avandia* did not discuss or apply the indirect purchaser bar, as the Third Circuit later explained. *Humana*, 2022 WL 17718342, at *1 & *4 n.32.

well, as indeed it's been held to do." *Fiala v. B&B Enters.*, 738 F.3d 847, 851 (7th Cir. 2013) (citing *Carter*, *McCarthy*, and other cases).

Humana's attempts to limit *McCarthy* and *Trollinger* to cases involving an "illegal overcharge" from price fixing or *Carter* to an "indirectly injured" party (Br. 31-33) likewise fail. As detailed below (pp. 26-29), Humana **does** claim an overcharge injury; Humana's claim that it paid out more for drugs than it otherwise would have squarely "fits the description" of an indirect purchaser claim. *Humana*, 2022 WL 17718342, at *2. That is because the direct injury, if any, was first suffered by distributors that paid supposedly "increased prices" for Biogen's drugs. *MSP Recovery Claims*, 2024 WL 1344446, at *10. Humana's alleged injury thus flows entirely from costs that distributors passed down the chain of distribution. *Id.* And while RICO cases occasionally speak of a bar on "indirect victim" suits (Br. 33, 35), that is a "broader version of the indirect purchaser rule, which bars not only the claims of indirect purchasers, but the claims of all indirect victims of any kind." *United Healthcare Servs., Inc. v. United Therapeutics Corp.*, No. DLB-22-2948, 2024 WL 1256266, at *10 (D. Md. Mar. 25, 2024); *see also Fiala*, 738 F.3d at 851 (similar).

### 2. Cases clarifying RICO's proximate cause requirements do not abrogate the direct purchaser rule

Unable to marshal any precedent rejecting the application of the direct purchaser rule of *Hanover Shoe* and *Illinois Brick* in the RICO context, Humana

instead focuses on precedent from the Supreme Court and this Court applying generalized proximate cause principles, also adopted from antitrust law. Humana contends those cases—including this Court's decisions in *In re Neurontin Marketing & Sales Practices Litig.*, 712 F.3d 21, 34 (1st Cir. 2013), and *In re Celexa & Lexapro Marketing & Sales Practices Litig.*, 915 F.3d 1 (1st Cir. 2019)—*implicitly* reject interpreting RICO in the same way as *Hanover Shoe* and *Illinois Brick* interpreted the Clayton Act's identical language. But *Neurontin, Celexa*, and Humana's other cases never address whether RICO allows an indirect purchaser to recover a passed-on overcharge. Instead, those cases construe a different statutory phrase—"by reason of"—as importing common law proximate causation. They do not eliminate the separate direct purchaser rule rooted in the separate statutory requirement that a plaintiff be "injured in [its] business or property." The district court correctly held that the direct purchaser rule for standing purposes and those general proximate cause principles are distinct limitations on the causes of action.[8]

Humana first argues (Br. 20-21) that the Supreme Court's decision in *Holmes* somehow rendered the direct purchaser rule inapplicable to RICO because,

---

[8] Although Biogen respectfully disagrees with the district court's ruling on proximate causation, Biogen does not appeal it at this stage. Biogen reserves the right to contest proximate causation in future proceedings, if necessary.

in that case, the Court did not address or apply *Illinois Brick*. But the Court in

*Holmes* had no occasion to consider *Illinois Brick*, because the plaintiff was not an

indirect purchaser seeking damages due to a passed-on overcharge. 503 U.S. at

261. Rather, the *Holmes* plaintiff was an entity forced to reimburse victims of a

stock manipulation scheme—*i.e.*, it did not purchase anything at all. *Id.*

Recognizing (correctly) that the RICO damages statute was derived from Section 4

of the Clayton Act, the Supreme Court applied the proximate cause analysis

articulated in *Associated General Contractors of California, Inc. v. California*

*State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), which is the standard

for determining whether a claimed injury was suffered "by reason of" an antitrust

violation. *Holmes*, 503 U.S. at 268; *see Neurontin*, 712 F.3d at 34 ("In *Holmes*, the

Supreme Court held that the civil RICO provision's 'by reason of' language

contains both but-for causation and proximate causation requirements.").

Nor do the cases cited by Humana's amici (at 17-18) address an injury

passed down a chain of distribution. *Anza v. Ideal Steel Supply Corp.*, 547 U.S.

451 (2006), addressed a lawsuit between competitors, not a purchaser's injury. *Id.*

at 453-454, 456-460. *Bridge v. Phoenix Bond & Indem. Corp.*, 553 U.S. 639

(2008), involved competing bidders for state tax liens; the plaintiff did not claim

that it purchased anything the defendant sold. *Id.* at 642-643. And in *Hemi Group,*

*LLC v. City of N.Y.*, 559 U.S. 1 (2010), the City of New York sued a cigarette

seller for failure to report cigarette purchasers to the state so the city could then seek those reports and collect taxes; the city did not claim that it was injured by purchasing cigarettes itself. *Id.* at 4, 10. Because these cases did not involve injury to a purchaser, they did not present an opportunity to address the applicability of the direct purchaser rule.

But just as *AGC* "neither overruled *Illinois Brick* nor limited its application," *McCarthy*, 80 F.3d at 850, *Holmes* and the other cases amici cite do not foreclose application of the direct purchaser rule to RICO. As this Court has explained, although certain elements of *AGC* and the direct purchaser rule "sometimes overlap," they are separate and distinct limitations. *SAS of Puerto Rico Inc. v. Puerto Rico Tel. Co.*, 48 F.3d 39, 43-44 & nn.2-3 (1st Cir. 1995). And, as the Supreme Court recently emphasized, the "bright line" direct purchaser rule continues to foreclose damages claims based on "passing an overcharge down a chain of distribution." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1524-1525 (2019).

Because the "bright line" direct purchaser rule of *Hanover Shoe* and *Illinois Brick* and the proximate cause analysis of *AGC* are distinct limitations, the district court was correct to distinguish this Court's *Neurontin* decision on the ground that it "only addressed the issues of but-for and proximate causation; it did not address the indirect purchaser rule, or indeed the question of standing at all." Add.19.

Emphasizing labels rather than substance, Humana (Br. 25-26) and its amici (at 5-7) argue that the district court was wrong to characterize the direct purchaser rule as providing a "standing" rule distinct from "proximate causation" addressed in *Neurontin* and *Holmes*. As this Court has noted, caselaw has certainly introduced confusion around the labeling of various antitrust "standing" and "proximate cause" concepts. *SAS of Puerto Rico*, 48 F.3d at 43. Humana and its amici illustrate this confusion by getting cross-wise with each other, with Humana claiming that both *Illinois Brick* and *Holmes* addressed "standing," Br. 26, and its amici saying *Illinois Brick* was not about standing at all, Scholars' Br. 5.

This well-documented confusion, though perhaps worthy of clarification, does not show any error in the district court's analysis. Like the district court, this Court has called the direct purchaser rule a "standing" doctrine. *New Motor Vehicles*, 533 F.3d at 2 ("Because plaintiffs are indirect purchasers, they lack standing to sue under section 4 of the Clayton Act[.]"). This Court has also described *Holmes* and *AGC* as addressing "proximate cause." *Neurontin*, 712 F.3d at 34-35. And while other courts might call *AGC* a standing doctrine or the direct purchaser rule a proximate cause doctrine, what matters is that the two are "analytically distinct" limitations on which entities may sue, and they should both be enforced and not conflated. *Blue Shield of Va. v. McCready*, 457 U.S. 465, 476 (1982); *McCarthy*, 80 F.3d at 851 n.14. As a result, it would be erroneous to read

*Neurontin*'s application of *AGC* as implicitly rejecting application of the indirect

purchaser bar in the RICO context. *Cf. Hernandez-Lara v. Lyons*, 10 F.4th 19, 37

(1st Cir. 2021) (declining to read a holding into the "majority's silence" on an

issue).

Further, while Humana tries to frame the plaintiff in *Neurontin* (Kaiser) as

an indirect purchaser (Br. 25), that was not how the case came to this Court. The

district court in *Neurontin* applied the direct purchaser rule: citing *Hanover Shoe*, it

held that Kaiser was entitled to seek its full payment as damages, even though it

passed on its injury through increased premiums. *In re Neurontin Marketing &*

*Sales Practices Litig.*, 799 F. Supp. 2d 110, 119-120 (D. Mass. 2011). The

defendant (Pfizer) did not challenge that finding on appeal, nor did it claim that

Kaiser's damages arose from overcharges passed down to it, triggering the indirect

purchaser bar. As a result, the only "proximate cause" issue *Neurontin* addressed

was whether—because the allegedly fraudulent marketing of Neurontin was

directed to physicians and because physicians make independent prescribing

decisions based on multiple factors—Kaiser could establish that Pfizer's marketing

proximately caused Kaiser to reimburse allegedly unnecessary and ineffective

prescriptions. 712 F.3d at 34-40.

The three-sentence holding on proximate cause in *Celexa* is no different.

The *Celexa* complaint alleged that the defendant "manufactures, distributes, and

sells prescription products, including Celexa and Lexapro." Amend. Compl. ¶¶ 11-12, *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, No. 09-MD-2067-NMG, 2016 WL 769585 (D. Mass. Jan. 15, 2016). This Court simply concluded, on a motion to dismiss, that the allegation that pediatricians (who prescribed but did not purchase the drugs at issue) were the target of the scheme did not undermine proximate causation. 915 F.3d at 14. The indirect purchaser bar was neither raised nor addressed.

### 3. Humana's attempts to confine the direct purchaser rule fail

Humana further argues that the direct purchaser rule should be narrowly confined to "'classic' antitrust claim[s] involving illegal overcharges." Br. 26-27. But that is precisely the type of damages Humana alleges. *See* Dist. Ct. Dkt. 56 (Humana's Memorandum in Support of Reconsideration) at 7 ("Humana allege[s] that ACS and Biogen acted in concert and conspired to ***overcharge*** for the MS Drugs.").[9] The complaint and proposed amended complaint are rife with statements that the alleged scheme allowed Biogen to "inflate both the number and price" of its drugs, A11(¶2), A25(¶46), "charge and maintain inflated prices," A39(¶90), "maintain or raise the price of the MS Drugs," A41-42(¶¶99, 110), avoid "lowering the price" of its drugs, A28-29(¶57), and have "free rein to inflate the price," A346(¶118).

---

[9] Emphases are added except where otherwise noted.

Before this Court, Humana studiously avoids repeating its many allegations that the alleged scheme resulted in inflated pricing. Humana's brief now speaks only of the alleged "increase in the number" of Biogen's MS Drugs that Humana reimbursed, *e.g.*, Br. 29, as if that would render the direct purchaser rule inapplicable to this case. It does not.

First, as the above demonstrates, the complaint clearly alleges that Humana's supposed harm came from inflated "price and utilization" of the MS Drugs. A36(¶81); *see also* A36-37(¶82) ("Biogen's scheme was designed to cause, and did cause, Humana … to pay more for prescriptions than it otherwise might have paid"); A41(¶100) ("Humana … would not have paid the higher prices that resulted from the illegal conduct"). A plaintiff cannot avoid the direct purchaser rule by rewriting its pleadings on appeal. *New Motor Vehicles*, 533 F.3d at 5 (rejecting plaintiffs' attempt to "re-frame" allegations to circumvent *Illinois Brick*, stating "[p]laintiffs' arguments take on qualities reminiscent of Lewis Carroll's *Through the Looking Glass*").

Second, even as to the "increased number" of reimbursements, the complaint alleges that, but for the supposed scheme, Humana would have reimbursed for "less expensive MS therapies, including generic drugs." A28(¶56); A39(¶93). Payment of a higher price for one product instead of a lower price for a competing product is a form of ***overcharge*** to which the direct purchaser rule regularly applies, including

in the pharmaceutical context. *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 45-46 (1st Cir. 2018) (plaintiffs alleging scheme designed to prevent "competition from generic[s]" were indirect purchasers because they purchased brand drug "from third party intermediaries").

The "higher prices" that Humana claims it paid (A41(¶100)) were first, according to Humana, charged to wholesalers and distributors, making those wholesalers and distributors the direct purchasers, and triggering the indirect purchaser bar on Humana's downstream claim here. *See* A312-313(¶31); A322-323(¶56); A351(¶130); Br. 5. As the Third Circuit recently explained, these allegations squarely fit the framework of the direct purchaser rule. *Humana*, 2022 WL 17718342, at *2; *see also MSP*, 2024 WL 1344446, at *10 (similar).

Finally, it does not matter whether Humana was the purported "target" of the alleged conspiracy (Br. 19, 26); either way, Humana remains at best an indirect purchaser. *See McCarthy*, 80 F.3d at 850 ("[A]n indirect purchaser, even if a 'direct target' of an antitrust conspiracy, lack[s] standing under *Illinois Brick*."); *Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958, 966 (3d Cir. 1983) (similar).

Accordingly, Humana has shown no basis in either the RICO statute or governing precedent for this Court to diverge from every other court that has ruled that the direct purchaser rule limits standing to assert civil RICO claims. Humana's effort to create a circuit split should be rejected.

## B. Humana Has Shown No Exception To The Direct Purchaser Rule

Humana alleges that, for each purchase of Biogen's drugs, there were at least two groups of innocent parties who purchased those drugs before Humana's reimbursement: (1) wholesalers or distributors and (2) patients who filled the prescription. These "antecedent transaction[s]" with "independent purchaser[s]" establish that the direct purchaser rule defeats Humana's standing. *See Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1169-1170 (8th Cir. 1998). Humana attempts to overcome this bright-line rule by (1) pointing to a so-called "co-conspirator exception" and (2) maintaining that it should have standing as a direct purchaser from an alleged co-conspirator (ACS). Humana's attempts to circumvent the direct purchaser rule fail for three reasons.

First, this Court has never recognized any co-conspirator exception to the direct purchaser rule. Br. 33-37. On the contrary, this Court has explained that, beyond the exceptions to the rule recognized in *Hanover Shoe* and *Illinois Brick* (neither of which Humana invokes here), courts have "refus[ed] to carve out exceptions to the *Illinois Brick* rule" because "determining when an *Illinois Brick* exception is truly justified would generate the type of complicated and costly litigation that the *Illinois Brick* rule was meant to avoid." *New Motor Vehicles*, 533 F.3d at 3. Courts have rejected Humana's desired "co-conspirator exception" in similar cases, where there are no allegations of fixed prices or restricted volume.

*Dickson v. Microsoft Corp.*, 309 F.3d 193, 215 (4th Cir. 2002) (holding co-conspirator exception is applicable only where prices are fixed); *cf. KPH Healthcare Servs., Inc. v. Mylan N.V.*, No. 20-2065-DDC, 2022 WL 3153687, at *23-27 (D. Kan. Aug. 8, 2022) ("[N]o court has applied a co-conspirator exception to an antitrust claim involving an alleged conspiracy to delay entry of a generic competitor[.]"). The Court need go no further to reject Humana's invitation.[10]

Second, even if the Court were to adopt the co-conspirator exception that some other courts have adopted, Humana did not purchase from a co-conspirator. To be sure, Humana argues that it was a direct purchaser from ACS, Br. 33-36, but as ACS's brief separately demonstrates (at Part I), those allegations are themselves insufficient. Patients, not Humana, purchased from ACS.

Finally, even if the Court deems Humana a direct purchaser from ACS, Humana still cannot take advantage of the exception. The co-conspirator exception, where recognized, "allocate[s] to the first non-conspirator *in the distribution chain* the right to collect 100% of the damages." *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631-632 (7th Cir. 2002); *see also Sports Racing Servs., Inc. v.*

---

[10] Humana attempts to read an adoption of the co-conspirator exception into the bare denial of permission to file an interlocutory appeal in *Marrero-Rolon v. Autoridad de Energia Electrica de P.R.*, No. 15-1167-JAG, 2016 WL 9459823, at *1 (D.P.R. Oct. 20, 2016), a case that is still pending in the District of Puerto Rico. Humana's view is flawed. The denial merely stated that the Court would await a "fuller record" (Add.41); the Court indicated no view of the merits.

*Sports Car Club of Am., Inc.*, 131 F.3d 874, 889 (10th Cir. 1997) (The "first 'innocent' purchaser in the chain of distribution" has standing). That "limited exception" applies only where ***all*** "middlemen" between the manufacturer and plaintiff are so bound up with the conspiracy that they could not sue under the "complete involvement defense," *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 379 (3d Cir. 2005), which requires a showing that the party was a "complete and substantially equal participant" in the conspiracy. *Sullivan v. National Football League*, 34 F.3d 1091, 1107 (1st Cir. 1994); *Roma Constr. Co. v. aRusso*, 96 F.3d 566, 582 (1st Cir. 1996) (Lynch, J., concurring) (explaining that RICO incorporates the "equal involvement defense"). The requirement that, for a co-conspirator exception to apply, all upstream sellers must be conspirators and joined as defendants is necessary to resolve the risk of duplicative recovery, by barring those intermediaries from suing in any subsequent lawsuit. *Howard Hess*, 424 F.3d at 379.

Notably, Humana recognizes that its desired co-conspirator exception allows only the "first non-conspirator in the chain of distribution to seek relief," but it cannot, and does not, allege that it is the "first non-conspirator" in the chain, nor does Humana join as defendants all upstream purchasers. *See* Br. 35. There are no allegations that "ACS made pricing, volume, or other equivalent sales decisions with" Biogen. *MSP*, 2024 WL 1344446, at *9. Humana's allegations—aimed at

***Biogen's*** price—establish that the relevant injury was first suffered by non-conspirator distributors who then potentially passed increased costs down the chain of distribution to pharmacies or physicians, then patients, and then eventually to Humana. *See* A312-313(¶31); Br. 5. Absent establishing that the distributors were equally involved members of the scheme (and naming those entities as defendants), the risk of duplicative recovery remains, and the co-conspirator exception does not apply. *Howard Hess*, 424 F.3d at 379.[11]

Rather than fit within this limited exception, Humana instead argues for its radical expansion, such that a purchase from any conspirator—even one who purchased from a non-conspirator—would satisfy the direct purchaser rule. Humana cites no case adopting such a position. *See MSP*, 2024 WL 1344446, at *11 (declining to "expand the co-conspirator exception further" to allow a suit in these circumstances). The cases Humana does cite do not support applying a co-conspirator exception when an upstream intermediary is uninvolved in the alleged conspiracy. In *Wallach v. Eaton Corp.*, 837 F.3d 356 (3d Cir. 2016), the Third Circuit explained that the exception applies when a "supplier *and* its supplier's

---

[11] The co-conspirator exception, even under Humana's view, would not apply to any reimbursements to pharmacies or physicians other than ACS. *See MSP*, 2024 WL 1344446, at *10 (explaining that co-conspirator exception could not assist plaintiffs where patients "did *not* purchase from ACS"). Humana's purchases from ACS were only a fraction of its overall purchases. *See* A323-324(¶57).

supplier" are co-conspirators. *Id.* at 362 n.3. *Insulate SB, Inc. v. Advanced Finishing Systems, Inc.*, 797 F.3d 538 (8th Cir. 2015), explained that the "direct purchaser" must be named as a co-conspirator and as a defendant. *Id. Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832 (7th Cir. 2020), explained that only the "first non-conspirator in the supply chain" has standing. *Id.* at 839. And in *Marrero-Rolon v. Autoridad de Energia Electrica de P.R.*, the plaintiffs alleged they were the first non-conspirators in the supply chain and that each link in the distribution chain above them was involved in the conspiracy. No. 15-1167-JAG, 2015 WL 5719801, at *1, 9 (D.P.R. Sept. 29, 2015).[12]

Humana speculates (Br. 24) that distributors were uninjured by the accused conduct because they passed on any increased costs. Whether distributors passed on the alleged overcharge is legally irrelevant, because they could still sue under the direct purchaser rule of *Hanover Shoe*. *See In re Brand Name Prescription Drugs*

---

[12] Humana's other cited cases involved schemes where ***all*** intermediaries were conspirators; they do not hold that a co-conspirator exception applies where an innocent non-conspirator purchased the products upstream from the plaintiff. *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 341-342 (7th Cir. 2022) (purchaser from distributor alleged that distributor and manufacturer were conspirators; no innocent intermediary); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1157 (9th Cir. 2019) (purchasers from DirecTV alleged conspiracy between NFL, NFL Teams, and DirecTV; no innocent intermediary). *Lowell v. American Cyanamid Co.*, 177 F.3d 1228 (11th Cir. 1999), involved a "vertical conspiracy with no allegations of passing on" and is clearly inapplicable here, where the claim is a passed-on injury down a chain of distribution. *Id.* at 1229-1232.

*Antitrust Litig.*, 123 F.3d 599, 606 (7th Cir. 1997) ("The only entities permitted to complain about the manufacturers' overcharging the wholesalers are the wholesalers themselves, the direct purchasers, even if every cent of the overcharge was promptly and fully passed on to the pharmacies in the form of a higher wholesale price."). "[D]irect purchasers who potentially experienced a net benefit from the defendants' conduct" are still injured in their business or property within the meaning of the statute and may sue for the full overcharge. *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1193 (11th Cir. 2003); *see MSP*, 2024 WL 1344446, at *10. Further, even if the finder of fact in this matter were somehow to conclude that the distributors were unharmed, that finding would not bind those non-party distributors in any future actions they bring. Thus, because Humana did not name the distributors as conspirators and defendants, this case presents the exact risk of duplicative recovery that the direct purchaser rule seeks to avoid. *Howard Hess*, 424 F.3d at 379; *MSP*, 2024 WL 1344446, at *10-11.

Moreover, Humana's own allegations undermine its contention that distributors suffered no injury. Humana claims that, but for the supposed scheme, Biogen would have faced pressure to reduce the price of its drugs or lose sales to competing alternatives. A346-347(¶118); *see* A327-328(¶¶63-64); A346(¶116). Taking that allegation as true, the distributors would—absent the scheme—have

been charged less for each Biogen drug.[13]  Given Humana's allegation that downstream consumers of Biogen's drugs are "price sensitive," *see* A346-347(¶118), the distributors could have potentially made more sales at a lower price point and earned more profit.  Thus, while Humana seeks support in some of the district court's statements (Br. 24), the most the district court could venture was that "the wholesaler (the direct purchaser) ***may*** have no incentive to file suit against the drug manufacturer" and that "the insurer ***may*** be the only injured party" (Add.23).  But as the district court rightly recognized, that kind of speculation does not justify creating new exceptions to the direct purchaser rule.  Indeed, it is precisely these complexities and the difficulty of determining an upstream intermediary's injury that prompted the direct purchaser rule's development in the first place.  *See Hanover Shoe*, 392 U.S. at 489; *Illinois Brick*, 431 U.S. at 745.

Because Humana is not a direct purchaser, and it has failed to allege that any exception to the direct purchaser rule applies, its federal RICO claim fails.

## II. HUMANA FAILED TO PLEAD ITS CIVIL RICO CLAIMS WITH SUFFICIENT PARTICULARITY UNDER RULE 9(B)

While the Court may affirm the district court judgment based on Humana's lack of standing to assert its civil RICO claims, the Court has the option of

---

[13] Given Humana's allegations that patients could potentially have switched to lower cost alternative therapies absent the alleged scheme, it is entirely plausible that those same distributors would have also benefited from distributing other cheaper therapies. *See* A13(¶6); A346(¶116).

affirming on the alternative basis that the complaint's allegations about Biogen's alleged use of the mail or interstate wires and alleged misrepresentations to Humana fall short of Rule 9(b)'s particularity requirements.[14]

Humana's complaint alleges that Biogen committed the RICO predicate offenses of mail and wire fraud. A41(¶98); *see* 18 U.S.C. § 1961(1)(B). To state a claim for mail fraud, Humana must plead "a scheme to defraud using false pretenses, the defendant's knowing and willing participation in the scheme with the intent to defraud, and the use of the mails in furtherance of that scheme." *United States v. Simon*, 12 F.4th 1, 33 (1st Cir. 2021). The elements of wire fraud are the same, except that the plaintiff must show "the use of wires (rather than the use of the mails) in furtherance of the alleged scheme." *Id*.

Rule 9(b) requires a plaintiff alleging fraud to go beyond the general allegations that usually suffice for pleading. *See Cordero-Hernandez v. Hernandez-Ballesteros*, 449 F.3d 240, 244 (1st Cir. 2006). This heightened pleading standard "extends to pleading predicate acts of mail and wire fraud under RICO." *Feinstein v. Resolution Tr. Corp.*, 942 F.2d 34, 42 (1st Cir. 1991),

---

[14] The district court did not reach Biogen's arguments that the complaint's enterprise and injury allegations are also insufficiently pled. *See* A7 (Dkt. 30 at 17-19, 21). The court also declined to dismiss the complaint on statute of limitations or proximate causation grounds. Add.10, 18-19. Biogen reserves its right to pursue these issues in any further proceedings, if necessary.

*abrogated on other grounds by United States v. Velazquez-Fontanez*, 6 F.4th 205 (1st Cir. 2021). Humana was accordingly "required 'to go beyond a showing of fraud and state the time, place and content of the alleged mail and wire communications perpetrating that fraud.'" *Cordero-Hernandez*, 449 F.3d at 244 (quoting *North Bridge Assocs., Inc. v. Boldt*, 274 F.3d 38, 43 (1st Cir. 2001)). "Failure to plead predicate acts adequately is enough to sink [a plaintiff's] RICO claim." *Ahmed v. Rosenblatt*, 118 F.3d 886, 889 (1st Cir. 1997).

### A. Humana Failed To Plead A Scheme To Defraud Using False Pretenses With Particularity

Humana failed to plead fraudulent misrepresentations with the particularity Rule 9(b) requires. Humana dedicates much of its briefing on this issue to discussing why the conduct alleged violates anti-kickback statutes, as though such a violation automatically satisfied the elements of a RICO claim. Br. 39-42. But Humana's claims are not premised on alleged violations of state or federal anti-kickback laws, but rather on "misconduct specifically directed to Humana"—the alleged "submission of false certifications to Humana," which allegedly "caus[ed] it to pay millions of dollars in reimbursements for the MS Drugs that Humana would not have otherwise paid." A14(¶8); A26(¶50). Humana's allegations about these alleged certifications—the basis for the alleged fraudulent scheme—fall short of Rule 9(b)'s particularity requirement.

Humana's complaint provides no specifics whatsoever as to the certifications that supposedly misrepresented Biogen's compliance with state and federal law. Humana's complaint states, in general and conclusory ways, that "Defendants caused the submission of false certifications to Humana." A14(¶8); *see* A22(¶35) ("Defendants misrepresented to Humana that they were complying with state and federal law[.]"); A26(¶50) (asserting that Defendants made "specific misrepresentations that those participating in the deceptive scheme were complying with the very laws that they were in fact flouting"); A40(¶95) ("False representations of compliance with federal and state laws were made to Humana for payment over the wires or by mail. These false representations were made directly to Humana and were a condition of reimbursement for all the MS Drugs claims submitted to Humana."). Despite its assertion that Biogen made these allegedly false representations "directly to Humana," *id.*, the complaint nowhere recites when the false representations were made, where they were made, how they were made, or the specific language of the certifications at issue. Humana's suggestion that it may rely on the generic allegation that "*Biogen* submitted false certifications in connection with *every* claim," Br. 43, ignores this Court's repeated holdings that RICO pleadings alleging mail and wire fraud "must state the time, place and content of the alleged mail and wire communications perpetrating that fraud" to satisfy Rule 9(b)'s particularity requirements. *Ahmed*, 118 F.3d at 889

(describing these requirements as "well settled law in this circuit"); *see Feinstein*, 942 F.2d at 42.

Humana's reliance (at 46) on an out-of-circuit district court decision, *Humana Inc. v. Mallinckrodt ARD LLC,* No. 19-CV-06926, 2020 WL 3041309 (C.D. Cal. Mar. 9, 2020), is misplaced. The district court there offered no analysis supporting its Rule 9(b) conclusion; instead, it merely recited Humana's barebones allegation and summarily declared that it was sufficient. *See id.* at *10. That lack of analysis is not remotely persuasive, particularly when measured against this Court's repeated acknowledgement of Rule 9(b)'s particularity requirement.

Humana's complaint also fails to detail, with particularity, Biogen's supposed involvement in the false certification scheme. The complaint states, at a general level, that entities that contract with Medicare Part D sponsors like Humana are required to comply with federal law and "any additional contractual obligations assumed by the Part D Plan," A19-20(¶28), and that certifications of compliance are made when entities "generate and submit" Prescription Drug Event ("PDE") claims requesting reimbursement, A20(¶29). But Humana's complaint does not allege that it contracted with Biogen related to Medicare Part D or that Biogen "generated or submitted" PDE claims for reimbursement. The complaint's only passing reference to a 2006 contract with Biogen involves "non-Medicare insurance policies," A22(¶36); A51(¶135), and the complaint does not allege that

that contract relates to the scheme alleged here. Moreover, the complaint describes the PDE reimbursement process as occurring between an insurer and a ***pharmacy*** (not a drug manufacturer). A18-19(¶¶25, 27). Unlike in *Mallinckrodt*, where the drug manufacturer was alleged to have submitted some PDE claims for reimbursement, *see Mallinckrodt*, 2020 WL 3041309, at *10, the complaint here leaves Biogen to guess at what role, if any, Humana believes that it played in the alleged certifications.

Humana's assertion that it did not know which claims were fraudulent, Br. 42, makes little sense, given its allegation that "false representations" accompanied each claim for reimbursement submitted to Humana. A40(¶95); Br. 40 ("false certifications to Humana … accompanied each claim for payment"). Presumably Humana knows when it received each request for reimbursement, where it received each request for reimbursement, how it received each request for reimbursement, and the content of each request for reimbursement that it received, even if it does not know who paid each specific copayment. Humana's reference to the complaint's Exhibit A does not cure these deficiencies. While Exhibit A lists the "Rx Fill Date," "Copay Foundation," "Drug Cost," and "Copay Subsidy" for 100 claims allegedly submitted to Humana through its own pharmacy, A59-62, Exhibit A still inexplicably fails to identify when each claim for reimbursement was submitted to Humana, where it was submitted, how it was submitted, what

information it contained, and the precise language in the claim that was misleading. *See United Healthcare Servs., Inc. v. United Therapeutics Corp.*, Civ. No. DLB-22-2948, 2024 WL 1256266, at *7 (D. Md. Mar. 25, 2024) (concluding that an insurance company's allegation that a drug manufacturer made false certifications of compliance with federal law in each drug reimbursement claim failed to meet Rule 9(b)'s particularity requirement because the plaintiff did not provide an example of the misrepresentation at issue and failed to state "what [was] certified, when, where, or to whom").

Humana attempts to weaken Rule 9(b)'s pleading requirements by asserting that the complaint just needs to "'contain[] enough factual detail to make it apparent that the plaintiff's claims' are not 'groundless' and to enable the defendant 'to file a responsive pleading.'" Br. 38 (quoting *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 51 (1st Cir. 2020)). *Foisie,* which Humana quotes, was not a RICO case, and this Court has recognized that "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000); *see also Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991) ("[I]n cases alleging civil RICO violations, particular care is required to balance the liberality of the Civil Rules with the necessity of preventing abusive or

vexatious treatment of defendants. … Civil RICO is an unusually potent

weapon—the litigation equivalent of a thermonuclear device. The very pendency

of a RICO suit can be stigmatizing and its consummation can be costly[.]"),

*abrogated on other grounds by United States v. Velazquez-Fontanez*, 6 F.4th 205

(1st Cir. 2021).[15]

## B. Humana Failed To Plead Use Of The Mail Or Wires With Particularity

Contrary to Humana's assertion, Br. 45, the district court did not fault

Humana for not alleging specific communications among the Defendants. Rather,

it faulted Humana for not pleading with particularity the details of

communications—specifically, claims for reimbursement—that Humana

---

[15] Humana attempts to call it "undisputed" that Humana sufficiently alleged Biogen's alleged knowing and willful participation in a fraudulent scheme. Br. 44. While Biogen did not discuss the issue in its motion to dismiss, the issue is far from "undisputed." Neither the complaint nor Humana's brief details what role Biogen supposedly played in the certification process—much less that Biogen made knowing misrepresentations. This is another attempt by Humana to shift the Court's focus from how it actually pled its claims. The crux of Humana's complaint is *not* that Biogen injured Humana when it allegedly violated anti-kickback statutes, but that Biogen "committed civil wrongs directly against Humana" when it "caused the submission of false certifications to Humana, thereby injuring Humana." A14(¶8); *see* A22(¶35); A26(¶50); A40(¶95). While the Court need not address this issue given the "skeletal" way Humana presents it, *see United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990), it provides an alternative basis for affirmance. *See Cook v. Gates*, 528 F.3d 42, 48 (1st Cir. 2008) ("In reviewing a Rule 12(b)(6) dismissal, 'we are not wedded to the [district] court's rationale and may affirm an order of dismissal on any basis made apparent from the record.'" (alteration in original) (quoting *McCloskey v. Mueller*, 446 F.3d 262, 266 (1st Cir. 2006))).

acknowledges were "submitted *directly to Humana.*"  Br. 45; *see* A36(¶80);

Add.27-29.

The complaint's relevant allegations are all at the highest level of conclusory

generality:

- "Biogen communicated with ACS, US Bioservices, and the foundations through the mail and wires causing thousands of reimbursement requests to be submitted to Humana over the wires or by mail, and used the wires and mail to effectuate their receipt of payments and contributions," A36(¶80);

- "False representations of compliance with federal and state laws were made to Humana for payment over the wires or by mail," A40(¶95);

- "The illegally obtained payments were sought through, and sent over, the wires or by mail," *Id.*

None of these allegations states the "time, place and content of the alleged mail

and wire communications perpetrating th[e] fraud," as Rule 9(b) requires.  *Ahmed*,

118 F.3d at 889; *see Feinstein*, 942 F.2d at 42 (stating that a complaint that failed

to "supply any additional detail as to when the communications occurred, where

they took place, or what they contained … fell measurably short of meeting Rule

9(b)'s specificity requirement").

Further, the "claims for reimbursement submitted for payment to Humana

over the wires or by mail" identified in the complaint's Exhibit A similarly lack the

requisite detail.  A40(¶95).  Neither the complaint, nor Exhibit A itself, identifies

which defendant is alleged to have submitted the reimbursement claims to

Humana, where the reimbursement claims were made, the contents of the

reimbursement claims, or whether the reimbursement claims were transmitted by mail or interstate wire. Humana's decision to omit this information is, as the district court noted, "particularly puzzling," given that Exhibit A lists reimbursement claims for prescriptions filled by Humana's **own pharmacy**. Add.28 (citing A37(¶85)). Also puzzling is Humana's suggestion that it need not allege whether accused communications occurred by mail or wire. Br. 45. Mail fraud and wire fraud are distinct RICO predicate offenses, *see Simon*, 12 F.4th at 33, which must be pled with particularity, *see Feinstein*, 942 F.2d at 42. Because Humana's allegations about Biogen's use of the mail or wires fail to satisfy Rule 9(b)'s particularity requirement, the Court should affirm the complaint's dismissal.

### C. The District Court Did Not Err In Dismissing The Complaint Without Allowing Discovery

Humana's contention, in opposing the motion to dismiss, that it needed or was entitled to discovery is belied by its own complaint. This is not a situation where "the specific information as to use [of the mail or wires] is likely in the exclusive control of the defendant." *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987). To the contrary, Exhibit A, entitled "Examples of 100 Biogen Subsidized Copayments," lists "claims for the prescriptions filled through Humana's specialty pharmacy." A37(¶85). Humana cannot plausibly assert that the details of when the reimbursement claims were submitted, where the reimbursement claims were submitted, what information the reimbursement claims

contained, and whether the reimbursement claims were submitted using mail or wires is "in the exclusive control of the defendant[s]." *Becher*, 829 F.2d at 290. Humana attempts to defend its deficient pleading by pointing to an allegation that Humana lacks access to sufficient information regarding Biogen's copayment assistance for prescriptions filled by pharmacies ***other than*** Humana's own, *see* A37-38(¶85), but that in no way explains why Humana omitted the details, required by Rule 9(b), for the reimbursement claims to which it ***did*** have access. The complaint also fails to explain why, even if Humana lacked access to ***copayment*** information for certain reimbursement claims, Humana could not produce the time, place, and content of each reimbursement claim for which it now claims damages.

The district court thus did not hold Humana to an unreasonable standard, Br. 48; it simply found "no basis to apply a 'more flexible' pleading standard" or to "permit Humana leave to amend" where Humana failed to include in its complaint details admittedly in its possession. Add.28 n.17. Humana cites no authority suggesting that it was entitled to discovery and an opportunity to amend prior to the district court's decision dismissing the case.

## III.   THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION IN DENYING HUMANA'S POST-DISMISSAL MOTION FOR LEAVE TO AMEND

Humana does not remotely show an abuse of discretion in the district court's denial of Humana's post-dismissal motion for leave to amend the complaint.

Humana's late-breaking attempt to add many facts that were in its possession before the original complaint was filed, and others which it had months before the court's dismissal of the complaint, is precisely the practice this Court warned "lead[s] to delays, inefficiencies, and wasted work." *Abiomed*, 778 F.3d at 247. The district court appropriately denied Humana's belated attempt to amend its complaint in a way that was futile in any event.

## A. The District Court Acted Within Its Discretion In Ruling That Humana Failed To Plead Information That It Itself Possessed

The district court properly exercised its discretion in denying Humana's post-dismissal motion for leave to amend after finding that Humana possessed the information needed to remedy its deficient mail and wire fraud pleadings. Add.28 ("The absence of further detail in Exhibit A is particularly puzzling, in that the communications in question were apparently made by a Humana subsidiary ('Humana's own specialty pharmacy') to Humana itself."); Add.28 n.17 ("For that reason, there is no basis to apply a 'more flexible' pleading standard, as may be appropriate when critical information is in the custody of the defendant or a third party.").

Humana's argument to the contrary takes the district court's statement out of context. The court did not find that Humana possessed information about every intricacy related to the alleged scheme. Rather, it found, based on Humana's own complaint, that details about reimbursement claims that were submitted to Humana

through its own specialty pharmacy "ought to be[] within the knowledge of Humana." Add.28, 33. The court concluded that, because Humana omitted the time, place, and content of these claims, despite possessing the required information, there was no basis to relax the pleading standard or permit leave to amend. Add.28 n.17, 33.

Humana's contention that it gained specifics for additional claims through discovery in the *Teva* matter does nothing to change the fact that Humana could have pled reimbursements submitted through ***its own pharmacy*** with the necessary particularity from the outset. Br. 51. The court did not abuse its discretion in finding that Humana possessed the information that it needed but inexplicably failed to plead it.

### B. The District Court Acted Within Its Discretion In Ruling That Humana's Proposed Amendments Were Futile

#### 1. Humana's proposed amendments do not cure its lack of standing

None of the additional alleged facts dispels the presence of innocent intermediaries in the distribution chain, which makes it impossible for Humana to be a direct purchaser. The district court therefore was well within its discretion in ruling that Humana's proposed amendments were futile. Add.39; *see In re Curran*, 855 F.3d 19, 29 (1st Cir. 2017) (affirming denial of leave to amend where "the new claim, like the old claim, would have been futile").

Humana points to new allegations regarding a set of rebate agreements between Biogen and Humana.  Br. 36; A320-322(¶¶52-55).  But Humana cites no case holding that rebate agreements between a manufacturer and an end payor somehow alter the direct purchaser rule; regardless of any rebate agreement, the real direct purchasers that Humana identifies in its complaint and briefing—wholesalers or distributors—could still sue for the full amount of any overcharge.  Thus, while rebates may show "some direct interactions," they do not "transform [an indirect purchaser] into a direct purchaser," so long as there is still an innocent intermediary between the manufacturer and the plaintiff.  *See Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 88-89 (3d Cir. 2011).

Humana also relies on a contract (which it did not attach or otherwise put before the district court) between Biogen and Humana purportedly governing the prices for Humana's purchases of drugs from one of Biogen's authorized wholesale distributors.  A322-323(¶56).  However, the question "who set the price" has no bearing on the direct purchaser rule.  *Apple*, 139 S. Ct. at 1522 ("*Illinois Brick* … was not based on an economic theory about who set the price.  Rather, *Illinois Brick* sought to ensure an effective and efficient litigation scheme in antitrust cases"; modifying the rule to a "who set the price" inquiry would draw an "arbitrary and unprincipled line").  A contract governing the terms of dealing with an "authorized

wholesaler" does not overcome the direct purchaser rule, nor does it eliminate the risk of duplicative recovery. *See Warren Gen. Hosp.*, 643 F.3d at 90 n.11.

### 2. Humana's proposed amendments still fail to comply with Rule 9(b)

Humana's proposed amended complaint also suffers from many of the same Rule 9(b) pleading issues that the district court identified in the original complaint. *See HSBC Realty Credit Corp. (USA) v. O'Neill*, 745 F.3d 564, 578 (1st Cir. 2014) (explaining that "a judge may deny leave if amending the pleading would be futile—that is, if the pined-for amendment does not plead enough to make out a plausible claim for relief").

The proposed amended complaint continues to omit key details regarding when and how the alleged fraudulent misrepresentations were made, and the specific language alleged to be false. Humana points to allegations that it added pertaining to "the mechanics of the … illegal subsidization scheme," Br. 54-55, but these allegations do not supply the missing details about misrepresentations supposedly contained within certifications to Humana. Humana's proposed amended complaint states that pharmaceutical manufacturers certify their compliance with federal law to their wholesalers, and the certifications are then passed down the distribution chain to insurers, A312-313(¶31), but Humana still fails to allege how these certifications were communicated and the specific language from the certifications that Humana contends was false. The amendment

also fails to identify precisely when Biogen allegedly represented compliance with federal law to its wholesalers, instead relying on the generalized and insufficient assertion that certifications were made each time a reimbursement claim was submitted to Humana. *See* A312-313(¶31); A343(¶107).

Humana's amended allegations regarding "contractual representations" Biogen allegedly made regarding rebates and in a Specialty Pharmacy Provider Services Agreement likewise fail. A320-323(¶¶51-56); A343-344(¶109). As the district court recognized, the complaint "does not include any allegations as to how" the contracts have "any relevance to the alleged scheme at issue here." Add.33. Rule 9(b) demands more than a barebones allegation that the "contractual representations … were an integral part of Defendants' fraudulent scheme." A343-344(¶109); *see S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (dismissal warranted where factual allegations are "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture"); *United Healthcare Servs.*, 2024 WL 1256266, at *7-8 (alleged contractual misrepresentation fell short of Rule 9(b)'s particularity requirement where the plaintiff failed to allege when the contract was made or what it pertained to and did not include the contractual language believed to be misleading).

Humana's proposed amended complaint also fails to sufficiently plead the alleged use of the mail or wires. Humana's amended pleading sought to reference

Exhibit G, a list of over 40,000 alleged fraudulent claims submitted to Humana. A325(¶59). But Exhibit G, which purports to lists claims pertaining to prescriptions filled through third-party pharmacies to which Humana asserts it previously lacked access, does nothing to correct Exhibit A, which pertains to prescriptions filled by Humana's own pharmacy and which the district court found wanting. S*ee* Br. 51; Add.28. Based on Humana's own description, Exhibit G still does not expressly identify who sent the listed communications or whether they were transmitted via mail or interstate wire, nor does it provide any specifics about Humana's communications with the pharmacies referenced. *See* A325(¶59). The district court was not required to credit Humana's bald assertion that the claims in Exhibit G were "illegally subsidized"—though it would not have affected the complaint's lack of specificity in any event. *See id.*; *Douglas*, 63 F.4th at 55 (court may properly disregard "conclusory legal allegations" (quotation marks omitted)).

Humana's reference to Exhibit H does not help Humana either. Exhibit H purports to list "twenty-nine interstate wire transfers" between Biogen and CDF and TAF. A342(¶106). But Humana does not identify the purpose of these wire transfers or explain which, if any, relate to the alleged scheme or how. Instead, Humana asserts, in a conclusory fashion, that they were "in furtherance of the illegal scheme." *Id.* Again, that is not enough. *See Ahmed*, 118 F.3d at 889 (rejecting a complaint that contained only the "bald assertion" that defendants used

the U.S. mail and wire communications); *Simon*, 12 F.4th at 33 (explaining that "some 'connection or relationship' between the mailing and the fraudulent scheme" must be alleged); *Feinstein*, 942 F.2d at 42 (stating that "[i]t is not enough for a plaintiff … [to] chant the statutory mantra[] and leave the identification of predicate acts to the time of trial").

### C. The District Court Acted Within Its Discretion In Ruling That Humana's Belated Proposed Amendment Was Inefficient And Unfair

The district court properly exercised its discretion in ruling that Humana's belated attempt to amend its pleadings after dismissal was inefficient, unfair, and burdensome. Humana tries to defend its decision, even while simultaneously acknowledging this Court's precedent discouraging such conduct. Br. 58; *see Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 39 (1st Cir. 2022) ("condemning 'wait and see' amendment practices"); *Abiomed*, 778 F.3d at 247 ("We wish to discourage this practice of seeking leave to amend after the case has been dismissed."). Humana admits that it could have moved to amend before its complaint was dismissed but chose not to because it would supposedly "have short-circuited the district court's deliberations" and required new briefing that Humana believed unnecessary.[16] Br. 59. Contrary to its contention, Humana was

---

[16] Humana does not deny that much of the information added to the proposed amended complaint was in its possession at the time of the original complaint.

not entitled to wait to review the dismissal order before moving to amend. *See*

*ACA Fin. Guar. Corp.*, 512 F.3d at 57 ("Plaintiffs may not, having the needed

information, deliberately wait in the wings for a year and a half with another

amendment to a complaint should the court hold the first amended complaint was

insufficient."); *id.* (stating that "wait and see" amendment strategies result in

"delays, inefficiencies, and wasted work," thus "plaintiffs do not get leisurely

repeated bites at the apple"); *Kader v. Sarepta Therapeutics, Inc.*, 887 F.3d 48, 61-

62 (1st Cir. 2018) (rejecting the argument that waiting to amend until after

dismissal "is desirable from the perspective of judicial economy"). The district

court properly exercised its discretion in denying leave to amend where Humana

strategically sat on the information it now asserts would have made a difference.

*See Kader*, 887 F.3d at 61 (affirming finding of undue delay where plaintiffs

waited three months after the discovery of new information—until the court ruled

on the motion to dismiss—to seek leave to amend).[17]

---

*See, e.g.*, A320-323(¶¶51-56) (describing contracts between Humana and Biogen
predating the complaint). While Humana cites information received through
discovery in the *Teva* matter, *see* Br. 51, Humana admits receiving this material
"[s]everal months" after filing the complaint, Br. 12. Yet Humana had **eighteen**
months between the complaint's filing and the district court's decision on the
motion to dismiss, during which it did not move to amend. *See* A4-9.

[17] Humana's argument that Biogen is a "sophisticated corporate entit[y] capable of
addressing a complaint more than once" is nonsensical and contrary to this Court's
statement that "wait and see" amendments "impose unnecessary costs and

While Humana asserts that it sought pre-dismissal leave to amend during oral argument, Br. 58, this Court has made clear that, "[i]n the absence of exceptional circumstances, a district court is under no obligation to offer a party leave to amend when such leave has not been requested by motion." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 735-736 (1st Cir. 2016). Humana points to no "exceptional circumstances" here, nor does it explain why the court was required to heed its oral statement when even remarks "in opposition papers" are properly disregarded. *See Amyndas Pharms.*, 48 F.4th at 38 n.6. The district court did not abuse its discretion in denying Humana's belated request for leave to amend.

## CONCLUSION

The district court's dismissal order should be affirmed.

---

inefficiencies on ***both*** the courts and party opponents." *ACA Fin. Guar. Corp.*, 512 F.3d at 57. Here, the burden to Biogen is further amplified because "[t]he very pendency of a RICO suit can be stigmatizing." *Miranda*, 948 F.2d at 44.

Respectfully submitted,

/s/ Mark C. Fleming
MARK C. FLEMING
MARK A. FORD
FELICIA H. ELLSWORTH
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
Mark.Fleming@wilmerhale.com
Mark.Ford@wilmerhale.com
Felicia.Ellsworth@wilmerhale.com

*Attorneys for Defendant-Appellee
Biogen Inc.*

May 23, 2024

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.     Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 12,823 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Mark C. Fleming
MARK C. FLEMING
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000
Mark.Fleming@wilmerhale.com

May 23, 2024

# CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Brief for Defendant-Appellee

Biogen Inc. with the Clerk of the United States Court of Appeals for the First

Circuit via the CM/ECF system this 23rd day of May, 2024 to be served on the

following counsel of record via ECF:

ROBERT E. DUNN
EIMER STAHL LLP
1999 South Bascom Avenue,
Suite 1025
Campbell, CA 95008
(408) 889-1690
rdunn@eimerstahl.com

SARAH H. CATALANO
EIMER STAHL LLP
10 East Doty Street, Suite 621
Madison, WI 53703
(608) 620-8574
scatalano@eimerstahl.com

SCOTT C. SOLBERG
JAMES W. JOSEPH
BENJAMIN E. WALDIN
GREGORY M. SCHWEIZER
EIMER STAHL LLP
224 South Michigan Avenue,
Suite 1100
Chicago, IL 60604
(312) 660-7600
ssolberg@eimerstahl.com
jjoseph@eimerstahl.com
bwaldin@eimerstahl.com
gschweizer@eimerstahl.com

/s/ Mark C. Fleming
MARK C. FLEMING
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
Mark.Fleming@wilmerhale.com

May 23, 2024